Israel David*
israel.david@davidllc.com
Blake Hunter Yagman^
blake.yagman@davidllc.com
Hayley Elizabeth Lowe*
hayley.lowe@davidllc.com
Madeline Sheffield*
madeline.sheffield@davidllc.com
ISRAEL DAVID LLC
17 State Street, Suite 4010
New York, New York 10004
Tel.:   (212) 739-0622

Jeff Westerman, Esq. (CA Bar No. 94559)
jwesterman@jswlegal.com
WESTERMAN LAW CORP.
16133 Ventura Blvd., Suite 685
Encino, California 91436
Tel.:   (310) 698-7450

Attorneys for Plaintiffs

*Pro Hac Vice Forthcoming
^Pro Hac Vice Admitted

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEPHEN GERBER and ERIC COHEN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TWITTER, INC.,<br><br>Defendant. | Case No. 4:23-cv-00186-KAW<br><br>**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Claims for:<br>1. Breach of Contract;<br>2. Negligence;<br>3. Gross Negligence;<br>4. Unjust Enrichment; and<br>5. Violations of California's Unfair Competition Law.<br><br>**DEMAND FOR JURY TRIAL** |

AMENDED CLASS ACTION COMPLAINT

Plaintiffs Stephen Gerber and Eric Cohen ("Plaintiffs"), on behalf of themselves and all other persons similarly situated, bring this Class Action Complaint (the "Action") against Defendant Twitter, Inc. ("Twitter" or "Defendant"), and allege upon personal knowledge as to their own actions and the investigation of counsel, and upon information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

*"This is one of the most significant leaks ever."*

Israel-based cybercrime intelligence firm, Hudson Rock (January 4, 2023)

1.  Twitter, in its most basic form, as a social media platform where users can post and digest short-form commentary, is a digital, modern-day version of the public square.

2.  At the very core of Twitter's business model is its invitation to would-be Twitter users to join the Twitter platform and share their interests and views on myriad subjects, including politics, religion, sports, fashion, pets, food, sexuality, and everything in between. Twitter prominently offers the user the opportunity to share and engage anonymously. Users may use pseudonyms and other anonymous usernames so that they may express themselves and their opinions without fear of retaliation, embarrassment, or other repercussions from their employers, colleagues, acquaintances, neighbors, or government.

3.  Many tens of millions of Twitter users have accepted this invitation from Twitter. Although these Twitter users do not pay Twitter directly for the ability to use Twitter, these users collectively deliver enormous value (and profits) to Twitter. These users and the data generated by their use of the platform are Twitter's revenue-generating product. Advertisers generate billions in annual revenues for Twitter for the opportunity to reach these tens of millions of users. Additional billions in revenues are generated for Twitter by licensing certain data generated by its

users.  These revenue streams — generated directly by the users — are the basis for Twitters recent valuation of approximately $40 billion.

4.     Notably, Twitter's business model of inviting tens of millions of users to express their views in an anonymous manner stands in stark contrast to the business model of several other leading social media platforms (such as Meta Platforms, Inc.'s Facebook and Instagram), which encourage users to use their actual name, likeness, and other identifying information on the platform.[1]  Thus, unlike Twitter, a substantial percentage of users on Facebook and Instagram use their actual names, albeit many such non-anonymous users appropriately limit those who can view their private information and photos to authorized friends and followers.  Unfortunately for Twitter's "anonymous" users, Twitter's promise of anonymity was sacrificed at the altar of profits, including, as detailed herein, per the testimony given in September 2022 at the Senate Judiciary Committee by a former high-ranking Twitter cyber security official.

5.     Twitter is obligated (because it has promised) to protect certain private information entrusted to Twitter by its users in order to gain access to the Twitter platform.  These users, in turn, provide Twitter with the source of its billions in revenues.  However, from approximately June 2021 through January 2022, a defect in Twitter's application programming interface ("API") allowed cybercriminals to exploit this defect and "scrape" data from Twitter.  The compromised information included users' Twitter usernames, email addresses and phone numbers (the "Personally Identifiable Information" or "PII" associated with specific Twitter accounts.  The combined set of compromised information deanonymized tens of millions of Twitter users — like Plaintiffs and members of the putative Class — who wished to stay anonymous for the aforementioned reasons while using Twitter.

6.     It is particularly problematic to leak users' Twitter usernames *in combination* with email addresses and/or phone numbers as here, because that combination gives the person interpreting (or, more aptly, the cybercriminal abusing) the data the ability to link an otherwise anonymous username on Twitter with that particular user's generally not anonymized email

---

[1] Jeff Kosseff, *How Facebook's real-name policy changed social media forever*, PROTOCOL.COM (March 16, 2022), at https://www.protocol.com/policy/anonymity-real-names-jeff-kosseff.

AMENDED CLASS ACTION COMPLAINT
2

address and/or phone number.  For example, both of the Plaintiffs in this Action used anonymous Twitter usernames which were compromised in this incident in combination with their non-anonymous email address (which contains elements of their actual names).  As a result, anyone who comes into possession of the combined compromised information can relatively simply connect the respective Plaintiff with their heretofore anonymous Twitter username.

7.      This is not only a breach of Twitter's Privacy Policy (the "Privacy Policy") and, therefore, Twitter's Terms of Service, but also violates a 2011 agreement between Twitter and the United States Federal Trade Commission which states:

> "[Twitter] shall not misrepresent in any manner, expressly or by implication, the extent to which [Twitter] maintains and protects the security, privacy, confidentiality, or integrity of any nonpublic consumer information,[2] including but not limited to misrepresentations related to its security measures to: (a) prevent unauthorized access to nonpublic consumer information; or (b) to honor the privacy choices exercised by users."

8.      The cache of information exposed by the API exploitation includes over 200,000,000 Twitter users' information including the aforementioned PII.  Due to the anonymized and confidential nature of Twitter (which, as detailed above, is Twitter's core premise and value proposition to would-be users), these Twitter users believed that they would remain publicly anonymous if they chose to do so and that the PII underpinning their accounts would also remain safely guarded by Twitter.

9.      To compound matters, Twitter buried its head in the sand regarding the magnitude of this API exploitation or, even worse, Twitter may have even taken actions intended to conceal the true extent of this API exploitation when they stated in August of 2022 regarding the API exploitation: "[w]hen we learned about this, we immediately investigated and fixed it.  At that time, we had no evidence to suggest someone had taken advantage of the vulnerability."

10.     This data set was posted to the dark web and triggered responses from identity theft protection services in or about the first week of January 2023.  Curiously, Twitter posted a blog post on its website merely days later (January 11, 2023) denying that Twitter was responsible for

---

[2] Defined as: "nonpublic, individually-identifiable information from or about an individual customer, including but not limited to an individual consumer's (a) email address… (c) mobile telephone number…"

Deleted: Plaintiff
Deleted: matter
Deleted: an
Deleted: username
Deleted: was
Deleted: his
Deleted: his
Deleted: name
Deleted: now
Deleted: his
Deleted: violation
Deleted: "),
Deleted: Because of
Deleted: anonymized, pseudo-
Deleted: were not only misled by Twitter into thinking
Deleted: , but
Deleted: seemingly
Deleted: magnitude

this particular API exploitation.  The blog post is problematic for several reasons.  First, it evidences that Twitter (which, to this day has inexplicably failed to directly notify or contact the victims of this particular API exploitation) refuses to acknowledge the seriousness of what has occurred.  Second, it suggests that Twitter's purported investigation into this API exploitation was not as thorough as a 200+ million person cybersecurity incident should require given the relatively short turn around (of less than two weeks) of its post following the notifications from identity theft monitoring services (particularly in light of Twitter's inability to identify inappropriate access within its own systems, as detailed below).  As detailed below, a high-ranking former Twitter employee in charge of cyber security at Twitter has disclosed (including at a recent Senate Judiciary Committee hearing) shocking security failures at Twitter which call into question Twitter's ability to make accurate statements (much less any denials) regarding the API exploitation at issue in this matter.

11.     The PII belonging to victims of the API exploitation is now being disseminated and sold on the dark web by cybercriminals who mined the information.

12.     Twitter's conduct, as alleged herein, failed to meet its obligations to Twitter users and exposed them to a multitude of harms related to Twitter's failure to protect their PII.  As such, Plaintiffs bring this Action against Twitter for violations of state law and seek damages, inclusive of actual and statutory damages and restitution, injunctive and equitable relief, reasonable costs and attorneys' fees, and pre- and post- judgment interest.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this Action pursuant to the Class Action Fairness Act, 28 U.S.C. 1332(d), because this Action is a putative Class Action wherein the amount-in-controversy exceeds $5,000,000 exclusive of interest and costs and there are well more than 100 members of the putative class.  In addition, at least one member of the class is a citizen of a different state from the Defendant – namely, Plaintiffs Gerber and Cohen are New York residents and Defendant Twitter is a corporation which is headquartered in California and incorporated in and under the laws of the state of Delaware.

**Deleted:** extremely

**Deleted:** because

**Deleted:** The PII belonging to victims of the API exploitation is now being disseminated and sold on the dark web by cybercriminals who mined the information, despite Twitter's representations and omissions to the contrary

**Deleted:**  deceived

**Deleted:** Plaintiff Gerber and the members of the putative Class

**Deleted:** to

**Deleted:** Plaintiff

**Deleted:** is a

**Deleted:** resident

14. This Court has personal jurisdiction over the Defendant because Defendant maintains its principal place of business in this District, at 1355 Market Street, San Francisco, California. Twitter has systematic and continuous contacts with the State of California, availing itself to the laws of California.

15. Venue is proper in this Court pursuant to 28 U.S.C. 1391 because the Defendant resides in this District and because a substantial part of the events giving rise to the claims herein occurred within this District. Additionally, Twitter's Terms of Service require that any and all disputes be heard in the state or federal courts located in San Francisco, California.

<u>**PARTIES**</u>

*Plaintiff Stephen Gerber*

16. Plaintiff Gerber is, and at all times relevant to this Action was, a resident of the state of New York.

17. Plaintiff Gerber was an active Twitter user for several years prior to terminating his account in 2022. During the time period in which Plaintiff Gerber used Twitter, Plaintiff Gerber used a pseudonym as his Twitter username in order to protect his identity so that he could express himself and his thoughts on Twitter anonymously and without fear of retribution, retaliation, or embarrassment from employer(s) and his peers.

18. Twitter exposed Plaintiff Gerber's PII in the API scraping incident that took place from 2021-2022. Had Plaintiff Gerber been aware that Twitter would allow its cache of PII collected from Twitter's users to be exposed by cybercriminals, he either would not have provided his email address or other identifying information to Twitter, or he otherwise would not have used Twitter at all. Indeed, Plaintiff Gerber no longer uses Twitter and does not intend to use Twitter in the foreseeable future.

*Plaintiff Eric Cohen*

19. Plaintiff Cohen is, and at all relevant times to this Action was, a resident of the state of New York.

AMENDED CLASS ACTION COMPLAINT
5

---

**Deleted:** a

**Deleted:** was exposed by Twitter

20.     Plaintiff Cohen is an active Twitter user.  During the time period relevant to this Action, Plaintiff Cohen used a pseudonym as his Twitter username in order to protect his identity so that he could express himself and his thoughts on Twitter anonymously and without fear of retribution, retaliation, or embarrassment from employer(s) and his peers.

21.     Twitter exposed Plaintiff Cohen's PII in the API scraping incident that took place from 2021-2022.  Had Plaintiff Cohen been aware that Twitter would allow its cache of PII collected from Twitter's users to be exposed by cybercriminals, he either would not have provided his email address or other identifying information to Twitter, or he otherwise would not have used Twitter at all.

**Defendant Twitter, Inc.**

22.     Defendant Twitter is a corporation existing and organized under the laws of the state of Delaware.  Twitter maintains its principal place of business at 1355 Market Street, San Francisco, California.

**FACTUAL ALLEGATIONS**

**Defendant's Business and Privacy Policy**

23.     Twitter operates one of the largest social media platforms in the world.

24.     The way that Twitter works is rather simple: after creating a Twitter account with a username and password, users are able to broadcast short messages called "Tweets" in order to share viewpoints, information, images, or videos with other Twitter users.  Additionally, Twitter users are displayed a "mini-feed" of Tweets by other users that they either follow or that Twitter's algorithm finds to be relevant to them.  Users can view and interact with these Tweets by "liking" them, reposting them (called a "Retweet"), or commenting on them.  Twitter users have access to a search bar that allows the respective user to search for other specific users, specific trending topics, and specific Tweets the user might be interested in.  While using Twitter, users also view advertisements, paid for by advertisers, that generate billions of dollars for Twitter.

25.     Twitter operates on a so-called freemium model: meaning, Twitter does not charge users for signing up or for using a Twitter account.  Twitter also has a premium model (Twitter

Deleted:  Inc.

Deleted: users,

Deleted: ,

Deleted:  so that the users

Deleted: either

Deleted: 'Retweet')

Deleted: by

Deleted: are also given

Deleted: which

Deleted: various types of

Deleted: which are

Deleted:  and

Deleted: it

Deleted: cost anything to sign

Deleted: and use

Blue), which allows certain Twitter users to pay a fee to gain access to Twitter platform components that are otherwise inaccessible to free Twitter users.

26.     Upon signing up for a Twitter account, all users must agree to the Terms of Service, which incorporates the Twitter Privacy Policy.

27.     Twitter's Privacy Policy describes how Twitter uses the information it collects from users, including the PII collected from Twitter users when they initially sign up to use Twitter.  At no point does Twitter disclose in its Privacy Policy that they allow cybercriminals to commandeer Twitter's API in order to scrape sensitive PII from Twitter and then weaponize or sell that information on the dark web.  Indeed, Twitter categorizes its use of PII into the following use-categories: (1) to operate, improve, and personalize services, (2) to foster safety and security, (3) to measure, analyze and make Twitter's services better, (4) to communicate with Twitter users about Twitter's services, and (5) for research purposes.  None of these use categories discuss or give permission to Twitter to publicly expose user PII to cybercriminals, or allow Twitter to leave unaddressed vulnerabilities with respect to its API(s) that are likely to lead to public exposure of user PII in violation of its Privacy Policy.

28.     Within Twitter's Privacy Center – an almost unreadable labyrinth of information stored on Twitter's website which contains the Privacy Policy – Twitter states, "[y]ou have more control over your Twitter experience than you might think."

29.     Regrettably, as Plaintiff Gerber, Plaintiff Cohen, and members of the Class have or will soon find out, Twitter did not honor its obligations.

**Defendant's API Exploitation**

30.     From at least on or about June 2021 through on or about January 2022 (although these dates are subject to change with discovery of non-public information within Twitter's control), a defect in Twitter's API allowed cybercriminals to exploit this defect and "scrape" data from Twitter.  The information compromised included Twitter usernames in combination with email addresses and/or phone numbers associated with specific Twitter accounts. This exploitation

Deleted: )

Deleted: of the platform

Deleted: that

Deleted: inclusive of

Deleted: their

Deleted: to

Deleted: their

Deleted: [

Deleted: ]

Deleted: [

Deleted: ]

Deleted: [

Deleted: ]

Deleted: <#>Notably, the Privacy Policy does contemplate sharing PII with third parties in certain limited circumstances through Twitter's APIs.  The privacy policy states:¶
¶
We use technology like **APIs** and embeds to make public Twitter information available to websites, apps, and others for their use, for example, displaying Tweets on a news website or analyzing what people say on Twitter. We generally make this content available in limited quantities for free and charge licensing fees for large-scale access. We have **standard terms** that govern how this information can be used, and a compliance program to enforce these terms. But these individuals and companies are not affiliated with Twitter, and their offerings may not reflect updates you make on Twitter. For more information about how we make public data on Twitter available to the world,
visit **https://developer.twitter.com**.¶

Deleted: <#>out

Deleted: would

Deleted: this representation is false

Deleted: ,

Deleted: Specifically, the

1  has had the effect of deanonymizing Twitter users (like Plaintiffs and members of the putative

2  Class) who had wished to stay anonymous while using Twitter.

3      31.    Twitter stated publicly in August of 2022 that this API exploitation would not harm

4  Twitter's users, stating in relevant part: "[w]hen we learned about this, we immediately

5  investigated and fixed it.  At that time, we had no evidence to suggest someone had taken

6  advantage of the vulnerability."  This statement evidences that Twitter, which to this day has failed

7  to directly notify or contact the victims of this particular API exploitation, fails to appreciate, or

8  acknowledge, the seriousness of what has occurred or take proper steps to attempt to remediate the

9  damage caused to its users.

10      32.    The PII belonging to victims of the API exploitation is now being disseminated and

11  sold on the dark web by cybercriminals who obtained the information.  The dark web posting to

12  access the sale of the data set leaked by Twitter appeared/appears as follows (with the user names

13  redacted here):

**Deleted:** and
**Deleted:** Plaintiff
**Deleted:** is highly problematic because it
**Deleted:** , in any way,
**Deleted:** mined
**Deleted:** , despite



33.     Below is how the data set itself appears:



34.     Media reports of Twitter's API data exploitation included, among many others:

a.  **BLEEPING COMPUTER**:  "Since July 22nd, 2022, threat actors and data breach collectors have been selling and circulating large data sets of scraped Twitter user profiles containing both private (phone numbers and email addresses) and public data on various online hacker forums and cybercrime marketplaces.  These data sets were created in 2021 by exploiting a Twitter API vulnerability that allowed users to input email address and phone numbers to confirm whether they were associated with a Twitter ID.  The threat actors then used another API to scrape the public Twitter data for the ID and combined this public data with private email addresses/phone number… [t]hough Twitter fixed this flaw in January 2022, multiple threat actors have recently begun to leak the data they collected over a year ago for free." – January 4, 2023

b.  **CNN**:  "Email addresses linked to more than 200 million Twitter profiles are currently circulating on underground hacker forums, security experts say.  The apparent data leak could expose the real-life identities of anonymous Twitter

AMENDED CLASS ACTION COMPLAINT
9

**Deleted:** representations

**Deleted:** omissions to the contrary

users and make it easier for criminals to hijack Twitter accounts, the experts warned, or even victims' accounts on websites.  The trove of leaked records also includes Twitter users' names, account handles, follower numbers and the dates the accounts were created… Bad actors have won the jackpot… previously private data such as emails, handles, and creation date can be leveraged to build smarter and more sophisticated hacking, phishing, and disinformation campaigns." – January 5, 2023

c.  **REUTERS**:  "Hackers stole the email addresses of more than 200 million Twitter users and posted on an online hacking forum… the breach []will unfortunately lead to a lot of hacking, targeting phishing and doxxing… Twitter has not commented on the report… first posted… on Dec. 24, nor responded to inquiries about the breach since that date.  It is not clear what action, if any, Twitter has taken to investigate to remediate the issue." – January 5, 2023

d.  **FORBES**:  "Twitter essentially ignored the calls for ransom to be paid after data from hundreds of millions of users was stolen following the breach… After… Musk bought Twitter, and dumps of these started showing up for sale as hackers were looking to get paid for their efforts… [i]t appears as though someone collected a bunch of these and tried to get Musk to pay up for them..." – January 5, 2023

e.  **MASHABLE**:  "… the obvious worry here is that malicious actors could potentially expose the identities of people who like to post anonymously… [i]n countries that crack down hard on political dissent, for example, that could be a huge problem for online activists." – January 6, 2023

f.  **LOS ANGELES TIMES**:  "Although account passwords were not leaked, malicious hackers could use the email addresses to try to reset people's passwords or guess them… That's especially a risk if the accounts are not protected by two-factor authentication… People who use Twitter anonymously

should have a Twitter-dedicated email address that does not disclose who they are and is solely for Twitter… In November [2022], a group of Democratic lawmakers asked federal regulators to investigate possible violations by the platform of consumer-protection laws or of its data security commitments… The FTC said at the time it is tracking recent developments at Twitter with deep concern." – January 6, 2023

g.  **LAPTOP MAG**:  "The anon behind Twitter's 200 million+ data dump on Breached (a hacker's forum) reached out … to tell us that Twitter [is almost certainly responsible for the breach] … [because] there is a link between the emails and the Twitter accounts in the data dump." – January 17, 2023

35.   Despite the publication of these articles, among others, and the highly publicized nature of the breach, Twitter did not (and has not) notified the victims of this API exploitation on an individual basis.  Instead, Twitter opted to cut corners and issue a blanket denial in the form of a blog post on its website.

*Twitter's January 11, 2023 Denial of Responsibility for the API Exploitation*

36.   On January 11, 2023, as a flurry of news reports prominently discussed the 200+ million person data breach at Twitter, Twitter released the following blog post (emphasis in original):

**January 11, 2023**

Update about an alleged incident regarding Twitter user data being sold online

We take our responsibility to protect your privacy very seriously. **In response to recent media reports of Twitter users' data being sold online, we conducted a thorough investigation and there is no evidence that data recently being sold was obtained by exploiting a vulnerability of Twitter systems.** We also want to share an update about an incident that took place earlier this year, and provide transparency into the steps we took to remediate it.

What happened

As we previously informed users in August 2022, in January 2022 we received a report through our bug bounty program of a vulnerability in Twitter's systems. As a result of the vulnerability, if someone submitted an email address or phone number to Twitter's systems, Twitter's systems would tell the person what Twitter account the submitted email addresses or phone number was associated with, if any. This bug resulted from an update to our code in June 2021. When we learned about this, we immediately investigated and fixed it.

In July 2022, we learned through a press report that someone had potentially leveraged this and was offering to sell the information they had compiled. After reviewing a sample of the available data for sale, we confirmed that a bad actor had taken advantage of the issue before it was addressed. At the time, we notified the affected users promptly and the relevant authorities.

In November 2022, some press reports published that Twitter users' data had been allegedly leaked online. As soon as we became aware of the news, Twitter's Incident Response Team compared the data in the new report to data reported by the media on 21 July 2022. The comparison determined that the exposed data was the same in both cases.

In December 2022, additional press reports published that someone claimed that they have access to over 400 million Twitter-associated user emails and phone numbers, and that the data had been exposed through the same vulnerability discovered in January 2022. Recently, in January 2023, a similar attempt to sell data from 200 million Twitter-associated accounts was reported in the media.

After a comprehensive investigation, our Incident Response and Privacy and Data Protection teams concluded that:

- 5.4 million user accounts reported in November were found to be the same as those exposed in August 2022.
- 400 million instances of user data in the second alleged breach could not be correlated with the previously reported incident, nor with any new incident.
- 200 million dataset could not be correlated with the previously reported incident or any data originating from an exploitation of Twitter systems.
- Both datasets were the same, though the second one had the duplicated entries removed.
- None of the datasets analyzed contained passwords or information that could lead to passwords being compromised.

**Therefore, based on information and intel analyzed to investigate the issue, there is no evidence that the data being sold online was obtained by exploiting a vulnerability of Twitter systems.** The data is likely a collection of data already publicly available online through different sources.

We are in contact with Data Protection Authorities and other relevant regulators from different countries to provide clarification about the alleged incidents, and we will continue to do so.

1    Twitter will continue to monitor reports about incidents and will provide updates
2    accordingly.

3    How to Protect Your Account

4    While no passwords were exposed, we encourage everyone who uses Twitter
5    to enable 2-factor authentication using authentication apps or hardware security
6    keys to protect your account from unauthorized logins. If you're concerned about
     the safety of your account, or have any questions about how we protect your
7    personal information, you can reach out to our Office of Data protection through
     this form.

8    We also encourage Twitter users to remain extra vigilant when receiving any kind
9    of communications over email, as threat actors may leverage the leaked information
     to create very effective phishing campaigns. Be wary of emails conveying a sense
10   of urgency and emails requesting your private information, always double check
11   that emails are coming from a legitimate Twitter source.

12   To learn more about reporting a security vulnerability, visit our Help Center. To
     learn more about our efforts to protect Twitter from platform manipulation and
13   state-backed activity, visit the Twitter Transparency Report.

14       37.     This denial of responsibility by Twitter came within days of the news breaking
15   regarding the dissemination and sale on the dark web of a massive trove of Twitter users' PII,
16   involving over 200 million Twitter users.  This contrasts with ordinary data breach investigation
17   practices, where it often takes months to ascertain the source of a particular data breach prior to
18   making such a definitive public statement regarding the nature of the breach.  Notably, Twitter
19   wordsmiths much of its response (for instance, claiming that the "data was *likely* a collection of
20   data already publicly available") (emphasis added), while still leaving uncertainty regarding the
21   extent and source of this API exploitation incident.

22       38.     Twitter's vulnerability was initially spotted in January of 2022.  Rather than inform
23   users immediately that this vulnerability could be exploited (*i.e.*, mined from Twitter and then
24   subsequently organized to be disseminated or sold on the dark web), Twitter sat on its hands and
25   hoped for the best for at least the next seven months.  And, while Twitter did so, the vulnerability
26   was exploited by cybercriminals who actually did package the information and disseminate or sell
27
28

it on the dark web.  Then (and only then) did Twitter finally disclose to the public that their PII was at risk.

39. Put simply, it defies logic and common sense to claim that Twitter's breach did not emanate from Twitter.  Twitter usernames (which are public) were compromised in tandem with information which was (in the quantities at issue here) known only to Twitter.  That information known only to Twitter includes Twitter users' actual email addresses, names, and phone numbers.  This pairing could not have occurred without the exfiltration of data from Twitter because there is virtually no other way this combination of public and non-public information (particularly, in these quantities) could have conceivably made its way into the massive set of compromised data, comprised of nearly a quarter of a billion Twitter usernames coupled with corresponding emails and/or phone numbers.

**Twitter's 2011 Agreement with the Federal Trade Commission**

40. Twitter's history of failing to adequately protect user data goes back over a decade. In 2011, Twitter and the FTC entered into an agreement resulting from Twitter's alleged violations of Section 5(a) of the FTC Act for misrepresenting the extent to which it protected consumers' privacy.  The Agreement, as memorialized in a consent order, prohibited Twitter from using "any telephone number or email address obtained from a [u]ser before the effective date of this Order for the purpose of enabling an account security feature."  While the Agreement did not prohibit Twitter from doing so in the future, Twitter would first have to comply with notice, disclosure, and consent requirements of the Agreement.

41. The Agreement and consent order prohibits Twitter from misrepresenting "the extent to which [Twitter] maintains and protects the security, privacy, confidentiality, or integrity of any nonpublic consumer information, including, but not limited to, misrepresentations related to its security measures to: (a) prevent unauthorized access to nonpublic consumer information; or (b) honor the privacy choices exercised by users."

Deleted: in response to

Deleted: (which was ultimately

Deleted: )

Deleted: it

42.     Twitter's failures with respect to the 2021-2022 API exploitation are a violation of the FTC Agreement and consent order, which were facially designed to benefit Plaintiffs and members of the Class and to protect them from the harms that Twitter would inflict on them.

***Whistleblowers Reveal the Ugly Truth Regarding Twitter's Shocking Lack of Control or Care for its Users' Online Data Privacy***

43.     The failure of Twitter's privacy protections have also been exposed by two whistleblowers.  In July 2022, the former head of security at Twitter, Peter Zatko, filed a 200-page complaint with the Department of Justice, the Securities and Exchange Commission, and the FTC.  Following Zatko's complaint to the FTC, he also testified before the Senate Judiciary Committee.  As detailed below, Zatko's disclosures reveal a pervasive and dangerous disregard for data privacy at Twitter perpetuated by the highest levels of management and the board of directors.

44.     Zatko was head of security at Twitter between November 2020 and January 2022.  During his time at Twitter, Zatko repeatedly sounded alarms to Twitter's senior-most executives and board of directors without avail.  Zatko's complaint alleges that, in 2021, Zatko (along with Twitter's head of privacy engineering and chief privacy officer) reported to the board of directors that (i) every Twitter employee has access to data they do not need to have access to for purposes of their role at Twitter, (ii) until Twitter could reach the point where it could implement a system to manage access to data, Twitter was at risk of inappropriate employee access to data, (iii) Twitter's inability to delete data compounds the risk of inappropriate employee access, and (iv) Twitter retains data that Twitter should not have and that this data is therefore accessible by Twitter employees who do not need to have access to this data.  Zatko's complaint also alleged that Twitter does not log or know who at Twitter accesses data at Twitter or what these Twitter employees do once inside the system.  Zatko noted that, during his tenure at Twitter, a severe security breach occurred—on average—every week.

45.     In January of 2022, Zatko was fired from Twitter.

46.     On September 13, 2022, Zatko testified before the Senate Judiciary Committee regarding his disclosure.  In his opening statement before the Committee, Zatko stated,

**Deleted:** Plaintiff

**Deleted:** very harm

**Deleted:**

The company's cyber security failures make it vulnerable to exploitation causing real harm to real people and when an influential media company can be compromised by teenagers, thieves, and spies, and the company repeatedly creates security problems on their own, this is a big deal for all of us[…] Twitter leadership ignored its engineers because key parts of leadership lacked competency to understand the scope of the problem. But more importantly, their executive incentives lead them to prioritize profits over security. Upton Sinclair famously said 'it is difficult to get a man to understand something, when his salary depends on his not understanding it'[…] I discovered two basic issues. First, they don't know what data they have, where it lives, or where it came from and so unsurprisingly, they can't protect it. And this leads to the second problem, which is the employees then have too much access to too much data and too many systems. *You can think of it this way, it doesn't matter who has keys if you don't have any locks on the doors*. (emphasis added)

47.     Zatko attributes this vulnerability to three primary shortcomings at Twitter: the ability for half of Twitter's employees to have unbridled access to this data, the lack of any internal logging system that would record and identify inappropriate access within the systems, and the utter lack of basic security hygiene.

48.     Zatko testified that Twitter repeatedly prioritized profits over security and that Twitter is over a decade behind industry standards related to cybersecurity.

49.     Zatko also testified that half of Twitter employees have access to all of the data in Twitter's system and that the accumulation of data is bewildering. Half of Twitter's employees, specifically all of the company's several thousand "engineers," have unhindered access to data at Twitter. In both Zatko's complaint and testimony, he stated that these employees have access to data they do not need to have access to for their respective roles and that Twitter needs to implement a system to manage access to data.

50.     Zatko provided further testimony explaining that, once an engineer is inside of the platform, they can obtain the following information regarding a user: (i) email address, (ii) phone number, (iii) any other email address used to create accounts or any other account created with that particular email address, (iv) the latest IP address connected to, and whether the user is still connected to, that IP address (geolocation information), (v) what type of device they connected with, and (vi) their user name and persona on other social media platforms.

51.     Thus, the amount of information related to a single user is extensive; the total amount of information on Twitter's platform is unfathomable – and, Twitter has allowed unbridled access to this trove of sensitive personal information.

52.     Incredibly, according to Zatko's testimony, Twitter has only 20% of the vast trove of data registered and, therefore, is only *capable* of securing that 20% of the information.  As for the other 80%, Zatko testified that Twitter does not know what the data is, why Twitter has the data, or where the data came from.  Zatko testified that a sampling of that 80% revealed that data to be personally identifying information.

53.     Zatko testified that Twitter retains all of the information of past employees because Twitter does not delete data.  This retention includes user data.  According to Zatko, once a user leaves the site, the user's account is merely deactivated, but the user's data is not deleted.

54.     Zatko further points to a lack of centralized logging as a critical failure of Twitter's ability to control and assess the misappropriation of data.  Zatko explained that Twitter does not have centralized logging, meaning the tech company does not log what is happening within its system, who tried to log in, and who was doing what inside the system.  During his time at Twitter, Zatko discovered that thousands of attempts to access internal systems were happening per week.  And nobody was noticing.  Twitter could not ascertain who was trying to access these internal systems and whether they were successful.  Twitter is simply unable to internally look for or identify inappropriate access within its own system.

55.     Twitter creates yet additional security deficiencies as a result of poor cybersecurity hygiene.  Zatko explained that Twitter's culture prioritized profits and growth.  Despite his pleas to the executive team to push basic cyber hygiene, Twitter's executives were focused on profits, not identifying existing errors.

56.     Members of the Senate Judiciary Committee elicited testimony from Zatko to the effect that pushing patches and security updates on employee devices would be a relatively low-cost way to mitigate a great deal of security risk.  During his tenure at Twitter, Zatko discovered

AMENDED CLASS ACTION COMPLAINT
17

that 40% of the systems had turned off software updates and that no employee laptops were in compliance with security policies.

57.    In October 2022, a second former Twitter employee filed a complaint with the Federal Trade Commission supporting Zatko's complaint and testimony.  According to published reports, this former employee, an engineer at Twitter, alleges that any Twitter engineer can activate an internal program (called "GodMode" or "privileged mode") and tweet from any account.  This allegation stems from a 2020 incident where teenagers hacked into Twitter and tweeted as several famous people, including Elon Musk and former President Barack Obama.  Following this hack, Twitter promised the public that the problem leading to this hack was "fixed."  The new complaint filed with the FTC alleges that this internal program is still accessible on Twitter's system.

**Harm to Consumers**

58.    Consumers, like Plaintiffs and members of the Class, for the most part, have discovered the exposure of their respective PII as a result of dark web scans as performed by credit reporting agencies and identity theft services that those respective consumers are subscribed to.  Indeed, social media users report that that they have been receiving various identity theft alerts regarding their PII traceable to the Twitter API exploitation.

59.    Not only is it always dangerous as a general matter for email addresses and phone numbers to appear on the dark web with respect to how that information may be used, but, given that Twitter's API exploitation allows cybercriminals to link the Twitter persona of a respective user to their PII, this intrusive privacy violation is all the more dangerous and offensive under these unique circumstances.

60.    Plaintiffs Gerber and Cohen, accepted Twitter's invitation to stay anonymous during their use of the Twitter platform.  As such, Plaintiffs (like tens of millions of other Twitter users) used a pseudonym as a username and attempted to conceal their identities when using the platform due to a multitude of well-recognized privacy concerns.  However, Twitter, in contravention of the Twitter Privacy Policy and in violation of the FTC agreement and order, failed

to ensure that the Plaintiffs' accounts would remain anonymous, as was their right and expectation when they signed up for Twitter initially.

61.     Plaintiffs and Class members suffered significant harm as a result of Twitter's failure to protect their PII.  This harm includes: (1) Twitter users being subjected to potential phishing attacks and other types of targeted, email-centric privacy intrusions; (2) potential for Twitter users being subject to unwanted robocalls and texts and other types of targeted, phone-centric privacy intrusions; (3) Twitter users having private Twitter accounts unmasked, leading to harm for the multitude of Twitter users who did not wish to have their accounts exposed; (4) Twitter users' loss of time and effort due to the issues caused by having their private Twitter accounts unmasked; (5) Twitter users having their PII disseminated and available for sale on the dark web; (6) substantial risk of future identity theft and other harm based on the information taken (combined with the fact that their information is currently on the dark web); (7) loss of value of personal information; (8) failure to receive the benefit of their bargain with Twitter; and (9) perhaps most significantly, the constant and relentless concern that numerous viewpoints and personal information shared anonymously (in some cases regarding a user's most intimate views and matters) over the course of years will now be publicly unmasked as belonging to that particular Twitter user.

62.     Indeed, the fact that this data set was nefariously uploaded to the dark web also represents real and imminent harm – as it was exfiltrated from Twitter and organized in a way where any conceivable user on the dark web could purchase, access, and abuse it.

63.     Tens of millions of anonymous Twitter users who did not want their identities revealed to the public suffered a very concrete harm.

**CALIFORNIA LAW APPLIES TO THE NATIONWIDE CLASS**

64.     California substantive laws apply to every member of the Class.  California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process and the Full Faith and Credit Clauses of the U.S. Constitution.  California has significant contacts, or significant aggregation of contacts, to the claims asserted by Plaintiffs and

AMENDED CLASS ACTION COMPLAINT
19

**Deleted:** Plaintiff Gerber's account

**Deleted:** his

**Deleted:** (

**Deleted:** )

**Deleted:** he

**Deleted:** Plaintiff Gerber

**Deleted:** the

**Deleted:** of the Class

**Deleted:** potential

**Deleted:** and (6

**Deleted:** There is a very concrete harm suffered by the tens of millions of anonymous Twitter users who did not want their actual identities (and, potentially, intimate personal details) revealed to the public.  However, against their will, and contrary to the representations made by Twitter, this is exactly what happened.

the Class Members, thereby creating state interests to ensure that the choice of California state law is not arbitrary or unfair.

65.   Twitter maintains its principal place of business in California.   Additionally, Twitter conducts substantial business in California such that California has an interest in regulating Twitter's conduct under its laws.  Twitter also selected California's laws as the laws that govern the applicable agreements (the 'Terms of Service') made with consumers, like Plaintiffs and Class Members.  Twitter's decision to reside in California and avail itself to the laws of California, renders the application of California law to the claims herein constitutionally permissible.

## CLASS ALLEGATIONS

66.   Plaintiffs bring this nationwide class action pursuant to Rule 23(b) and 23(c) of the Federal Rules of Civil Procedure, on behalf of themselves and on behalf of all members of the following class:

> **Nationwide Class.** All Twitter users who had their email addresses and/or telephone numbers compromised by Twitter's API exploitation between June of 2021 through January of 2022 (the "Class").

67.   Excluded from the Class are the following individuals and/or entities: Defendant and its parent(s), subsidiaries, affiliate(s), officers and directors, current or former employees, and any entity in which the Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol to opt out; and any and all government officials as well as all judges (and their immediate family members) assigned to this Action.

68.   Plaintiffs reserve the right to modify or amend the definitions of the proposed Class prior to the Court's determination regarding whether class certification is appropriate.

69.   **Numerosity.**  The Class is so numerous that joinder of all members is impracticable.  Defendant collected the PII of tens of millions of users upon sign up, and that information was compromised by the API exploitation as described herein.   Determining membership in the Class can be easily determined via Defendant's records.

AMENDED CLASS ACTION COMPLAINT
20

70. **Commonality.** The Class has questions of law and fact that exist which are common among Class members; and these questions of law and fact predominate over any questions affecting only individual Class members. These questions include:

  a.  Whether Defendant owed a duty to the Class to protect PII;

  b.  Whether Defendant breached that duty;

  c.  Whether Defendant was negligent;

  d.  Whether Defendant was grossly negligent;

  e.  Whether Defendant violated either its Terms of Service or its Privacy Policy when it allowed the API exploitation to take place (and, subsequently, when it failed to inform Twitter's users about the exploitation);

  f.  Whether Defendant's conduct violated Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. 45(a);

  g.  Whether Defendant's conduct as alleged herein violates the 2011 FTC Agreement and accompanying consent order;

  h.  Whether Defendant was unjustly enriched;

  i.  Whether Defendant's conduct violated the state laws as alleged herein;

  j.  Whether Defendant caused Plaintiffs' and Class Members' injuries; and

  k.  Whether Plaintiffs and the other Class Members are entitled to restitution, monetary, equitable, injunctive, and other appropriate relief.

71. **Typicality.** Plaintiffs' claims are typical of those of the other Class Members, all of whom suffered from the API exploitation's exposure of their PII as alleged herein.

72. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' counsel is competent and is experienced in litigating complex class actions nationwide, including data breach and privacy-related class action litigations.

73. **Superiority and Manageability:** Under Rule 23(b), a class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Individual damages for any individual Class

**Deleted:** Twitter

**Formatted:** Left

**Deleted:** Plaintiff

**Deleted:** Plaintiff

**Deleted:** Plaintiff's

**Deleted:** Twitter

**Deleted:** Plaintiff

**Deleted:** Plaintiff's

Members are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's misconduct would go unpunished and unrectified. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.  There will be no difficulty in the management of this action as a class action.

74.     Class certification is also appropriate under Rules 23(a) and (b) because Defendant has acted or refused to act on grounds generally applicable to the Class, so that final monetary and/or injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

## CAUSES OF ACTION

## COUNT I

## Breach of Contract

75.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding and following paragraphs.

76.     As a condition of using the Twitter platform, Plaintiffs and Class Members were required to and did consent to a contract, namely, Twitter's Terms of Service, including its Privacy Policy.

77.     In exchange for access, Twitter users consented to and allowed Twitter to collect and use certain of their non-public sensitive information.  Twitter's Privacy Policy expressly promised users that certain other information, like the PII of Plaintiffs and Class Members, would not be disclosed to third parties unless and until users affirmatively consented to the disclosure.

78.     In consideration for the use of Twitter's platform, Twitter users also provided their PII and their enormous time and attention.  As described above, without users' time and attention, Twitter could not monetize these users and promote its number of active users to advertisers to induce them to spend money on the Twitter platform.

79.     Twitter promised in the Privacy Policy that users would be informed as to how their data is collected and used and that users would be empowered to make informed decisions as to what information Twitter shared with third parties.  Twitter violated this provision of its agreement

with users by failing to safeguard their data and allowing data to be shared with third parties without the users' express consent.

80.     Plaintiffs and Class Members fully performed their material obligations under their contracts with Twitter.

81.     Twitter breached its contractual duties to Plaintiffs and Members of the Class by failing to adhere to its promise that users must affirmatively consent to share their PII with third parties, and by failing to give users meaningful choice or allow them to make informed decisions as to what information they chose to share and with whom.

82.     Further, in violation of the FTC Act and the FTC agreement and consent order, Twitter failed to comply with its promise that PII would only be used in conformity with U.S. law.

83.     As a direct and proximate result of Twitter's breach of contract, Plaintiffs and Class Members were harmed.  Plaintiffs and Class Members kept their end of the bargain by surrendering their time and attention and their PII to Twitter.  Plaintiffs and Class Members did not receive the level of security and service that they were promised.  Twitter users were deprived of the benefit of the bargain that they struck with Twitter.  The PII that they provided to Twitter suffered a diminution in value by virtue of being shared with third parties without the consent or knowledge of Plaintiffs and Class Members.

84.     As a direct and proximate result of Defendant's breach of contract, Plaintiffs are entitled to and demand on behalf of Class Members restitution, actual, consequential, and nominal damages and injunctive relief, to be determined at trial.

## COUNT II

## Negligence

85.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding and following paragraphs.

86.     As a condition for doing business, Defendant's current and former consumers were obligated to provide Defendant with the sensitive PII described herein in order to become users of Defendant's platform.

87.     Plaintiffs and the Class entrusted their PII to Defendant on the promise and Defendant's obligation to safeguard their information and/or not disclose their PII to unauthorized third parties or make it publicly available.

88.     Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if the PII were wrongfully disclosed.

89.     Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

90.     Defendant had a duty to Plaintiffs and the Class to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.  This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the PII of Plaintiffs and the Class in Defendant's possession was adequately secured and protected.

91.     Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiffs and the Class.

92.     Defendant's duty to use reasonable security measures arose because of the relationship that existed between Defendant and Plaintiffs and the Class.

93.     Defendant was also subject to an independent duty, untethered to any contract between Defendant and Plaintiffs or the Class, to safeguard the PII that it solicited and maintained.

94.     A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly considering Defendant's inadequate security practices, as detailed above.

95.     Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures.  Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, and the critical importance of providing adequate security of that information.  Defendant's own conduct created a foreseeable risk of harm

AMENDED CLASS ACTION COMPLAINT
24

Deleted: Plaintiff

Deleted: premise

Deleted: with the understanding that Defendant would

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: class

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: , and the necessity for encrypting or redacting PII stored on Defendant's systems.

to Plaintiffs and the Class.  Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the API exploitation as set forth herein.  Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of the PII of the Plaintiffs and the Class, as detailed above.

96.     Defendant had a duty to employ proper procedures and safeguards to prevent the unauthorized dissemination of the PII of Plaintiffs and the Class.

97.     Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and the Class by failing to exercise reasonable care in protecting and safeguarding the PII of Plaintiffs and the Class during the time the PII was within Defendant's possession or control.

98.     Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry practices at the time of the API exploitation, as detailed above.

99.     Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and the Class by failing to have appropriate procedures in place to detect and prevent improper disclosure and dissemination of PII in its possession.  Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry practices at the time of the API exploitation.

100.    Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and the Class the existence and scope of the API exploitation.

101.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the PII of Plaintiffs and the Class would not have been compromised.

102.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Class and the present harm, or risk of imminent harm, suffered by Plaintiffs and the Class.  The PII of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

**Deleted:** Plaintiff

**Deleted:** to

**Deleted:** Plaintiff

**Deleted:** .

**Deleted:** <#>Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.¶ Defendant was able to protect against the harm suffered by Plaintiff and the Class as a result of the API exploitation.¶

**Deleted:** <#>Plaintiff

**Deleted:** <#>Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the API exploitation.¶

**Deleted:** <#>Plaintiff

**Deleted:** <#>implement industry standard protocols and

**Deleted:** <#>Plaintiff

**Deleted:** Plaintiff

**Deleted:** rules, regulations, and

**Deleted:** <#>Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiff and the Class in the face of increased risk of theft. ¶

**Deleted:** <#>Plaintiff

**Deleted:** Plaintiff

**Deleted:** Plaintiff

**Deleted:** Plaintiff

**Deleted:** Plaintiff

**Deleted:** Plaintiff

**Deleted:** Plaintiff

103.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted, and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII.  The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

104.   Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that could result to Plaintiffs and the Class.

105.   Defendant's violation of Section 5 of the FTC Act, as well as the standards of conduct established by these statutes and regulations, constitutes negligence.

106.   Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

107.   The harm that occurred because of the API exploitation is the type of harm the FTC Act was intended to guard against.  The FTC has pursued enforcement actions against businesses, including against Defendant, which (because of its failure to employ reasonable data security measures and avoid unfair and deceptive practices) caused the same harm as that suffered by Plaintiffs and the Class.

108.   As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) potential or actual identity theft; (ii) the loss of the opportunity of (and control over) how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) potential or actual out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual present and future consequences of the API exploitation; (vi) loss of value of their PII; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so

---

**Deleted:** Additionally,

**Deleted:** Plaintiff

**Deleted:** *per se*

**Deleted:** Plaintiff

**Deleted:** Plaintiff

**Deleted:** and negligence *per se*, Plaintiff

**Deleted:** effort

long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and the Class; and (viii) costs in terms of time, effort, and money that will (or might) be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the API exploitation for the remainder of the lives of Plaintiffs and the Class.

109.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, loss of privacy, and other economic and non-economic losses.

110.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

111.    Plaintiffs and Class Members are therefore entitled to damages, including actual and compensatory damages, restitution, declaratory and injunctive relief, and attorney's fees, costs, and expenses.

### COUNT III

### Gross Negligence

112.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding and following paragraphs.

113.    The foregoing conduct described constitutes gross negligence due to Twitter's extreme departure from ordinary standards of care, and its knowledge that it had failed to secure the PII of Plaintiffs and the Class, as set forth in detail above.

114.    Defendant owed a duty to Plaintiffs and the Class to exercise reasonable care in the obtaining, using, and protecting of their PII, arising from the sensitivity of their PII and the expectation that their PII was not going to be revealed or shared without their consent. This duty included that Twitter ensure that no third parties were improperly collecting, storing, obtaining, sharing and/or selling Plaintiffs' information.

AMENDED CLASS ACTION COMPLAINT
27

115.   Plaintiffs' and the Class' willingness to entrust Defendant with their PII was predicated on the understanding that Twitter would take appropriate measures to protect it.  Twitter had a special relationship with Plaintiffs and the Class as a result of being entrusted with their PII, which provided an independent duty of care.

116.   Twitter received multiple warnings, including the express warnings issued by Peter Zatko as detailed above, a well as a 5+ million user data breach suffered the very same year, that Plaintiffs' PII was at risk.

117.   Despite these warnings, Twitter failed to take reasonable steps to prevent harm to Plaintiffs and the Class.

118.   Twitter breached its duties by, among other things: (a) failing to insure third parties were not improperly accessing, collecting, storing, sharing and/or selling Plaintiffs' and the Class' PII without users' informed consent; and (b) failing to provide adequate and timely notice that Plaintiffs' and the Class' PII had been improperly obtained by unauthorized third parties.

119.   Plaintiffs and the Class were foreseeable victims of Twitter's breach of its duties. Twitter knew or should have known that allowing third parties to access Plaintiffs' and Class Members' PII would cause damage to Plaintiffs.

120.   As a result of Twitter's failure to safeguard Plaintiffs' and the Class' PII, Plaintiffs and the Class have suffered injury, as detailed herein.

121.   The injuries to Plaintiffs and the Class were proximate, reasonably foreseeable results of Twitter's breaches of the aforementioned duties.

122.   As a proximate result of Twitter's gross negligence in failing to take due care, Plaintiffs suffered damages in an amount to be awarded at trial.

123.   Additionally, public policy voids any purported waiver of liability that could potentially apply to this cause of action.

### COUNT IV

**Unjust Enrichment (in the alternative to Count I, Breach of Contract)**

124.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding and following paragraphs.

125.    To the extent no adequate legal remedy is available under any applicable contract, Plaintiffs bring this count in order to pursue restitution based on Defendant's unjust enrichment, including by way of Defendant's retention of profits that should have been expended to protect the data of Plaintiffs and the Class.

126.    As alleged herein, Defendant has been unjustly received and retained enormous monetary benefits from Plaintiffs and the Class – *i.e.*, by way of Defendant's use of, and profiting from, their data under unjust circumstances, such that inequity has resulted.

127.    By engaging in the conduct described herein, Defendant knowingly obtained benefits from Plaintiffs and the Class as alleged herein under circumstances such that it would be inequitable and unjust for Twitter to retain them.

128.    Plaintiffs and the Class are therefore entitled to a restitutionary award in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by Twitter by means of the above-described actions, or both as the circumstances may merit to provide complete relief to Plaintiffs and the Class as this Court deems just and proper.

**COUNT V**

**Violations of California's Unfair Competition Law ("UCL")**

129.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding and following paragraphs.

130.    Defendant is a business as defined by the UCL.

131.    By reason of the conduct alleged herein, Defendant engaged in unlawful "business practices" within the meaning of the UCL.

132.    Defendant misrepresented and/or omitted material information regarding the privacy practices and policies with respect to protecting Twitter users' PII.

AMENDED CLASS ACTION COMPLAINT
29

133.    Defendant did not disclose to Plaintiffs and Class Members that the PII that they provided in response to Twitter's representations regarding login verification and account security would not be adequately protected and would be disclosed to unknown third parties.

134.    **Unlawful Prong.**  Defendant violated the unlawful prong of the UCL because Defendant's acts, omissions, and/or misrepresentations as alleged herein were unlawful and in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a).

135.    Section 5(a) of the Federal Trade Commission Act (FTC Act) (15 USC §45) prohibits "unfair or deceptive acts or practices in or affecting commerce."  The FTC Act prohibits acts or practices that cause or are likely to cause substantial injury to consumers, that cannot be reasonably avoided by consumers, and are not outweighed by the countervailing benefits to consumers or the marketplace.  The FTC Act also prohibits material representations, omissions, or practices that are likely to mislead reasonable consumers.  This prohibition applies to all persons engaged in commerce, including Defendant.

136.    Plaintiffs and Class Members are consumers within the meaning of the FTC Act and Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.  The harm that occurred as alleged herein is the type of harm that the FTC Act was intended to guard against.

137.    Twitter's failure to protect the PII of Plaintiffs and Class Members, is an unfair and deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

138.    Moreover, Twitter's violation of the 2011 FTC agreement and consent order is a violation of the unlawful prong of the UCL.  The agreement and consent order prohibited Twitter from engaging in the conduct alleged herein and was intended and implemented for the benefit of Twitter's users and the consumer marketplace.  Twitter disregarded these strictures to the detriment of Plaintiffs and the Class.

139.    Additionally, Twitter violated the unlawful prong of the UCL by violating Cal. Bus. & Prof. Code § 22576, which prohibits Twitter from knowingly, negligently, and materially failing to adhere to its published Privacy Policy.  Twitter's Privacy Policy represented that its users would

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: exact

Deleted: as

Deleted: Plaintiff

have control over their privacy choices, must affirmatively opt-in to share that information and that email addresses and phone numbers would not be shared with unauthorized third parties.

140.   **Unfairness Prong.**  The UCL further prohibits unfair acts and practices.  Defendant engaged in unfair acts and practices with respect to the collection of PII by failing to fully disclose that the PII would not be adequately protected.  This information was not available to Plaintiffs or Class Members.  Additionally, Twitter stated that the API exploitation did not result in the exposure of PII, which hamstrung Twitter's users and victims of the exploitation from being able to protect themselves after the exploitation (and the subsequent posting of the information on the dark web) had taken place.

141.   Due to Defendant's affirmative misrepresentations and material omissions the injury suffered by consumers was not reasonably avoidable through ordinary investigation.  These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class Members.  They were likely to deceive the public into believing their PII was securely stored, when it was not.  The harm these practices caused to Plaintiffs and Class Members outweighed their utility, if any.

142.   As a result of Defendant's failure to comply with its representations regarding data security, and the material misrepresentations and omissions which were intended to and did induce Plaintiffs and Class Members to surrender their PII to Defendant, Plaintiffs and Class Members were harmed and suffered an economic loss.  Plaintiffs and Class Members lost money and/or property as a result of Defendant's inducements in that they provided valuable, non-public and sensitive contact information and their significant time and attention to Twitter.  This is information and attention for which there is an active and viable marketplace, and the data has a quantifiable value.  Plaintiffs and the Class have also suffered harm in the form of diminution of the value of their non-public and sensitive personally identifiable data.

143.   As a result of Defendant's unlawful, unfair, and fraudulent business practices, Plaintiffs and Class Members are entitled to relief including restitution and all other remedies allowed by law.

Deleted: it

Deleted: Plaintiff,

Deleted: , or the public at large

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff has

Deleted: Plaintiff

**PRAYER FOR RELIEF**

144.   **WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request that the Court grant the following:

A.   For an order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

B.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members, and from continuing to refuse to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

C.   For injunctive relief, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

   i.   prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

   ii.   requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

   iii.   requiring Defendant to provide additional options regarding data retention and/or delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

   iv.   requiring Defendant to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

   v.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct

Deleted: Plaintiff

Deleted: himself

Deleted: requests

Deleted: Plaintiff

Deleted: his

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: requested by Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Plaintiff

Deleted: Information Security Program

Deleted:

Deleted: Plaintiff

testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any material problems or issues detected by such third-party security auditors;

vi.   requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

vii.   requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

viii.   requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.   requiring Defendant to conduct regular database scanning and security checks;

x.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xi.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.   requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

AMENDED CLASS ACTION COMPLAINT
33

**Deleted:**

**Deleted:** Plaintiff

xiii. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves; and

xv. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment.

D. For an award of damages, including actual, statutory, nominal, and consequential damages, or restitution as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. For such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

145. Plaintiffs hereby demand a trial by jury.

AMENDED CLASS ACTION COMPLAINT
34

**DATED**: February 21, 2023                    Respectfully submitted,

Deleted: January 13

/s/ Israel David

Formatted: Underline

Israel David*
*israel.david@davidllc.com*
Blake Hunter Yagman^

Deleted: *

*blake.yagman@davidllc.com*
Hayley Elizabeth Lowe*
*hayley.lowe@davidllc.com*
Madeline Sheffield*
*madeline.sheffield@davidllc.com*
**ISRAEL DAVID LLC**
17 State Street, Suite 4010
New York, New York 10004
Tel.:    (212) 739-0622

*Pro Hac Vice Forthcoming
^Pro Hac Vice Admitted

Jeff Westerman (Calif. Bar 94559)
*jwesterman@jswlegal.com*
**WESTERMAN LAW CORP.**
16133 Ventura Blvd., Suite 685
Encino, California 91436

Deleted: Ca.

Tel.:    (310) 698-7450

*Attorneys for Plaintiffs and the Proposed Class*

Deleted: ¶

Deleted: *Plaintiff*

AMENDED CLASS ACTION COMPLAINT
35