**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph P. Guglielmo (*pro hac vice admitted*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
jguglielmo@scott-scott.com

**ISRAEL DAVID LLC**
Israel David (*pro hac vice admitted*)
17 State Street, Suite 4010
New York, NY 10004
Telephone: (212) 739-0622
israel.david@davidllc.com
hayley.lowe@davidllc.com

**LYNCH CARPENTER LLP**
Gary F. Lynch (*pro hac vice pending*)
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412.322.9243
gary@lcllp.com

**ZIMMERMAN REED LLP**
Jeff Westerman (CA Bar No. 94559)
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Telephone: 877-500-9780
jeff.westerman@zimmreed.com

*Attorneys for Plaintiff Casey Weitzman*

*Attorneys for Plaintiffs Stephen Gerber and Eric Cohen*

[Additional counsel appear on signature page.]

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| STEPHEN GERBER, ERIC COHEN, and CASEY WEITZMAN, Individually and on Behalf of Themselves and All Others Similarly Situated, | Case No. 4:23-cv-00186-KAW |
| Plaintiffs, | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| TWITTER, INC. and X CORP., as Successor in Interest to Twitter, Inc., | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiffs Stephen Gerber, Eric Cohen, and Casey Weitzman ("Plaintiffs"), on behalf of themselves and all other persons similarly situated, bring this Consolidated Amended Class Action Complaint against Defendant Twitter, Inc. and its successor in interest, X Corp. ("Twitter" or "Defendants").  Plaintiffs allege, upon personal knowledge as to Plaintiffs' own actions, upon the investigation of counsel, and upon information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1.      This action stems from Twitter's failure to comply with its duties to secure sensitive user data.  For years, Twitter has chosen profits over user privacy.  Twitter knowingly ignored dangerous inadequacies in its data security infrastructure and flouted Federal Trade Commission ("FTC") guidelines and regulations intended to protect consumer privacy interests.  As a result, a 2021 breach of Twitter's system has placed approximately 200 million users' valuable and sensitive personal identifying information, including names, email addresses, and phone numbers ("PII") in the hands of cybercriminals.  As set forth in detail herein, as a result of Twitter's grave derelictions of duty, including as set forth in Twitter's User Agreement contract, Plaintiffs and the Class have suffered damages and are at imminent risk of serious identity theft.  Plaintiffs and Class members have incurred and will continue to incur damages in the form of, among other things, lost time and expenses related to mitigating the harms caused by the Data Breach, increased risk of harm, diminished value of their PII, loss of privacy, and additional damages as described below.

2.      Twitter is a social media platform where users can post and engage with short-form commentary, called "Tweets."  Twitter has positioned itself as a modern-day public square – a platform to "to serve the public conversation" by offering a "free and safe space to talk."  Many tens of millions of individuals have accepted this invitation from Twitter.  These Twitter users collectively deliver enormous value (and profits) to Twitter through advertising and data licensing revenues.  These revenue streams – generated directly by user engagement and activity on the platform – are the basis for Twitter's recent valuation of approximately $40 billion.

3.      As Twitter has grown to become one of the largest social media and networking platforms in the world, so has the volume and value of sensitive user data that it holds.  As Twitter

is well aware, it is duty bound to protect the security of user PII and related data and the consumer privacy interests it represents, but it has failed to do so.

4.      Twitter knowingly failed to implement and maintain reasonable or adequate data security measures to protect its users' PII and related data.  As Twitter's former head of security recently testified before Congress, among other stunning revelations, Twitter's cybersecurity systems are a decade behind industry standards and Twitter has consistently failed to take any action in response to internal alarm bells regarding dangerous inadequacies in its systems, as detailed below.

5.      The natural result of Twitter's failures is the data breach at issue in this Action.

6.      Beginning in 2021, a dangerous defect in Twitter's application programming interface ("API") allowed internal or external cybercriminals to access and obtain Twitter users' PII.  The compromised information included users' Twitter usernames, email addresses, and phone numbers associated with (*i.e.*, connected to) the specific Twitter accounts.  The data was in turn offered for sale and leaked by cybercriminals on the "dark web."

7.      The data breach was foreseeable and preventable.  Had Twitter been in compliance with a decade-old FTC consent order and heeded the repeated warnings levied to management and the board by its head of security and others, Plaintiffs and the Class would not have suffered the harms caused by the breach.  Twitter, however, repeatedly chose profits over user privacy.  As a result, an unfathomably large trove of private user data is now in the hands of cybercriminals and millions of users have been harmed and will continue to suffer harm.

8.      The data breach not only exposed all of the affected users to the serious harms generally associated with disclosure of sensitive PII, such as phishing attacks and risk of identity theft, the combined set of compromised information also deanonymized tens of millions of Twitter users – like Plaintiffs Gerber and Cohen and millions of members of the putative Class – who believed that they were safely sharing and accessing information on Twitter anonymously.

9.      In particular, at the very core of Twitter's business model is its invitation to would-be users to share information and views on myriad subjects, including politics, religion, sports, fashion, pets, food, sexuality, and everything in between.  Unlike a public square or other prominent

social media platforms, however, Twitter users are invited to do so anonymously by operating on the platform with pseudonymous usernames.  These users may express themselves and access information on Twitter without fear of retaliation, embarrassment, or other repercussions from their employers, colleagues, acquaintances, neighbors, or government.  These users were led by Twitter to believe that they were safely and anonymously sharing and accessing information on Twitter but, as a result of the breach, their pseudonymous accounts are now publicly linked to identifying information, in effect 'de-anonymizing' these users.

10.     Against this backdrop, Plaintiffs, on behalf of themselves and all others similarly situated, bring this Action against Twitter for breach of contract, negligence, negligence *per se*, gross negligence, unjust enrichment, violation of California's unfair competition statute, violation of California's Consumers Legal Remedies Act, and Declaratory Judgment.  Plaintiffs seek damages, restitution, equitable, declaratory relief, and injunctive relief, including an order of the Court compelling Twitter to adopt reasonably adequate security practices to safeguard the PII in Twitter's custody in order to prevent incidents like the data breach at issue in this Action from reoccurring in the future, together with reasonable costs and attorneys' fees, and pre- and post-judgment interest.

**JURISDICTION AND VENUE**

11.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §1332(d), as provided by the Class Action Fairness Act, because:  this is a civil action filed under Rule 23 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P." or the "Rules"); the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and members of the Class are citizens of a State different from Defendants.  Specifically, Plaintiffs Gerber and Cohen are citizens of the State of New York and Defendants are citizens of the State of California and/or the State of Nevada.

12.     This Court has personal jurisdiction over Defendants because Defendants' principal place of business is in California and a substantial part of Defendants' conduct giving rise to this Action substantially took place in the State of California.

13.     Venue is proper in the Northern District of California (the "District") pursuant to 28 U.S.C. §1391(b)(1), because Twitter is a resident in this District pursuant to 28 U.S.C. §1391(c)(2). Venue is also proper in this District pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events and omissions giving rise to this Action occurred in this District.

14.     In addition, the agreements at issue with respect to Plaintiffs' breach of contract claims asserted in this Action provide that any dispute arising from the contract or Plaintiffs' use of Twitter's platform and related services "will be brought solely in the federal or state courts located in San Francisco County, California, United States," and further that the parties "consent to personal jurisdiction and waive any objection as to inconvenient forum."  (Terms of Service [as that term is defined below], §6.)

## LOCAL RULE 3-5 DIVISIONAL ASSIGNMENT

15.     Pursuant to Local Rule 3-2(c) and 3-2(d) of the United States District Court, Northern District of California Civil Local Rules ("L.R." or the "Local Rules"), assignment of this Action to the Oakland Division is proper because a substantial part of the events and omissions giving rise to this Action occurred in San Francisco County where Defendant Twitter resides.

## PARTIES

### Plaintiff Stephen Gerber

16.     Plaintiff Gerber is, and at all times relevant to this Action was, a resident of the State of New York.

17.     Plaintiff Gerber was an active Twitter user for several years prior to terminating his account in 2022.  When creating his account, Plaintiff Gerber provided Twitter with PII, including his name, address, email address, phone number, date of birth, and other information.  The email address Plaintiff Gerber provided to Twitter (in order to establish his account) reflects his identity.

18.     During the time period in which Plaintiff Gerber used Twitter, Plaintiff Gerber used a pseudonym as his Twitter username and display name in order to protect his identity so that he could express himself and his thoughts on Twitter anonymously and without fear of retribution, retaliation, or embarrassment.

19.     Plaintiff Gerber's PII was disclosed by the Data Breach (as that term is defined below).  Had Plaintiff Gerber been aware that Twitter did not maintain adequate data security systems to prevent the disclosure and use of his PII, he either would not have provided an email address with identifying information to Twitter in order to register, or he would not have used Twitter at all.

***Plaintiff Eric Cohen***

20.     Plaintiff Cohen is, and at all relevant times to this Action was, a resident of the State of New York.

21.     Plaintiff Cohen is an active Twitter user.  When creating his account, Plaintiff Cohen provided Twitter with PII, including his name, address, email address, phone number, date of birth, and other information.  The email address Plaintiff Cohen provided to Twitter (in order to establish his account) reflects his identity.

22.     During the time period relevant to this Action, Plaintiff Cohen used a pseudonym as his Twitter username and display name in order to protect his identity so that he could express himself and his thoughts on Twitter anonymously and without fear of retribution, retaliation or embarrassment.

23.     Plaintiff Cohen's PII was disclosed by the Data Breach (as that term is defined below).  Had Plaintiff Gerber been aware that Twitter did not maintain adequate data security systems to prevent the disclosure and use of his PII, he either would not have provided an email address with identifying information to Twitter in order to register, or he would not have used Twitter at all.

***Plaintiff Casey Weitzman***

24.     Plaintiff Weitzman is, and at all relevant times to this Action was, a resident of the State of California.

25.     Plaintiff Weitzman is an active Twitter user.  When creating her account, Plaintiff Weitzman provided Twitter with PII, including her name, address, email address, phone number, date of birth, and other information.

26.     Plaintiff Weitzman's PII was disclosed by the Data Breach (as that term is defined below).  Since one or more threat actors announced the Data Breach, Plaintiff Weitzman has been required to spend her valuable time monitoring her various accounts in an effort to detect and prevent any misuses of her PII – time which she would not have had to expend but for the Data Breach.  Had Plaintiff Weitzman been aware that Twitter did not maintain adequate data security systems to prevent the disclosure and use of her PII, she would not have used Twitter at all.

### *Defendants Twitter, Inc. and X Corp.*

27.     At all relevant times until on or about March 15, 2023, Twitter, Inc. was a corporation existing and organized under the laws of the state of Delaware.  According to defense counsel in this Action, on or about March 15, 2023, Twitter, Inc. merged into (and has been replaced by its successor in interest) X Corp., a Nevada corporation.  As indicated above in the preamble to this pleading, Twitter, Inc. and its successor in interest X Corp. are collectively referred to herein as "Twitter."  Twitter maintains its principal place of business at 1355 Market Street, San Francisco, California.

## FACTUAL ALLEGATIONS

### A.     Twitter and Its Business Model

28.     Twitter is a popular online social media platform on which users communicate in short posts called "Tweets."  Twitter is accessible to the public, including its registered users, via a mobile application (as may be used, for example, on an iPhone, Android phone, or any smart device) or by visiting Twitter's website (www.twitter.com) on a web browser.

29.     The way that Twitter works is rather simple: after creating a Twitter account, a user is able to publicly post Tweets, which may include text, images, and/or video.  The Twitter platform also allows for users to engage with each other.  Namely, users may "like," comment on, or "retweet" (post themselves) Tweets that are posted by other users and may exchange direct messages with other registered users.

30.     To facilitate user engagement, the Twitter platform allows a user to search for information that interests them and also employs an algorithm to present users with targeted information and advertising.  More specifically, upon logging into the platform, Twitter users are

displayed a "mini-feed" of Tweets by other users that they either have chosen to "follow" or that Twitter's algorithm finds to be relevant to the user's particular interests and online activities. Twitter users may also use a search tool to find particular users, content, or information, including news, trending topics, or any other subject matter.  While this full range of functionality is limited to registered Twitter users, any person can view publicly posted Tweets.

31.     Twitter operates on a so-called freemium model: meaning, Twitter does not charge users for signing up or for using a Twitter account.  Although Twitter users generally do not pay Twitter directly for the ability to use Twitter, these users collectively deliver enormous value (and profits) to Twitter through the valuable data that they provide to Twitter and generate while using Twitter.  Put simply, Twitter users and their data are Twitter's revenue-generating mechanism. Twitter generates billions in annual revenues from the targeted-advertisements that appear in users' mini-feeds.  This digital advertising 'space,' is particularly valuable because advertisers are able to target specific demographic(s) of Twitter users based on their activity across the platform.  Twitter also generates billions in annual revenues through licensing valuable user data.

**B.     The Twitter User Agreement and Privacy Policy**

32.     To establish a Twitter account and operate on the platform, an individual must provide certain information required by Twitter, including the name, email address, phone number, and date of birth of the user associated with the account.  Each Twitter user must also create a username and display name, which are displayed publicly on the Twitter platform and identify the user and their activity across the Twitter platform.  For example, each Tweet, re-Tweet, like, comment, or direct message by a particular user is labelled with their username and/or display name, similar to a digital signature specific to the Twitter platform.

33.     In order to register, a user must also agree "to form a binding contract with Twitter" governing use of the Twitter platform – the Twitter User Agreement.  (Terms of Service, §1.)  The Twitter User Agreement incorporates three components: the Terms of Service, the Privacy Policy, and the Twitter Rules and Policies, and all incorporated policies.  (Terms of Service, introduction.)

34.     Twitter's User Agreements generally provide that Twitter may revise the terms of the User Agreement from time to time, such changes are not retroactive, the most current version of

the User Agreement will govern the parties relationship, and that by continuing to access or use the Twitter platform and related services after any such revisions become effective, the user agrees to be bound by the revised terms of the User Agreement then in effect. *See*, *e.g.*, 2022 Terms of Service, §6; *see also*, *e.g.*, 2022 Privacy Policy, § 8 ("The most current version of this Privacy Policy governs our processing of your personal data and we may revise this Privacy Policy from time to time as needed. If we do revise this Privacy Policy and make changes that are determined by us to be material, we will provide you notice and an opportunity to review the revised Privacy Policy before you continue to use Twitter.").

35.     As relevant to the Action, three separate versions of the Terms of Service and the Privacy Policy, respectively, of the User Agreement were effective: Terms of Service, effective June 10, 2022 through the date of this Consolidated Amended Class Action Complaint (the "2022 Terms of Service"); Terms of Service, effective as of August 19, 2021 and labeled as Version 16 in Twitter's Terms of Service Archive (the "2021 Terms of Service"); Terms of Service, effective as of June 18, 2020 and labeled as Version 15 in Twitter's Terms of Service Archive (the "2020 Terms of Service"); Privacy Policy, effective June 10, 2022 through the date of this Consolidated Amended Class Action Complaint (the "2022 Privacy Policy"); Privacy Policy, effective as of August 19, 2021 and labeled as Version 17 in Twitter's Policy Archive (the "2021 Privacy Policy"); and the Privacy Policy, effective as of June 18, 2020 and labeled as Version 16 in Twitter's Policy Archive (the "2020 Privacy Policy").[1] The operative provisions of the Terms of Service and Privacy Policies that are relevant to this Action are substantially and materially similar or identical.

36.     Twitter requires users to provide identifying PII in order to establish an account, including their name, email address, phone number, date of birth, and other information. While an

---

[1]     The 2022 Terms of Service, 2021 Terms of Service, and 2020 Terms of Service are referred to collectively herein as the "Terms of Service." The 2022 Privacy Policy, 2021 Privacy Policy, and 2020 Privacy Policy are referred to collectively herein as the "Privacy Policies." Unless specifically stated otherwise, the term "User Agreements" refers collectively to all contracts, in their entirety, between Twitter on the one hand and Plaintiffs and Class Members on the other, in effect during the period relevant to the Data Breach (as that term is defined below) and this Action including, the Terms of Service and the Privacy Policies.

individual's display name and username are public, Twitter promises its registered users that their PII, including their email addresses and phone numbers – which are required to be provided to Twitter in order to register – will never be publicly disclosed or publicly displayed on Twitter. As detailed below, this PII is valuable, sensitive information.

37.     Importantly, the Privacy Policies address the use and disclosure of Twitter user data, including PII, among other user privacy matters, which each user must agree to in order to establish a Twitter account. Twitter's Privacy Policy describes how Twitter uses the information it collects from users, including the PII provided when they initially register. All user data, including data provided to Twitter by a registered user, such as PII, content generated by a user, or data otherwise generated by a user in the course of their respective use of the Twitter platform is governed by the operative Privacy Policy.

38.     Twitter categorizes, and promised to limit, its use of data into the following general categories: (1) to operate, improve, and personalize services offered to users, (2) to foster safety and security, (3) to measure, analyze and improve Twitter's services, (4) to communicate with users about Twitter's services, and (5) for research purposes. (*See* 2022 Privacy Policy, §2;2021 Privacy Policy, §1 2020 Privacy Policy, §1.) Twitter also promised to limit any sharing of Plaintiffs' and Class Members' data. (*See* 2022 Privacy Policy, §3; 2021 Privacy Policy, §3; 2020 Privacy Policy, §3.) And, in each case, the permissible data use and disclosure categories are subject to further conditions allowing for such disclosure or use, including based on the particular type of user data subject to the provisions. These operative sections of the Privacy Policies also impose limitations on the use and disclosure of all user data – the permissible use and disclosure of the specific, sensitive PII category of user data at issue in this Action is even more limited. For example, Twitter promises to only use or disclose user email addresses or telephone numbers for even more limited purposes. (*See* 2022 Privacy Policy, §2.2; 2021 Privacy Policy, §1.3; 2022 Privacy Policy, §2.1.)

39.     At no point does Twitter disclose in the Privacy Policies, or elsewhere in the User Agreements, that it may elect to leave dangerous data security vulnerabilities unaddressed and thus allow internal or external cybercriminals to scrape sensitive user PII from Twitter, or that the categories of user PII disclosed in the Data Breach may be made available through its API or may

be publicly disclosed.  Nor do the User Agreements otherwise provide for any other exception to the scope of permitted use and disclosure of user data, and related conditions, as specifically provided therein.

      **C.**      **Twitter Offers Users a Unique Opportunity to Engage Anonymously**

      40.      As a key component of Twitter's brand identity as a "free and safe space to talk," Twitter prominently offers its users the opportunity to use and engage anonymously on its platform and, in turn, the ability to disseminate and access information without being identified.

      41.      As noted above, in order to create a Twitter account, an individual must create a username and display name.  Users who wish to operate anonymously on Twitter may do so by creating a unique pseudonym(s) for the username and display name associated with their Twitter account.  As such, the selected pseudonym associated with the information the user posts and accesses on Twitter will not reveal the true identity of the user.

      42.      The ability to operate anonymously on Twitter is unique among the prominent social media platforms.  Facebook, by way of example, enforces what is referred to as a "real-name policy," requiring users to use their real names on the platform.  Twitter's lack of a real-name policy uniquely positions Twitter to serve prospective social media users that, for myriad reasons, wish to engage anonymously.

      43.      As such, Twitter users may use a pseudonym in order to express themselves and their opinions freely and anonymously, and without fear of embarrassment, retaliation, or other repercussions from employers, family, friends, colleagues, acquaintances, neighbors, or governments.  Other users may choose to engage anonymously based on more general privacy concerns.  For example, privacy advocates have criticized real-name policies as eroding online freedom by letting services tie user interests (as reflected by their online actions) to their names, thereby generating a treasure trove of information.  Twitter responds to this concern by offering its anonymous users additional privacy protection on their platform.

      44.      Many Twitter users, such as Plaintiffs Gerber and Cohen, have elected to protect their diverse collective privacy interests in the information that they share and access by operating anonymously on Twitter.  In one study, approximately 26% of Twitter accounts analyzed were

anonymous, in so far as the name of the user was not ascertainable by the username and display name associated with the account.[2]

**D.    The Data Breach**

45.    Plaintiffs, like millions of other registered Twitter users, entrusted Twitter with their PII in order to create a Twitter account.  However, despite Twitter's representations that Plaintiffs' and Class Members' PII would remain private, Twitter has allowed at least one threat actor to scrape PII from tens of millions of registered Twitter users' accounts, including Plaintiffs.

46.    Between in or around June 2021 through January 2022, a vulnerability existed in Twitter's system, specifically, its API, which allowed internal or external threat actors to access and obtain, or "scrape," Twitter user PII, including email addresses and telephone numbers, and also to link that PII to the respective Twitter usernames and display names.[3]  On at least one occasion during the existence of the API vulnerability, one or more threat actors took advantage of the vulnerability in order to scrape a massive trove of PII associated with (reportedly) over 200 million Twitter users, including Plaintiffs and the Class.  The user PII extracted includes: usernames, display names, email addresses, phone numbers, follower counts, and account creation data.  This data was in turn offered for sale and/or leaked via platforms on the dark web in a series of incidents which occurred in or around July 2022, August 2022, November 2022, December 2022, and January 2023.[4]  This series of occurrences pursuant to which PII associated with Plaintiffs and the Class was compromised and leaked is referred to herein collectively as the "Data Breach."

---

[2]    Sai Teja Peddinti, et al., User Anonymity on Twitter, 15 IEEE SEC. & PRIVACY 84 (2017) https://ssl.engineering.nyu.edu/papers/peddinti_ieeemag_2017.pdf.

[3]    "Threat actor" is a term generally used to describe a person or organization that acts intentionally to cause harm in the cyber or digital realm by, for example, exploiting vulnerabilities in hardware, software, or network to cause disruptions or misappropriate data.

[4]    The dark web refers to a part of the internet that is only accessible by way of specialized software or other access.  A person's online activity on the dark web may remain anonymous.  The dark web is used by a range of criminal actors to facilitate illegal activity, including, as is the case here, threat actors marketing and selling improperly obtained PII.

47.     Alon Gal, co-founder of Israeli cybersecurity-monitoring firm Hudson Rock, wrote on LinkedIn that the Data Breach is "one of the most significant leaks I've seen"[5]  He further stated that the breach "will unfortunately lead to a lot of hacking, targeted phishing and doxing,"[6]

48.     The PII belonging to Plaintiffs and Class Members that has been compromised as a result of the Data Breach is highly sensitive and valuable and, in the hands of cybercriminals, can be readily weaponized to extract exponential value from that information, including by way myriad commonplace identity theft and related hacking techniques, and, in turn, cause serious harm to Plaintiffs and the Class.

49.     In addition, it is particularly problematic to leak users' Twitter usernames in combination with email addresses and/or phone numbers as here, because that combination gives the person interpreting (or, more aptly, the cybercriminal abusing) the data the ability to link an otherwise anonymous username on Twitter with that particular user's generally not anonymized email address and/or phone number.  It is further problematic that such data was disclosed for Plaintiffs Gerber and Cohen who used anonymous Twitter usernames and display names which were compromised in this incident in combination with their non-anonymous email address (which contains elements of their actual names).  As a result, anyone who comes into possession of the information compromised by the Data Breach can relatively simply connect a respective user with their heretofore anonymous Twitter account and related activity.  As such, the Data Breach has caused the further harmful effect of deanonymizing Twitter users (like Plaintiffs Gerber and Cohen and millions of members of the putative Class) who had wished to stay anonymous while using Twitter.

---

[5]     Raphael Satter, Twitter hacked, 200 million user email addresses leaked, researcher says, Reuters (Jan. 5, 2023, 8:52 PM), https://www.reuters.com/technology/twitter-hacked-200-million-user-email-addresses-leaked-researcher-says-2023-01-05/.

[6]     *Id.*

50.     In order to understand the significance of the Data Breach, the inadequacy of Twitter's response, and the gravity of Twitter's failure to prevent the Data Breach, it is critical to understand the value of PII and the lasting effects of its disclosure on affected consumers.

51.     "Personal Data is currency in the Information Age and is being traded to the tune of billions of dollars globally – and increasing each year as the more personal data is analysed, categorised and linked."[7]   PII carries immense value to not only companies and social media platforms, but also to cybercriminals who seek to steal and use PII for a variety of reasons including blackmail, identity theft, extortion, phishing attacks, distribution of malware, and sale to other cybercriminals on the dark web.[8]

52.     PII has considerable value and constitutes an enticing and well-known target to hackers.  Hackers easily can sell stolen data as there has been "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[9]

53.     Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.  According to the U.S. Government Accountability Office, which conducted a study regarding data breaches, "in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years.  As a result, studies that

---

[7]     The Value of Personal and Private Data, Digital Control Room, https://www.digitalcontrolroom.com/the-value-of-personal-and-private-data/ (last visited Jan. 3, 2023).

[8]   How Much is Your Data Worth? The Complete Breakdown for 2021, Invisibly (Jul. 13, 2021), https://www.invisibly.com/learn-blog/how-much-is-data-worth/; Ravi Sen, *Here's How Much Your Personal Information is Worth to Cybercriminals – and What They Do With It*, PBS (May 14,2021), Here's how much your personal information is worth to cybercriminals – and what they do with it | PBS NewsHour.

[9]   Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[10]

54.     Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft.  Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing.  In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

55.     As Wired has explained, specifically with respect to Twitter:

"[A] breach of Twitter could expose the company or users in myriad ways.  Of particular concern would be an incident that endangers users who are activists, dissidents, or journalists under a repressive regime.  With more than 230 million users, a Twitter breach would also have far-reaching potential consequences for identity theft, harassment, and other harm to users around the world.  And from a government intelligence perspective, the data has already proved valuable enough over the years to motivate government spies to infiltrate the company [. . . .]"[11]

56.     Specifically, an email address (alone) has exponential harmful and valuable uses in the hands of cybercriminals who can readily gain access to the email account through various techniques once the email address is in hand.  And, once that access is obtained, cybercriminals can use it to steal the account holder's identity and access their financial accounts, among other things.  Likewise, a personal phone number is valuable in the hands of threat actors and may be used in numerous harmful ways to extract additional value.  For example, a phone number can be readily used to link its holder to additional personal data, including their name, address, and family members, which information can, in turn be used for blackmail, stalking, doxing, social media hacking, or identity theft.

---

[10]     U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited Dec. 29, 2022).

[11]     Lily Hay Newman, *Here's How Bad a Twitter Mega-Breach Would Be*, Wired (Nov. 17, 2022), https://www.wired.com/story/twitter-mega-breach-what-if/.

57.    The ramifications of Twitter's failure to keep Plaintiffs' and Class Members' PII secure are long lasting and severe.  Once PII is stolen, cybercriminals can make the information publicly available on the internet and often trade stolen PII on the cyber black-market for years following a breach.  As such, fraudulent use of stolen personal information and damage to victims can continue for years.

58.    Twitter, however, has failed entirely to timely or adequately respond to the Data Breach, reflecting a dangerous continuation of its well-documented pattern of disregard for user data privacy and security.  Meanwhile, PII belonging to victims of the API exploitation is being disseminated and sold on the dark web by cybercriminals.

59.    An example of a dark web posting to access the sale of the Twitter user data exposed in connection with the Data Breach and the related data set is seen as follows, with appropriate redactions to identifying information:



60. Not surprisingly, the Data Breach received significant media attention, given the volume and sensitivity of the PII at issue. For example, among many others:

    A. BLEEPING COMPUTER: "Since July 22nd, 2022, threat actors and data breach collectors have been selling and circulating large data sets of scraped Twitter user profiles containing both private (phone numbers and email addresses) and public data on various online hacker forums and cybercrime marketplaces. These data sets were created in 2021 by exploiting a Twitter API vulnerability that allowed users to input email address and phone numbers to confirm whether they were associated with a Twitter ID. The threat actors then used another API to scrape the public Twitter data for the ID and combined this public data with private email addresses/phone number… [t]hough Twitter fixed this flaw in January 2022, multiple threat actors have recently begun to leak the data they collected over a year ago for free."[12]

    B. CNN: "Email addresses linked to more than 200 million Twitter profiles are currently circulating on underground hacker forums, security experts say. The apparent data leak could expose the real-life identities of anonymous Twitter users and make it easier for criminals to hijack Twitter accounts, the experts warned, or even victims' accounts on websites. The trove of leaked records also includes Twitter users' names, account handles, follower numbers and the dates the accounts were created… Bad actors have won the jackpot… previously private data such as emails, handles, and creation date can be leveraged to build smarter and more sophisticated hacking, phishing, and disinformation campaigns."[13]

---

[12]     Lawrence Abrams, *200 million Twitter users' email addresses allegedly leaked online*, Bleeping Computer (Jan. 4, 2023, 3:16 PM), https://www.bleepingcomputer.com/news/security/200-million-twitter-users-email-addresses-allegedly-leaked-online/.

[13]     Brian Fung, *Hackers post email addresses linked to 200 million Twitter accounts, security researchers say*, CNN (Jan. 5, 2023, 3:18 PM), https://www.cnn.com/2023/01/05/tech/twitter-data-email-addresses/index.html.

CASE NO. 4:23-cv-00186-KAW
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1

C. REUTERS: "Hackers stole the email addresses of more than 200 million Twitter users and posted on an online hacking forum… the breach []will unfortunately lead to a lot of hacking, targeting phishing and doxxing… Twitter has not commented on the report… first posted… on Dec. 24, nor responded to inquiries about the breach since that date.  It is not clear what action, if any, Twitter has taken to investigate to remediate the issue."[14]

2

3

4

D. FORBES: "Twitter essentially ignored the calls for ransom to be paid after data from hundreds of millions of users was stolen following the breach… After… Musk bought Twitter, and dumps of these started showing up for sale as hackers were looking to get paid for their efforts… [i]t appears as though someone collected a bunch of these and tried to get Musk to pay up for them…"[15]

5

6

7

E. MASHABLE:  "… the obvious worry here is that malicious actors could potentially expose the identities of people who like to post anonymously… [i]n countries that crack down hard on political dissent, for example, that could be a huge problem for online activists."[16]

8

9

10

F. LOS ANGELES TIMES:  "Although account passwords were not leaked, malicious hackers could use the email addresses to try to reset people's passwords or guess them… That's especially a risk if the accounts are not protected by two-factor authentication… People who use Twitter anonymously should have a Twitter-dedicated email address that does not disclose who they are and is solely for Twitter… In November [2022], a group of Democratic lawmakers asked federal regulators to investigate possible violations by the platform of consumer-protection laws or of its data security commitments… The FTC said at the time it is tracking recent developments at Twitter with deep concern."[17]

11

12

13

14

15

G. LAPTOP MAG:  "The anon behind Twitter's 200 million+ data dump on Breached (a hacker's forum) reached out … to tell us that Twitter [is almost

16

17

18

19

20

[14]     Raphael Satter, *Twitter hacked, 200 million user email addresses leaked, researcher says*, Reuters (Jan. 5, 2023, 8:52 PM), https://www.reuters.com/technology/twitter-hacked-200-million-user-email-addresses-leaked-researcher-says-2023-01-05/.

21

22

[15]     Peter Suciu, *Cybersecurity Experts Warn Twitter Breach Will Have Lasting Ramifications*, Forbes (Jan. 5, 2023, 3:12 PM), https://www.forbes.com/sites/petersuciu/2023/01/05/cybersecurity-experts-warn-twitter-breach-will-have-lasting-ramifications/?sh=29ceaa162032.

23

24

[16]     Alex Perry, *235 million Twitter accounts were leaked in a huge data breach*, Mashable (Jan. 6, 2023), https://mashable.com/article/twitter-data-breach-elon-musk-january-2023.

25

26

[17]     Barbara Ortutay, *Twitter leak exposes 235 million email addresses from hack*, Los Angeles Times (Jan. 6, 2023, 1:48 PM), https://www.latimes.com/business/story/2023-01-06/twitter-leak-exposes-235-million-email-addresses-from-hack.

27

28

certainly responsible for the breach] … [because] there is a link between the emails and the Twitter accounts in the data dump."[18]

**E.      Twitter Fails to Reasonably Respond to or Remediate the Data Breach and Does Not Notify Impacted Users of the Breach**

61.      Rather than exercising reasonable diligence to identify issues related to the Data Breach and timely self-report to its impacted users, the existence of the Data Breach and related PII leaks were disclosed to the public by media reports, not by Twitter.  Twitter has only made statements regarding the Data Breach in response to these reports, not on the basis of its own accord or diligence.  Twitter's statements regarding the Data Breach reflect Twitter's dangerous inability to acknowledge or appreciate their responsibility for user privacy.

62.      Following the initial PII leaks in connection with the Data Breach, which occurred in July and August of 2022, Twitter made a statement, dated August 5, 2022 (the "August Statement").  Twitter admitted that it became aware of the API vulnerability giving rise to the Data Breach in January 2022, but claimed that, at that time, Twitter "had no evidence to suggest someone had taken advantage of the vulnerability."  In that statement, Twitter professed that it only became aware "that a bad actor had taken advantage of the issue before it was addressed" after it conducted a review of leaked data in response to a July 2022 press report.

63.      Nonetheless, Twitter failed to identify and directly notify any of their users whose PII was stolen as a result of the Data Breach, including Plaintiffs.

64.      Twitter claims that it initially discovered the vulnerability when it was informed of the issue in January of 2022.  Rather than inform users immediately that this vulnerability could be exploited (*i.e.*, user data could have been mined from Twitter and could be disseminated or sold by threat actors), Twitter sat on its hands for at least the next seven months.  While Twitter failed to take action, the vulnerability was exploited by internal or external cybercriminals.  Even still, only

---

[18]      Kimberly Gedeon, *Twitter is 'almost certainly lying' about being faultless for 200M data leak – here's why*, Laptop Mag (Jan. 18, 2023), https://www.laptopmag.com/news/twitter-is-almost-certainly-lying-about-being-faultless-for-200m-data-leak-insider-tells-us-why.

after media began reporting on these leaks, did Twitter finally disclose to the public that user PII was at risk.

65.    Moreover, Twitter's August Statement recognized the specific and significant potential harm of the Data Breach to its anonymous users, stating that: "[We] are particularly mindful of people with pseudonymous accounts who can be targeted by state or other actors . . . .  If you operate a pseudonymous Twitter account, we understand the risks an incident like this can introduce and deeply regret that this happened."  Nonetheless, Twitter also failed to identify and directly notify these particularly vulnerable users, including Plaintiffs Gerber and Cohen, of the Data Breach and attendant risks to their anonymity on the platform.

66.    Twitter's only other public statement regarding the Data Breach was issued on January 11, 2023 (the "January Statement").  This statement followed a flurry of media reports regarding additional leaks connected to the Data Breach, which are reported to have included data associated with 200+ million users and occurred in November 2022, December 2022, and January 2023.  This statement was again made, not based on Twitter's own exercise of diligence, but "[i]n response to recent media reports of Twitter users' data being sold online[.]"

67.    In the January Statement, Twitter attempted to disclaim any responsibility for the latter leaks of data, stating that "there is no evidence that data recently being sold was obtained by exploiting a vulnerability of Twitter systems."  Later in the statement, Twitter's attempt to deny responsibility for the leaks connected to the Data Breach was (tellingly) more carefully worded, explaining that certain data leaks "could not be correlated with the previously reported incident, nor with any new incident [. . . .] or any data originating from an exploitation of Twitter systems."

68.    Twitter's apparent denial of any connection between the originating API vulnerability and the latter leaks of user PII is not credible.  First, the January Statement, purportedly based on a fulsome internal investigation, was issued within days of news breaking regarding the dissemination and sale on the dark web of a massive trove of Twitter users' PII, involving over 200 million Twitter users.  It strains credulity that an adequate investigation reaching the broad conclusions of the January Statement could take place in such a short span of time, given that a typical data breach investigation often requires months to ascertain the source of a particular data

breach or leak.  Moreover, the January Statement fails to offer any explanation for the origin of the breach or how the particular data set could have possibly originated from any source besides Twitter.

69.     In addition, due to the nature of the leaked data, it defies logic and common sense to suggest that Twitter's breach did not emanate from Twitter.  Twitter usernames (which are public) were compromised in tandem with user PII which was known only to Twitter in relation to the user's username.  This pairing could not have occurred without the exfiltration of data from Twitter, because there is virtually no other reasonably conceivable means by which this combination of public and non-public information – exclusively associated with Twitter users – particularly, in such a large quantity.

70.     Moreover, as detailed below, a high-ranking former Twitter employee in charge of cyber security at Twitter has publicly disclosed – including at a recent Senate Judiciary Committee hearing – a series of stunning data security failures at Twitter, which call into question Twitter's ability to make any well-informed statements (much less any denials) regarding the Data Breach.

71.     To this day, Twitter has inexplicably failed to directly notify or contact the victims of the Data Breach.  Twitter has admittedly failed to even attempt to identify the totality of users affected by the Data Breach.  Both of Twitter's statements on this matter were simply posted in the privacy center on Twitter's website, not distributed as a notification to users.  Accordingly, Twitter users, such as Plaintiffs and the Class, generally would not even know of the existence of the breach absent media reports or electing to review (or, in many cases, re-review) the privacy section of Twitter's website.

**F.      Whistleblower Testimony Establishes that Twitter Knowingly Disregarded Dangerous Inadequacies in Its Data Security Systems**

72.     Unfortunately, the Data Breach appears to merely be the latest consequence of a historic dereliction of duty at Twitter.  Twitter consistently failed to employ adequate data security infrastructure and to safeguard user privacy interests despite numerous red flags raised by its internal data security team, FTC enforcement actions, and high-profile hacking incidents, including one incident in which Twitter accounts belonging to President Barack Obama, President Joe Biden, Bill

Gates, and other prominent users were compromised and used to post tweets promoting a cryptocurrency scam.[19]

73.     Among the more recent revelations, Peiter Zatko, the former head of security for Twitter from November 2020 to January 2022, testified in September 2022 before the Senate Judiciary Committee, following his July 2022 submission of a 200-page whistleblower complaint to the Department of Justice (DOJ), the Securities and Exchange Commission (SEC), and the FTC. Zatko presented a comprehensive and disturbing picture of the data security inadequacies at Twitter.

74.     Zatko's testimony revealed a pervasive and dangerous disregard for data privacy at Twitter perpetuated by the highest levels of management and the board of directors – a culture that prioritized profits over security at any cost.  In his opening statement before the Senate Judiciary Committee, Zatko stated, in relevant part:

> "The company's cyber security failures make it vulnerable to exploitation causing real harm to real people and when an influential media company can be compromised by teenagers, thieves, and spies, and the company repeatedly creates security problems on their own, this is a big deal for all of us. [. . . .] Twitter leadership ignored its engineers because key parts of leadership lacked competency to understand the scope of the problem.  But more importantly, their executive incentives lead them to prioritize profits over security. [. . .]  I discovered two basic issues.  First, they don't know what data they have, where it lives, or where it came from and so unsurprisingly, they can't protect it.  And this leads to the second problem, which is the employees then have too much access to too much data and too many systems. You can think of it this way, it doesn't matter who has keys if you don't have any locks on the doors."[20]

75.     Other key disturbing revelations from Zatko's testimony, included:

a. During Zatko's tenure at Twitter, he repeatedly sounded alarms to Twitter's senior-most executives and board without avail.  Among other instances, Zatko's complaint alleges that, in 2021, Zatko (along with Twitter's head of privacy engineering and chief privacy officer) provided a detailed report to the board concerning a number of data privacy

---

[19]  Rishi Iyengar, *Twitter Blames "Coordinated" Attack on its Systems for Hack of Joe Biden, Barack Obama, Bill Gates, and Others*, CNN (July 16, 2022), https://www.cnn.com/2020/07/15/tech/twitter-hack-elon-musk-bill-gates/index.html.

[20]  *Data Security at Risk: Testimony from a Twitter Whistleblower*, 117th Cong., (Sep. 13, 2022) (statement of Peiter "Mudge" Zatko, Independent Security Consultant), https://www.judiciary.senate.gov/committee-activity/hearings/data-security-at-risk-testimony-from-a-twitter-whistleblower.

concerns, including a high degree of operational risk related to inappropriate employee access to data and unnecessary retention of private data.

b. Twitter has virtually no system to manage internal access to data, including user PII. Twitter does not log or know who at Twitter accesses data at Twitter or what any such Twitter employees do once inside the system.

c. During Zatko's tenure at Twitter, a severe security breach occurred – on average – every week.

d. Twitter is over a decade behind industry standards related to cybersecurity.

e. Twitter has only 20% of its vast trove of data registered and, therefore, is only capable of securing that 20% of the information. As for the other 80% of data held by Twitter, Zatko explained that Twitter does not know what the data is, why Twitter has the data, or where the data came from, but that a sampling of this data revealed it to largely be PII.

f. Twitter unnecessarily retains user data associated with terminated accounts, such that not only current but former user data is vulnerable because, once a user leaves the site, the user's data is not deleted.

g. Twitter is simply unable to internally search for or identify inappropriate access within its own systems. Namely, Twitter has a lack of centralized logging – meaning that the company does not log what is happening within its system, who tried to log in, and who is or was doing what inside the system. Zatko identified this as a critical failure of Twitter's ability to control and assess the misappropriation of data, stating that he discovered that thousands of attempts to access internal systems were occurring weekly without detection and that Twitter did not have capabilities to ascertain who was making these attempts to access internal systems and whether they were successful.

h. Despite Zatko's pleas to the Twitter executive team to push basic cyber hygiene, Twitter's executives were focused on profits, not remediating existing problems. Further, the patches and security updates recommended to Twitter executives would be a relatively low-cost way to mitigate a great deal of risk.

76. Materials provided by Zatko in conjunction with his Congressional testimony contain further damning details on Twitter's inadequate data security regime. In a redacted whistleblower complaint, originally sent to the DOJ, SEC, and the FTC, Zatko described massive vulnerabilities existing at Twitter at the time of his hiring, and a continued unwillingness at Twitter to acknowledge or address major security issues.[21] Some of these shortcomings included:

A. server vulnerabilities, with over 50% of Twitter's data servers with non-compliant kernels or operating systems;

---

[21] Whistleblower disclosure, July 6, 2022, https://techpolicy.press/wp-content/uploads/2022/08/whistleblower_disclosure.pdf (last visited April 20, 2023).

B. 30% of employees reporting they had disabled software and security updates on their work devices;

C. no mobile device management of employee phones whatsoever;

D. insufficient data center redundancy;

E. awareness of/potential complicity in foreign state actor access to sensitive Twitter data;

F. repeated stonewalling by Twitter CEO Parag Agarwal and members of the Board in acknowledging and addressing security problems; and

G. repeated misleading and false statements made by Twitter to regulators and the public regarding the state of Twitter's security apparatus.

77.     Included with the whistleblower submission was a report by Zatko given to the Twitter Board in February 2022 regarding false or incomplete information provided to Twitter's Risk Committee in the fourth quarter of 2021, which Zatko sought to correct by submission of the report to the Board.[22]  In addition to many items addressed in Zatko's written whistleblower report and Congressional testimony, Zatko's February 2022 report to the Twitter Board stated that:

Below is the accurate assessment of the state of Twitter's current security, as should have been conveyed to the O4 Risk Committee of the Board.

- Twitter is grossly negligent in several areas of information security.

- If these problems are not corrected, regulators, media, and users of the platform will be shocked when they inevitably learn about Twitter's severe lack of security basics.  They will lose confidence in Twitter and this will have real world impact to the platform and to the company.

* * *

There are 4 critical areas that have not been accurately represented to the Board:

    Out-of-date software and the lack of basic security configuration in existing software (Software and Security Versions/Configurations/Patches)

    Gross problems around access control to systems and data (Access Control)

    Lack of basic processes and compliance such as software development lifecycles, line-managers being allowed to unilaterally overrule security and privacy findings, and a prioritization of running products with known violations over compliance with regulatory requirements 4 (Processes and Compliance)

---

[22]     Issues and Objection Regarding Twitter InfoSec Information and the Q4 2021 Twitter Risk Committee, February 2022. https://techpolicy.press/wpcontent/uploads/2022/08/risk_committee_issues.pdf.

1

2

• A volume and frequency of security incidents impacting a large number of users' data that is frankly stunning (Incidents).

Zatko's testimony and related written submission to the DOJ, SEC, and FTC establish that, contemporaneous with the Data Breach, a complete and total lack of data security systems and controls existed at Twitter to prevent, detect, or adequately address the Data Breach, and that Twitter's Board and the highest levels of management were aware of these gross and dangerous inadequacies.

3

4

5

6

7

8

78.     Despite numerous opportunities, Twitter has done essentially nothing to address these serious inadequacies in its data security systems and, in turn, essentially nothing to secure its user data and prevent occurrences such as the Data Breach.

9

10

11

12

13

14

15

16

17

18

19

20

79.     Zatko is not the only former Twitter employee that has felt compelled to raise alarm bells concerning data security at Twitter.  In October 2022, a former Twitter engineer filed a complaint with the FTC supporting Zatko's complaint and further alleging that Twitter had still failed to resolve the defect in its system that led to a 2020 incident in which teenage hackers were able to Tweet as high-profile persons, including former President Barack Obama – a problem which Twitter had long ago promised was "fixed."  Reporting on this second whistleblower complaint focuses on a major security vulnerability at Twitter: the ability of any Twitter engineer to access an internal program known as "GodMode" or "privileged mode," which allows employees to access internal systems and user data, and enables them to delete or restore tweets on behalf of users without their knowledge.[23]  The whistleblower alleges that Twitter does not have the capability to record who has been using GodMode, and that it essentially relies on the honor system, with the code that allows a tweet to be deleted merely warning "THINK BEFORE YOU DO THIS."

21

22

23

24

25

80.     Most recently, on March 24, 2023, another former Twitter employee filed an arbitration demand against Twitter in which the former employee detailed his own "whistleblower report" regarding disturbing data security lapses at Twitter.  In particular, the arbitration demand alleges that, in February 2023, the then-employee "reported in a meeting [at Twitter] that he found

26

27

28

---

[23]     Joseph Menn, *Ex-Twitter engineer tells FTC security violations persist after Musk*, The Washington Post, (Jan. 24, 2023), https://techpolicy.press/wp-content/uploads/2022/08/risk_committee_issues.pdf.

clear evidence in Twitter source code that the company is not protecting user privacy.  He explained that any software can retrieve a user's phone number, and email and time of one's last log in.  Twitter enables this privacy breach by intentionally disabling the 'Authorization Decider' for the PSS Read API and the ESS Read API, which enabled any team or developer at Twitter to access the phone numbers or emails of Twitter users without being 'Allowed-Listed' by the Security team/Legal team to access this sensitive data.  In other words, today, all software engineers (even interns) at Twitter can access users' personal information whenever they want, and use it in whatever way they want. This was all done in order to cut costs."

81.     The arbitration demand further alleges that, in response to the then-employee's whistleblower report, a lead Twitter team member responded, "Who cares?  There are lots of fires already [in production]." (brackets in original).  The arbitration demand further alleges that Twitter unlawfully retaliated against this whistleblower for reporting internally regarding the foregoing severe data security lapses at Twitter.

82.     In yet another recent high-profile matter highlighting the utter lack of data security and internal controls at Twitter, a significant portion of Twitter's source code (the proprietary computer code which underpins the entire Twitter platform) was publicly leaked in March 2023 – an apparent act of unlawful revenge by a current or former Twitter employee.  Data security experts consider proprietary source code to be extremely sensitive information because, if leaked, as here, the source code could allow cybercriminals to identify and exploit latent vulnerabilities to hack and steal information, including PII, and to otherwise harm a company's competitive advantages and reputation.  As set forth in a lawsuit filed by Twitter in this District on March 24, 2023, seeking to enjoin any further publication of the leaked Twitter source code, Twitter admitted that, to date, it is unable to identify the person within its own organization that accessed, misappropriated, and leaked its most valuable intellectual property.  This recent incident further underscores the concerns raised by former employee whistleblowers concerning virtually unfettered internal access of Twitter employees to sensitive data.

**G.      Twitter Has Violated and Continues to Violate Section 5(a) of the FTC Act**

83.      Twitter's persistent failures to adequately protect its users' privacy interests (despite repeated warnings) are further demonstrated by its history of failing to comply with the FTC Act, including with respect to the Data Breach.

84.      Twitter is prohibited by the FTC Act, 15 U.S.C. §45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce."  The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

85.      The FTC has promulgated numerous cybersecurity guides for businesses, like Twitter, regarding what is required for compliance.  These guidelines require the protection of personal customer information, proper disposition of personal information that is no longer needed, encryption of information stored on networks, understanding of network vulnerabilities, and implementation of policies to correct security problems.  The FTC further recommends that companies maintain PII for no longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

86.      Twitter's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII, including the malfeasance testified to by Zatko and Twitter's negligence resulting in the Data Breach, constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

87.      Given that Twitter has been the subject of two prior FTC enforcement actions, directly addressed to these matters, Twitter was well aware of its obligations under the FTC Act.

88.      In 2010, the FTC filed a complaint against Twitter for violation of Section 5 of the FTC Act, alleging that Twitter mishandled private user information and failed to maintain internal controls, including with respect to employee access to information.  This complaint was resolved by an Agreement Containing Consent Order, finalized in March of 2011 (the "Consent Order"), in which Twitter vowed to clean up its act, including by creating and maintaining a comprehensive

information security program.  The Consent Order prohibits Twitter from using "any telephone number or email address obtained from a [u]ser before the effective date of this Order for the purpose of enabling an account security feature."  While the Consent Order did not prohibit Twitter from doing so in the future, it requires Twitter to first comply with specified notice, disclosure, and consent requirements.  The Consent Order further prohibits Twitter from misrepresenting "the extent to which [Twitter] maintains and protects the security, privacy, confidentiality, or integrity of any nonpublic consumer information, including, but not limited to, misrepresentations related to its security measures to: (a) prevent unauthorized access to nonpublic consumer information; or (b) honor the privacy choices exercised by users."

89.     In the years following, Twitter has continued to misrepresent the security and privacy of its users' data in violation of the Consent Order and Section 5(a) of the FTC Act.  Most recently, in May 2022, the FTC fined Twitter $150 million for violating the Consent Order.  The FTC alleged that, "while Twitter represented to users that it collected their telephone numbers and email addresses to secure their accounts, Twitter failed to disclose that it also used user contact information to aid advertisers in reaching their preferred audiences."

90.     The Data Breach is merely the latest culmination of Twitter's failure to observe its obligations under the FTC Act and the 2011 Consent Order.

**H.  Twitter Has Breached Its Duty to Safeguard User PII Resulting in Existing and Continuing Harm to Plaintiffs and Class Members**

91.     Twitter has an affirmative duty to protect the privacy interests of its users by securing their data, including user PII.  This duty requires Twitter to exercise a reasonable degree of care to ensure that the PII entrusted to Twitter by its users are protected by adequate security measures, including as specifically required by the FTC.

92.     As one of the largest social media companies in the world, Twitter is certainly aware of its duties and what measures are required in order to meet its obligations to ensure user privacy. Twitter also knows that user PII, and the vast trove of user PII specifically held by Twitter is a prime target for internal and external cybercriminals.  Nevertheless, as detailed above, Twitter acquiesced

to, knew of, or consciously ignored critical deficiencies in its data privacy infrastructure allowing for the Data Breach to occur.

93.    The unaddressed glaring vulnerabilities giving rise to the Data Breach and Twitter's response to the Data Breach, as detailed above, demonstrate a dangerous and extreme departure from the applicable (or, for that matter, any) standard of care, particularly for a social media and technology company of Twitter's size, sophistication, and cultural import.  The Data Breach is the direct and natural consequence of inadequacies in Twitter's data security infrastructure of which Twitter was aware of and consciously determined to ignore, going so far as to oust its head of security rather than heed his warnings and implement industry standard data security measures.

94.    Twitter prioritized profits over security, ignored the red flags raised by Twitter security staff, and disregarded the FTC Consent Order.  Twitter created the conditions ripe for a significant security incident leading to the Data Breach and privacy injury suffered by many millions of Twitter users.

95.    All the while, Twitter has realized billions of dollars in profits from its users and the data that they generate while using the Twitter platform.  Twitter has wrongfully declined to use even a small portion of those substantial revenues that would be required to adequately protect its users' privacy interests.

96.    Twitter knew that prioritizing profits over security would cause precisely the nature of harm as has been inflicted on Plaintiffs and Class Members as a result of the Data Breach.  The numerous warnings from Twitter security staff, occurrence of prior security breaches, and the FTC Consent Order collectively show that Twitter was on notice of the grave flaws within its systems that gave rise to the Data Breach and that it was foreseeable to Twitter that these unresolved deficiencies in its systems could and would foreseeably cause user PII to become compromised.  Moreover, given the serious security issues arising from Twitter's lack of internal controls, as detailed by Zatko, and Twitter's failure to provide any substantive explanation for the Data Breach, it is difficult to determine at this point whether the Data Breach was caused by internal or external threat actors.  Indeed, as detailed above, there has been at least one recent incident in which a current

or former Twitter employee is believed to have intentionally orchestrated a significant data security breach at Twitter.

97.   All Plaintiffs and Class Members provided their PII in order to become Twitter users. In each case, this PII was provided to Twitter on the strength of Twitter's promise (and with the users' expectation) that this PII would remain private, and that Twitter would protect and secure the privacy of such information, including as specified by the User Agreement.  As a result of the Data Breach, this PII, including user email addresses and phone numbers has been publicly disclosed and released on the dark web.

98.   The harm caused to Plaintiffs and Class Members is the direct result of Twitter's breaches of duty and the User Agreement.  In addition, Twitter's actions with respect to the Data Breach violate Twitter's contractual obligations under the Terms of Service, Section 5 of the FTC Act, and the 2011 FTC Consent Order.

99.   As a result of Twitter's wrongdoing, Plaintiffs and Class members have suffered significant harm, and have suffered and will continue to suffer injuries, including: potential phishing attacks and other types of targeted, email-centric privacy intrusions; being subjected to unwanted robocalls and texts and other types of targeted, phone-centric privacy intrusions; diminution of value of PII as a result of it being disseminated and available for sale on the dark web; loss of time and productivity through efforts to ameliorate, mitigate, and deal with the existing and future consequences of the Data Breach; out-of-pocket expenses to monitor, identify, and address potential identity theft; substantial risk of future identity theft; and, significant concern, anxiety, and unease arising from the public dissemination of sensitive private information.  Furthermore, Twitter has unjustly retained the significant benefit and value of user data without incurring the reasonable costs of data security to protect it.  Among the most immediate of these injuries is the diminished value of Plaintiffs' and Class Members' PII as a result of the Data Breach.

100.   The ramifications of Twitter's failure to keep PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years because, once PII is exposed, there is virtually no way to ensure that the information has been fully recovered or protected from future misuse.  Namely, Plaintiffs and Class Members are at a

substantially increased risk of suffering identity theft and fraud or misuse of their PII as a result of the Data Breach.  A recent study found that 28% of consumers affected by a data breach become victims of identity fraud.  This is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud.  Without a data breach, the likelihood of identify fraud is only about 3%.[24]  Besides the monetary damage sustained in the event of identity theft, Plaintiffs and Class Members may have to spend hours trying to resolve identity theft issues. The FTC estimates that it takes consumers an average of 200 hours of work over approximately six months to recover from identity theft.[25]

101.    Plaintiffs and Class Members are also at a continued risk because their information remains in Twitter's systems, which have already been shown to be vulnerable, particularly in light of Twitter's documented unwillingness to address significant data security issues when they are raised internally.  User PII held by Twitter will remain susceptible to compromise and attack so long as Twitter fails to undertake the necessary and appropriate measures to address the dangerous inadequacies of its data security infrastructure.

102.    Plaintiffs and Class Members now face years of constant surveillance of their personal records, monitoring, and loss of rights.  For this reason, Plaintiffs and Class Members may need to maintain heightened credit and identity theft monitoring measures for years, and possibly their entire lives as a result of Twitter's malfeasance (in addition to damages that may be incurred from any specific fraudulent use of their PII in the future).  The Class is incurring and will continue to incur such damages in the form of, among other things, lost time and expenses related to mitigating the harms caused by the Data Breach, increased risk of harm, diminished value of their PII, loss of privacy, and/or additional damages as described herein.

---

[24]    Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited Jan. 3, 2023).

[25]    Katheryn Parkman, *How to Report Identity Theft*, ConsumerAffairs (Feb. 17, 2022), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html.

103.    It is always dangerous as a general matter for PII such as personal email addresses and phone numbers to appear on the dark web with respect to how that information may be used – Plaintiffs and Class Members are now at imminent risk of serious and crippling identity theft, among other injuries that Plaintiffs and Class Members have incurred and will continue to incur.

104.    In addition, given that Twitter's API exploitation allows cybercriminals to link the Twitter persona of a respective user to their PII, this intrusive privacy violation is all the more dangerous under these unique circumstances.  Here, Plaintiffs Gerber and Cohen each used their email addresses, which contain components of their full names, to create an anonymous Twitter username in order to protect their privacy interests by operating anonymously on the Twitter platform.  As a result of the Data Breach, Plaintiffs Gerber and Cohen, and tens of millions of other Twitter users who accepted Twitter's invitation to operate anonymously on Twitter, have been de-anonymized on the dark web, resulting in the potential public disclosure of their activity on Twitter, which they at all times intended to be anonymous and protected by Twitter from public disclosure. As such, in addition to the other injuries applicable to all Twitter users whose PII was compromised in the Data Breach, these persons also face the constant and relentless concern that numerous viewpoints and personal information shared anonymously (in some cases regarding a user's most intimate views and matters) over the course of years will now be publicly linked with their actual identity.

105.    Twitter has made billions of dollars off its users, like Plaintiffs and the Class.  Twitter could have used some small portion to protect their privacy, but it made an informed decision – time and time again – to disregard consumer privacy for its own financial gain.  The consequences for Plaintiffs and the Class are serious harm that may continue in perpetuity.

## CALIFORNIA LAW APPLIES TO THE CLASS

106.    California substantive laws apply to every member of the Class.  California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process and the Full Faith and Credit Clauses of the U.S. Constitution.  California has significant contacts, or significant aggregation of contacts, to the claims asserted by Plaintiffs and

the Class Members, thereby creating state interests to ensure that the choice of California state law is not arbitrary or unfair.

107.     Twitter maintains its principal place of business in California.  Additionally, Twitter conducts substantial business in California, such that California has an interest in regulating Twitter's conduct under its laws.  In addition, Twitter selected the laws of the State of California to apply to any dispute that may arise between Twitter and its users, such as Plaintiffs and the Class Members, as provided by the User Agreements entered into by the parties.  (*See* Terms of Service, §6 ["The laws of the State of California, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and Twitter."].)  Twitter's California residence, Twitter's choice to avail itself of the laws of California in the operation of its business, and the User Agreements' choice of law provision render the application of California law to the claims asserted in this Action constitutionally permissible.

108.     The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the Class, and California has a greater interest in applying its laws here, given Defendant's location and the location of the conduct at issue, than any other interest state.

## CLASS ALLEGATIONS

109.     Plaintiffs bring this nationwide class action pursuant to Rule 23(b) and 23(c) of the Federal Rules of Civil Procedure, on behalf of themselves and on behalf of all members of the following class ("Class"):

> **Nationwide Class.**  All individuals in the United States whose PII was compromised in connection with the Data Breach (the "Class" or "Class Members").

110.     Excluded from the Class are the following individuals and/or entities:  Twitter and its parent(s), subsidiaries, affiliate(s), officers and directors, and any person or entity which has a controlling interest in Twitter, or in any entity in which Twitter has a controlling interest; and any judicial officers assigned to this Action; and each of their respective legal representatives, heirs, successors, or assigns.

111.   Plaintiffs reserve the right to modify or amend the definition of the proposed Class prior to the Court's determination regarding whether class certification is appropriate.

112.   **Numerosity.**  The Class is so numerous that joinder of all members is impracticable. Twitter collected the PII of tens of millions of users upon sign up, and that information was compromised by the Data Breach as described herein.  Determining membership in the Class can be easily determined via Twitter's records.

113.   **Commonality.**  The Class has questions of law and fact that exist which are common among Class members; and these questions of law and fact predominate over any questions affecting only individual Class members.  These questions include:

a.   Whether Twitter violated the User Agreements as a result of the Data Breach;

b.   Whether Twitter owed a duty to the Class to protect PII;

c.   Whether Twitter breached that duty;

d.   Whether Twitter was negligent;

e.   Whether Twitter was negligent per se;

f.   Whether Twitter was grossly negligent;

g.   Whether Twitter violated Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. 45(a);

h.   Whether Twitter violated the 2011 FTC Consent Order;

i.   Whether Twitter was unjustly enriched;

j.   Whether Twitter breached its contracts with the Class;

k.   Whether Twitter violated California's unfair competition statute;

l.   Whether Twitter violated California's Consumers Legal Remedies Act;

m.   Whether Plaintiffs and other Class Members are entitled to relief under the Declaratory Judgment Act;

n.   Whether Twitter caused Plaintiffs' and Class Members' injuries; and

o.   Whether Plaintiffs and the other Class Members are entitled to damages, including restitution, monetary, equitable, injunctive, and other appropriate relief.

114.   **Typicality.**  Plaintiffs' claims are typical of those of the other Class Members, all of whom suffered from the Data Breach's exposure of their PII as alleged herein.

115.   **Adequacy.**  Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs' counsel is competent and is experienced in litigating complex class actions nationwide, including data breach and privacy-related class action litigations.  Plaintiffs intend to prosecute this action vigorously; and Plaintiffs' counsel has adequate financial means to vigorously pursue this action to ensure the interests of the Class will not be harmed.

116.   **Superiority and Manageability:**  Under Rule 23(b), a class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable.  Individual damages for any individual Class Members are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Twitter's misconduct would go unpunished and unrectified.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.  Certifying the case as a Class will centralize these substantially identical claims in a single proceeding, which is the most manageable litigation method available to Plaintiffs and the Class and will conserve the resources of the parties and the court system, while protecting the rights of each member of the Class.  There will be no difficulty in the management of this action as a class action.

117.   Class certification is also appropriate under Rules 23(a) and (b) because Twitter has acted or refused to act on grounds generally applicable to the Class, so that final monetary and/or injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

<u>**CAUSES OF ACTION**</u>

<u>**COUNT I**</u>
**Breach of Contract – User Agreements**
**(On Behalf of Plaintiffs and the Class)**

118.   Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth and incorporated herein.

119.    Upon registering as a Twitter user, each of Plaintiffs and the Class Members entered into a binding contract with Twitter, in the form of the then-effective Twitter User Agreement, including the Terms of Service, Privacy Policies.

120.    Each User Agreement in effect during a period in which Plaintiffs or Class Members used or accessed the Twitter platform as registered Twitter Users is a binding contract between Twitter and each such Plaintiff or Class Member for the effective period of the operative User Agreement.

121.    Plaintiffs and Class Members performed all obligations under the User Agreements by using and accessing the Twitter platform in compliance with the terms of the User Agreement and all applicable laws, rules and regulations.  (*See* 2022 Terms of Service, §4.)  Plaintiffs and Class Members also performed their obligation under the User Agreement to provide Twitter with the information, including PII, that Twitter requires to establish a user account.  (*See* 2022 Privacy Policy, §1.1.).

122.    Pursuant to the User Agreement, Twitter agreed to limit use of Plaintiffs' and Class Members' data, to the purposes specified by the Privacy Policy, as further limited by the terms and conditions of each such category.  (*See* 2022 Privacy Policy, §2 [identifying the five ways in which Twitter uses the information provided to it by users, as follows: to "Operate, improve, and personalize our service"; to "Foster safety and security"; to "Measure, analyze and make our services better"; to "Communicate with you about our services"; and for "Research"]; 2021 Privacy Policy, §1 [identifying the ways in which Twitter uses the information provided to it by users, as follows: to "operate our service"; to "send you information about our service"; to "personalize our service"; and "to protect the safety and integrity of our platform."]; 2020 Privacy Policy, §1 [identifying the ways in which Twitter uses the information provided to it by users, as follows: to "operate our service"; to "send you information about our service"; to "personalize our service"; and to "to protect the safety and integrity of our platform."].).

123.    Pursuant to the User Agreement, Twitter also agreed to limit any sharing of Plaintiffs' and Class Members' data, to the categories specified by the Privacy Policy, as further limited by the terms and conditions of each such category.  (*See* 2022 Privacy Policy, §3 [specifying

how, when, and to which third-parties that user data may be shared to:  content that that is shared "When you Tweet, post, and share"; data that is shared by Twitter "with service providers" that "perform functions and provide services" on behalf of Twitter; data that may be shared  in connection with "Third-party content & integrations[,]" such as when a user authorizes "a third-party web client or application"; data that is accessed by third-party developers through Twitter APIs in accordance with Twitter's standard developer agreement and in accordance with its related compliance program; data or information that Twitter may be compelled to share "[w]hen required by law," or otherwise "to prevent harm, or in the public interest"; data that is shared with Twitter's affiliates, specifically in order "to provide our products and services"; and data and information held by Twitter that will necessarily be disclosed "[a]s a result of a change in ownership" of Twitter, as "in connection with a merger, acquisition, reorganization, sale of assets, or bankruptcy"]; 2021 Privacy Policy, §3 [specifying how, when, and to which third-parties that user data may be shared: content that is shared "your personal data with your consent or at your discretion, such as when you authorize a third-party web client"; and that "private personal data" is shared "with service providers" that help Twitter "operate our services"; data or information that Twitter may be compelled to share data when it is "necessary to comply with a law" or "protect the safety or integrity of our platform"; data and information held by Twitter that will necessarily be disclosed as a result of "[c]hange in [o]wnership of Twitter[,]" as in connection with "a bankruptcy, merger, acquisition, reorganization, or sale of assets"; and data that is "non-personal data" such as "demographics" and "engage[ment]" with Tweets"]; 2020 Privacy Policy, §3 [specifying how, when, and to which third-parties that user data may be shared: content that is shared "your personal data with your consent or at your discretion, such as when you authorize a third-party web client"; and that "private personal data" is shared "with service providers" that help Twitter "operate our services"; data or information that Twitter may be compelled to share data when it is "necessary to comply with a law" or "protect the safety or integrity of our platform"; data and information held by Twitter that will necessarily be disclosed as a result of "[c]hange in [o]wnership" of Twitter[,]" as in connection with "a bankruptcy, merger, acquisition, reorganization, or sale of assets"; and data that is "non-personal data" such as "demographics" and "engage[ment]" with Tweets"].).

124.   Twitter also promised Plaintiffs and Class Members that their email addresses and phone numbers, specifically, would only be used for certain purposes.  (*See* 2022 Privacy Policy, §2.2 ["We use information we collect to provide for the safety and security of our users, our products, services, and your account.  This includes verifying your identity, authenticating your account, and defending against fraud, unauthorized use, and illegal activity.  We also use the information to evaluate and affect the safety and quality of content on Twitter."]; 2021 Privacy Policy, §1.3 ["We use your contact information, such as your email address or phone number, to authenticate your account and keep it – and our services – secure, and to help prevent spam, fraud, and abuse.  Subject to your settings, we also use contact information to enable certain account features (for example, for login verification), to send you information about our services, and to personalize our services, including ads.  [. . .]  Twitter also uses your contact information to market to you as your country's laws allow, and to help others find your account if your settings permit, including through third party services and client applications."]; 2020 Privacy Policy, §1.3 [similar].  *See also* 2022 Privacy Policy, §2.1 ["We use your contact information to help others find your account if your settings permit, including through third-party services and client applications."].).

125.   Twitter further promised Plaintiffs and Class Members that they could otherwise control access to their data security through their personalized privacy and account settings.  (*See* 2022 Privacy Policy, §5 ["Take Control" – "Access it, delete it, or change your settings. Basically, you're the boss."]; *see also*, id., §§ 3, 3.1; 2021 Privacy Policy, §4 ["You control the personal data you share with us.  You can access or rectify this data at any time.  You can also deactivate your account.  We also provide you with the tools to object, restrict, or withdraw consent where applicable for the use of data you have provided to Twitter."]; *see also*, id., §§1.6, 2.10; 2020 Privacy Policy, §4 ["You control the personal data you share with us. You can access or rectify this data at any time. You can also deactivate your account.  We also provide you tools to object, restrict, or withdraw consent where applicable for the use of data you have provided to Twitter."]; *see also*, id., §§1.6, 2.10.).

126.   Twitter also promised Plaintiffs and Class Members that their email addresses and phone numbers, specifically, would only be used for certain purposes.  (*See* 2022 Privacy Policy, §

2.1 ["we use your contact information to help others find your account if your settings permit, including through third-party services and client operations."]; 2021 Privacy Policy, § 1.3 ["We use your contact information, such as your email address or phone number, to authenticate your account and keep it - and our services - secure, and to help prevent spam, fraud, and abuse. Subject to your settings, we also use contact information to enable certain account features (for example, for login verification), to send you information about our services, and to personalize our services, including ads. [. . .] Twitter also uses your contact information to market to you as your country's laws allow, and to help others find your account if your settings permit, including through third party services and client applications."]; 2020 Privacy Policy, §1.3 [similar]. *See also* 2022 Privacy Policy, §2.1 ["We use your contact information to help others find your account if your settings permit, including through third-party services and client applications."].).

127. But for the API vulnerability caused, and allowed to persist, by Twitter, the Data Breach would not have occurred.

128. The Data Breach caused by Twitter disclosed PII provided to Twitter by Plaintiffs and Class Members. The use and disclosure of Plaintiffs' and Class Members' PII resulting from the Data Breach violated the User Agreements, because the resulting disclosure on the dark web and related uses or potential uses are not within any of the use or disclosure categories permitted by the User Agreement and were not otherwise authorized or consented to by Plaintiffs or Class Members by such users' privacy settings or otherwise.

129. Twitter accordingly breached the User Agreement by causing the Data Breach.

130. Twitter's breach of the User Agreements is continuing, as PII associated with Plaintiffs and the Class Members continues to be used and disclosed outside the permissible uses and conditions provided by the User Agreement.

131. Twitter's breaches of the User Agreement have caused Plaintiffs and the Class Members injuries, including:

A. Theft of their PII;

B. Loss of value of their PII;

C. Loss of the opportunity of (and control over) how their PII is used;

D.     The compromise, publication, and/or theft of their PII;

E.     The deanonymizing of their usernames and exposure of private Twitter communications;

F.     Costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;

G.     Costs associated with purchasing credit monitoring and identity theft protection services;

H.     Lowered credit scores resulting from credit inquiries following fraudulent activities;

I.     Costs associated with the time and the loss of productivity from taking time to address and attempt to ameliorate, or mitigate, the actual and future consequences of the data breach – including finding fraudulent charges, canceling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

J.     Lost opportunity costs associated with the efforts expended and the loss of productivity addressing and attempting to mitigate the actual present and future consequences of the Data Breach;

K.     The continued risk to their PII, which remains in Twitter's possession and may be subject to further unauthorized disclosures so long as Twitter fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and Class Members;

L.     The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of cyber criminals; and

M.     Costs in terms of time, effort, and money that will (or might) be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach of the remainder of the lives of Plaintiffs and Class Members.

132.   Plaintiffs and Class Members will also foreseeably continue to suffer further injury for such time as Twitter remains in breach of the User Agreement.

133.    These injuries have caused Plaintiffs and Class Members contract damages in an amount to be determined at trial.  Alternatively, in the event that the trier of fact determines that the injuries caused by Twitter's breaches of the User Agreement have not resulted in quantifiable contract damages, Plaintiffs and the Class Members are entitled to an award of nominal damages, including as provided by Section 3360 of The Civil Code of the State of California.

134.    Plaintiffs and Class Members accordingly also seek a declaration that Twitter is in breach of the User Agreement and injunctive relief compelling Twitter to refrain or take such actions as required to ensure that Plaintiffs' and Class Members' data is only used and disclosed in accordance with the terms of the User Agreement.

## COUNT II

### Negligence
### (On Behalf of Plaintiffs and the Class)

135.    Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth and incorporated herein.

136.    Twitter owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.  More specifically, this duty included, among other things: (a) designing, maintaining, and testing Twitter's  security systems to ensure that Plaintiffs' and Class Members' PII in Twitter's possession was adequately secured and protected; (b) implemented processes that would prevent or detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts including those generated by its own security personnel or systems, regarding intrusions to its networks; and (d) maintaining data security measure consistent with industry standards.

137.    Twitter had a common law duty to prevent foreseeable harm to others.  This duty existed because Plaintiffs and Class members were the foreseeable and probable victims of the inadequate security practices on the part of Twitter, as detailed above.  By collecting and storing valuable PII that is routinely targeted by cybercriminals for unauthorized access, Twitter was obligated to act with reasonable care to protect against these foreseeable threats.  Twitter has full

knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class Members could and would suffer if the PII were wrongfully disclosed and anonymous users could and would be deanonymized.

138.    Twitter breached the duty owed to Plaintiffs and Class Members and thus was negligent.  Twitter breached its duty by, among other things, failing to (a) exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiff and Class Members; (b) detect the data breach while it was ongoing; (c) maintain security systems consistent with industry standards; and (d) adequately and timely disclose to Plaintiffs' and Class Members' the existence and scope of the data breach and that Plaintiffs' and Class Members PII in Twitter's possession had been or was reasonably believed to have been stolen or compromised.

139.    But for Twitter's wrongful and negligent breach of its duties owed to Plaintiffs and the Class Members, their PII would not have been compromised, and their once anonymous accounts would not have been deanonymized.

140.    There is a close causal connection between Twitter's failure to implement security measures to protect the PII of Plaintiffs and Class Members and the present harm, or risk of imminent harm, suffered by Plaintiffs and Class Members.  The PII of Plaintiffs and Class Members was lost and accessed as the proximate result of Twitter's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

141.    As a direct and proximate result of Twitter's negligence, Plaintiffs and Class Members have suffered and will continue to suffer forms of injury and/or harm, including but not limited to loss of privacy and other economic and non-economic losses, including:

    a.   Theft of their PII;

    b.   Loss of value of their PII;

    c.   Loss of the opportunity of (and control over) how their PII is used;

    d.   The compromise, publication, and/or theft of their PII;

    e.   The deanonymizing of their user names and exposure of private Twitter communications;

f.   Costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;

g.   Costs associated with purchasing credit monitoring and identity theft protection services;

h.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

i.   Costs associated with the time and the loss of productivity from taking time to address and attempt to ameliorate, or mitigate, the actual and future consequences of the Data Breach – including finding fraudulent charges, canceling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

j.   Lost opportunity costs associated with the efforts expended and the loss of productivity addressing and attempting to mitigate the actual present and future consequences of the Data Breach;

k.   The continued risk to their PII, which remains in Twitter's possession and may be subject to further unauthorized disclosures so long as Twitter fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and Class Members;

l.   The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of cyber criminals; and

m.   Costs in terms of time, effort, and money that will (or might) be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach of the remainder of the lives of Plaintiffs and Class Members.

142.   As a direct and proximate result of Twitter's negligence, Plaintiff and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## COUNT III

### Negligence *Per Se*
### (On Behalf of Plaintiffs and the Class)

143.    Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth and incorporated herein.

144.    As detailed above, Twitter acted negligently.

145.    Violation of applicable law in the course of conduct giving rise to a claim for negligence constitutes negligence per se.

146.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Twitter for failing to use reasonable measures to protect PII.  Various FTC publications and orders also form the basis for Twitter's duty.

147.    Twitter violated Section 5 of the FTC Act and the 2011 FTC Consent Order by failing to use data security reasonable measures to protect user privacy interests and data, including PII. Twitter's conduct was particularly unreasonable given the nature and amount of user data it obtains and stores, and the inability or unwillingness to categorize and delete the PII data as detailed above, and the foreseeable consequences of a data breach within the technology industry.

148.    Plaintiffs and Class Members are within the class of persons the FTC Act and the Consent Order are intended to protect.

149.    Moreover, the harm that has occurred is the type of harm the FTC Act and the Consent Order are intended to guard against.  Indeed, the FTC has pursued over fifty enforcement actions against businesses, including the Twitter, which, as a result of their failure to employ reasonable data and security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

150.    Twitter's violation of Section 5 of the FTC Act, accordingly, constitutes Negligence *per se*.

151.    As a direct and proximate result of Twitter's negligence, Plaintiffs and Class Members have been injured as described herein and above and are entitled to damages, including compensatory and nominal damages, in an amount to be proven at trial.

## COUNT IV

**Gross Negligence**
**(On Behalf of Plaintiffs and the Class)**

152.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding and following paragraphs.

153.    The foregoing allegations constitute negligence and negligence *per se*.

154.    Twitter's conduct also constitutes gross negligence in so far as Twitter's breach of duty constitutes an extreme departure from the ordinary standard of care, because Twitter knowingly operated without data security systems sufficient to adequately secure user PII or to detect inappropriate or unauthorized access to user PII within Twitter's systems, including despite repeated warnings to senior management from its engineers and head of data security.  In the course of breaching its duty to users to secure PII, Twitter also knowingly operated in violation of the FTC Act and the 2011 FTC Consent Order.  Taken together, the publicly available information indicates that Twitter did essentially nothing to secure Plaintiffs' and Class Members' PII.

155.    Twitter's actions in the course of breaching its duty of care to Plaintiffs and Class Members accordingly constitute an extreme departure from the ordinary standard of care and constitute gross negligence.

156.    As a direct and proximate result of Twitter's gross negligence, Plaintiffs and Class Members have been injured as described herein and above and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## COUNT V

**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

157.    Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth and incorporated herein.

158.   Plaintiffs and Class Members have an interest, both equitable and legal, in their data that was conferred upon, collected by, and is held and maintained by Twitter and was ultimately stolen in the Data Breach.

159.   Twitter accepted the benefits accompanying the conferral of Plaintiffs' and Class Members' data and its ability to retain and use this data.  Among other valuable benefits, Twitter used this data to develop, design, market, and sell their revenue generating products, including advertising and data licensing.  Twitter also uses this data to develop and maintain its social media platform and the services provided by this platform.

160.   Twitter knew and understood that it would benefit and continues to benefit by its access to and use of this data.  Twitter also knew and understood that Plaintiffs' and Class Members' PII was private, and confidential and its value depended on Twitter securely maintaining the privacy, and confidentiality of that PII.

161.   Twitter held and profited from the data at the expense and to the detriment of Plaintiffs and Class Members by failing to implement adequate safeguards to secure their PII.

162.   Twitter was repeatedly placed on notice of numerous inadequacies in its data security systems that placed user PII at risk.  Twitter was also aware of cost-effective measures to mitigate these data security risks.  Nonetheless, Twitter decided to further benefit itself financially, to Plaintiffs' and Class Members' detriment, by not incurring the costs to implement reasonable measure to secure user PII.

163.   Twitter has accordingly unjustly received and retained enormous monetary benefits from Plaintiffs and Class Members – *i.e.*, by way of Twitter's use of, and profiting from, their data under unjust circumstances and by retaining funds that it saved by shirking data-security, such that inequity has resulted.

164.   Twitter's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiffs' and Class Members' sensitive PII and failure to securely maintain that information.

165.     The benefits conferred upon, received, and enjoyed by Twitter were not conferred gratuitously, and it would be inequitable and unjust for Twitter to retain these benefits under the circumstances.

166.     Under the common law doctrine of unjust enrichment, it is inequitable and unconscionable for Twitter to be permitted to retain the benefits it received, and it is still receiving from the use of Plaintiffs' and Class Members' PII, including the funds it has retained by failing to incur the costs required to implement adequate data security measures, while Plaintiffs and Class Members must suffer the resulting harm.

167.     Plaintiffs and Class Members are therefore entitled to an award of restitution damages, in an amount to be determined at trial, consisting of the monetary benefits that have been unjustly conferred upon Twitter, and a constructive trust over any such benefits that may be unjustly conferred upon Twitter in the future.  Plaintiffs and Class Members seek this equitable relief only to the extent that they are not otherwise entitled to an adequate legal remedy.

## COUNT VI

**Violation of California Unfair Competition Law (Cal. Bus. & Prof. Code §17200, *et seq*.)**
**(On Behalf of Plaintiffs and the Class)**

168.     Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth and incorporated herein.

169.     Plaintiffs bring this claim on behalf of themselves and Class Members pursuant to the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq*., which prohibits unfair and unlawful business acts or practices.

170.     Plaintiffs are "persons" within the meaning of Cal. Bus. & Prof. Code §17201.

171.     Twitter is a "business" within the meaning of Cal. Bus. & Prof. Code §17201.

172.     Twitter engaged in both unfair and unlawful business practices in violation of the UCL by unreasonably failing to adopt data security measures adequate to protect Plaintiffs' and Class Members' PII and prevent the Data Breach, and, by the same action, violating applicable state and federal laws intended to protect consumer privacy interests.

173.     These unfair and unlawful practices occurred repeatedly in connection with Twitter's trade or business.

174.     Twitter willfully engaged in these unfair and unlawful acts and practices and knew or should have known that these acts and practices were unfair and unlawful in violation of the UCL.

***Twitter's Unfair Business Acts and Practices***

175.     Under the UCL, any business act or practice that is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers or violates a legislatively declared policy constitutes an unfair business act or practice.

176.     Twitter's affirmative acts in adopting and maintaining grossly inadequate data security measures are unfair within the meaning of the UCL because they constituted immoral, unethical, oppressive, and unscrupulous activity, caused substantial injury to consumers and businesses, and did not benefit consumers or competition.

177.     These affirmative acts were also unfair within the meaning of the UCL because this conduct undermined California public policy that businesses protect personal and financial information as reflected in Article I, Section 1 of the California Constitution, which states that all persons have an inalienable right to privacy and was enacted to protect consumers from violations of these rights by private sector data processing activity, and other California statutes.  *See* Online Privacy Protection Act, Cal. Bus. & Prof. Code §22578 (explaining that the Legislature intended to have a uniform policy statewide regarding privacy policies on the internet); the Information Practices Act, Cal. Civ. Code §1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); and Cal. Civ. Code §1798.81.5(a)(1) ("It is the intent of the Legislature to ensure that personal information about California residents is protected.").

178.     Twitter also engaged in unfair competition by affirmatively misrepresenting the adequacy of its data security measures, the disclosures and uses that Plaintiffs' and Class Members' PII would be subject to, and omitting material information concerning serious inadequacies (of which Twitter was aware) in its data security systems and, in turn, its ability to safeguard PII.

Plaintiffs and Class Members relied on these misrepresentations and omissions to their detriment by providing Twitter with their PII and allowing Twitter to continue to use and possess their PII by maintaining a Twitter account.

179.    Upon information and belief, Twitter also made materially misleading statements and omissions in its public statements related to the Data Breach concerning the potential risk of leaks arising from the Data Breach, and the nature, origin, and extent of the Data Breach.  Plaintiffs and Class Members detrimentally relied on these misrepresentations and omissions by failing to initiate independent action to investigate or remediate the possible impact of the Data Breach based on Twitter's inaccurate characterizations of the extent and attendant risk of the Data Breach.

### Twitter's Unlawful Business Acts and Practices

180.    The violation of any law constitutes an unlawful business practice under the UCL.

181.    As detailed above, Twitter has violated FTC Act, 15 U.S.C. §45(a)(1) and the 2011 FTC Consent Order.  These unlawful acts also provide an independent basis for Twitter's violation of the UCL.

182.    In addition, Twitter's violations of the California Customer Records Act, Cal. Civ. Code §1798.81.5(b) (the "California Customer Records Act") constitute unlawful acts or practices under the UCL.  The California Customer Records Act requires a "business that owns, licenses, or maintains personal information about a California resident" to "implement and maintain reasonable security procedures and practices appropriate to the nature of the information" and "to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." Twitter failed to implement and maintain such reasonable security procedures and practices before, at the time of, and following the Data Breach in violation of the California Customer Records Act, Cal. Civ. Code §1798.81.5(b).

183.    Additionally, Twitter violated the unlawful prong of the UCL by violating Cal. Bus. & Prof. Code §22576, which prohibits Twitter from knowingly, negligently, and materially failing to adhere to its published Privacy Policy, as specifically addressed above.

### Twitter's Business Acts and Practices Harmed Competition and Caused Injury and Losses to Plaintiffs and the Class

184.    Twitter's conduct harmed competition.  While Twitter cut corners and minimized costs, its competitors spent the time and money necessary to ensure PII was appropriately secured and safeguarded.  Further, the injuries suffered by Plaintiffs and Class Members are not outweighed by any countervailing benefits to consumers or competition.  And, because Twitter is solely responsible for securing its networks and protecting its customers' PII, there is no way Plaintiffs and Class Members could have known about Twitter's inadequate security practices or avoided the injuries they sustained.  There were reasonably available alternatives to further Twitter's legitimate business interests other than its conduct responsible for the Data Breach.

185.    Twitter's unlawful and unfair business practices have caused Plaintiffs and Class Members to suffer injury and lose money and property, including loss of the independent monetary value of their PII.  Due to the nature of Twitter's wrongdoing these injuries and losses will continue, as detailed above.  These injuries and losses are the direct and proximate result of Twitter's violations of the UCL, and Plaintiffs and the Class are entitled to equitable and such other relief as this Court considers necessary and proper.

### COUNT VII

**CALIFORNIA CONSUMERS LEGAL REMEDIES ACT,**
**Cal. Civ. Code §§1750, *et seq.*
(On Behalf of Plaintiffs and the Class)**

186.    Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth and incorporated herein.

187.    Plaintiffs bring this claim on behalf of themselves and Class Members pursuant to the California Consumers Legal Remedies Act, Cal. Civ. Code §§1750, et seq. ("CLRA").  The CLRA is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property or services to consumers primarily for personal, family, or household use.

188.    Twitter is a "person" as defined by Civil Code §§1761(c) and 1770, and has provided "services" as defined by Civil Code §§1761(b) and 1770.  Plaintiffs and the Class are "consumers" as defined by Civil Code §§1761(d) and 1770, and have engaged in a "transaction" as defined by Civil Code §§1761(e) and 1770.

189.   Twitter's acts and practices were intended to and did result in the sales of products and services to Plaintiffs and the Class Members in violation of Civil Code §1770, including:

> A.  Representing that goods or services have characteristics that they do not have;
>
> B.  Representing that goods or services are of a particular standard, quality, or grade when they were not;
>
> C.  Advertising goods or services with intent not to sell them as advertised; and
>
> D.  Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

190.   Twitter's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Twitter's data security and ability to protect the confidentiality of consumers' PII.

191.   Had Twitter disclosed to Plaintiffs and Class Members that its systems were not secure and, thus, vulnerable to attack, Twitter would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law.

192.   As a direct and proximate result of Twitter's violations of California Civil Code §1770, Plaintiffs and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII and loss on their anonymity.

193.   Pursuant to § 1782(a) of the CLRA, on April 20, 2023, Plaintiffs' counsel notified Defendant in writing by certified mail of the particular violations of §1770 of the CLRA and demanded that it rectify the problems associated with the actions detailed above and give notice to all affected consumers of Twitter's intent to act.  If Twitter fails to respond to Plaintiffs' letter or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within thirty (30) days of the date of such written notice, as proscribed by §1782, Plaintiffs will move to amend their Complaint to pursue all claims for actual, punitive and statutory

damages, as appropriate against Twitter.  As to this cause of action, at this time, Plaintiffs seek only injunctive relief.

**COUNT VIII**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Class)**

194.    Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth and incorporated herein.

195.    Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes, as described in this Complaint.

196.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' PII and whether Twitter is currently maintaining data-security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII.  Plaintiffs allege that Twitter's data-security measures remain inadequate.  Twitter denies these allegations.  Furthermore, Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

197.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

A.    Twitter owes a legal duty to secure consumers' PII and to timely notify consumers of a data breach pursuant to its common law duties, Section 5 of the FTC Act, and various state statutes; and

B.    Twitter continues to breach these legal duties by failing to employ reasonable measures to secure consumers' PII.

198.    This Court also should issue corresponding prospective injunctive relief requiring Twitter to employ adequate security protocols consistent with its duties at law and industry standards to protect consumers' PII.

199.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Twitter.  The risk of another such breach is real, immediate, and substantial.  If another breach at Twitter occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

200.    The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to Twitter if an injunction is issued.  Plaintiffs and Class Members will likely be subjected to substantial identity theft and other damage.  On the other hand, the cost to Twitter of complying with an injunction by employing reasonable prospective data-security measures is relatively minimal, and Twitter has a pre-existing legal obligation to employ such measures.

201.    Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by preventing another data breach at Twitter, thus eliminating the additional injuries that would result to Plaintiffs, Class Members, and other consumers whose confidential information would be further compromised absent the injunctive relief requested herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and all other similarly situated, pray for relief as follows:

A.    For an order certifying the Class and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B.     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

C.     For monetary damages, including punitive damages, in an amount to be determined by the trier of fact;

D.     For an order of restitution and all other forms of equitable monetary relief;

E.     Declaratory and injunctive relief as described herein;

F.     Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

G.     Awarding pre- and post-judgment interest on any amounts awarded; and,

H.     Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), a jury trial is demanded on all claims so triable.

**Dated:**  April 20, 2023

| | |
|---|---|
| **SCOTT+SCOTT ATTORNEYS AT LAW LLP** | **ISRAEL DAVID LLC** |
| By: /s/ Joseph P. Guglielmo | By: /s/ Israel David. |
| Joseph P. Guglielmo | Israel David |
| SCOTT+SCOTT ATTORNEYS AT LAW LLP | **ISRAEL DAVID LLC** |
| Joseph P. Guglielmo (pro hac vice admitted) | Israel David (*pro hac vice admitted*) |
| The Helmsley Building | Hayley Elizabeth Lowe (*pro hac forthcoming*) |
| 230 Park Avenue, 17th Floor | Blake Hunter Yagman (*pro hac vice admitted*) |
| New York, NY 10169 | Madeline Sheffield (*pro hac forthcoming*) |
| Telephone: (212) 223-6444 | 17 State Street, Suite 4010 |
| jguglielmo@scott-scott.com | New York, NY 10004 |
| | Telephone: (212) 739-0622 |
| Joseph A. Pettigrew (CA Bar No. 236933) | israel.david@davidllc.com |
| **SCOTT+SCOTT ATTORNEYS AT LAW LLP** | hayley.lowe@davidllc.com |
| 600 W. Broadway, Suite 3300 | blake.yagman@davidllc.com |
| San Diego, CA 92101 | madeline.sheffield@davidllc.com |
| Telephone: (619) 233-4565 | |
| jpettigrew@scott-scott.com | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LYNCH CARPENTER LLP**
Gary F. Lynch (*pro hac vice pending*)
Jamisen A. Etzel (*pro hac vice forthcoming*)
Nicholas A. Colella (*pro hac vice pending*)
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412.322.9243
gary@lcllp.com
jamisen@lcllp.com
nickc@lcllp.com

**WOOD LAW FIRM, LLC**
E. Kirk Wood (pro hac vice forthcoming)
P.O. Box 382434
Birmingham, AL 35238-2434
Telephone: (205) 908-4906
kirk@woodlawfirmllc.com

*Attorneys for Plaintiff Casey Weitzman*

**ZIMMERMAN REED LLP**
Jeff Westerman (CA Bar No. 94559)
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Telephone: 877-500-9780
jeff.westerman@zimmreed.com

*Attorneys for Plaintiffs Stephen Gerber
and Eric Cohen*