STEPHEN A. BROOME (Bar No. 314605)
  stephenbroome@quinnemanuel.com
VIOLA TREBICKA (Bar No. 269526)
  violatrebicka@quinnemanuel.com
NICOLAS MOLINA JR. (Bar No. 339383)
  nicolasmolina@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443 3000
Facsimile: (213) 443 3100

CASEY ADAMS (admitted *pro hac vice*)
  caseyadams@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Defendant X Corp.,*
*successor in interest to Twitter, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| STEPHEN GERBER, ERIC COHEN, and CASEY WEITZMAN, Individually and on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> TWITTER, INC and X CORP., as Successor in Interest to Twitter, Inc., <br><br> Defendants. | CASE NO. 4:23-cv-00186-KAW <br><br> **DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> [*Filed Concurrently with the Declaration of Stephen A. Broome and Request for Judicial Notice*] <br><br> **Judge:**   Hon. Kandis A. Westmore <br> **Hearing Date:** October 19, 2023 <br> **Location:** TBD <br> **Time:** 1:30 PM |

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 1:30 PM on October 19, 2023, or as soon thereafter as counsel may be heard, before the Honorable Kandis A. Westmore, located at 1301 Clay Street, Oakland, California 94612, Defendant X Corp., successor in interest to Twitter, Inc., will, and hereby does, move this Court for an order granting its Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint with prejudice, in its entirety, pursuant to Federal Rule of Civil Procedure 12(b)(6).  The motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the attached Declaration of Stephen A. Broome, the Request for Judicial Notice, the Court's files in this action, the oral argument of counsel at the hearing, and such materials and evidence as may be presented to the Court.

## RELIEF REQUESTED

Defendant requests that the Court dismiss Plaintiffs' Consolidated Amended Class Action Complaint with prejudice, in its entirety and without leave to amend, on the ground that Plaintiffs fail to state a claim upon which relief can be granted.

## STATEMENT OF THE ISSUES TO BE DECIDED

Whether Plaintiffs' Consolidated Amended Class Action Complaint should be dismissed, in its entirety and with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6) because it fails to state a claim for relief.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................... 1

II.  BACKGROUND ..................................................................................................... 2

    A.  The Twitter Platform and Twitter Accounts ............................................... 2

    B.  Twitter's Default "Discoverability" Feature ............................................... 3

    C.  Bad Actors Exploit a Bug in Twitter's API ................................................ 3

    D.  Twitter Promptly Fixes the API Bug .......................................................... 4

    E.  Plaintiffs' Bare-Boned Allegations of Damages ....................................... 4

    F.  Whistleblower Claims and the FTC Consent Order .................................. 6

III.  ARGUMENT .......................................................................................................... 6

    A.  Plaintiffs' Common Law Claims (Counts I through V) Are Barred by the ToS's Disclaimer and Limitation of Liability Clauses .............................. 6

    B.  Plaintiffs' Contract Claim (Count I) Should be Dismissed ....................... 9

        1.  Plaintiffs Fail to Identify a Breached "Promise" ........................... 9

        2.  Plaintiffs Fail to Allege the Purported Breach Caused Plaintiffs Damage .......................................................................................... 10

        3.  Plaintiffs Do Not Plead Cognizable Damages ............................... 11

    C.  Plaintiffs' Unjust Enrichment Claim (Count V) Should Be Dismissed ............... 14

    D.  Plaintiffs' Negligence Claims (Counts II through IV) Should Be Dismissed ....... 15

        1.  The Economic Loss Rule Defeats Plaintiffs' Negligence Claims ............. 15

        2.  Plaintiffs Fail to Allege Causation or Damages ........................... 16

    E.  Plaintiffs' UCL and CLRA Claims (Counts VI and VII) Should Be Dismissed ............................................................................................... 17

        1.  Plaintiffs Fail to Plead a Claim Under the UCL's "Unlawful" Prong ...... 17

        2.  Plaintiffs Fail to Plead Their UCL "Unfair" Prong and CLRA Claims with the Particularity Required by Rule 9(b) .............................. 18

        3.  Plaintiffs Fail to Plead the Required Economic Injury ............................. 20

        4.  Plaintiffs Fail to Plead a Basis for Restitution or Injunctive Relief .......... 21

5.      Plaintiffs Fail to Allege They Entered Into a "Transaction" for the
Sale or Lease of "Services" as Required Under the CLRA ...................... 22

F.      Plaintiffs' Declaratory Judgement Claim (Count VIII) Should Be Dismissed ..... 23

IV.     Conclusion.......................................................................................................... 24

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*Ace Am. Ins. Co. v. Accellion, Inc.*,
   2022 WL 2341155 (N.D. Cal. Apr. 11, 2022) ..................................................... 15

*Adkins v. Facebook*,
   2019 WL 3767455 (N.D. Cal. Aug. 9, 2019) ...................................................... 7, 9

*Anderson v. Apple Inc.*,
   500 F. Supp. 3d 993 (N.D. Cal. 2020) ............................................................... 18

*In re Anthem, Inc., Data Breach Litig.*,
   162 F. Supp. 3d 953 (N.D. Cal. 2016) ............................................................... 10

*Architectural Res. Grp. v. HKS, Inc.*,
   2013 WL 568921 (N.D. Cal. Feb. 13, 2013) ...................................................... 15

*Astiana v. Hain Celestial Grp.*,
   783 F.3d 753 (9th Cir. 2015) ............................................................................. 14

*Bass v. Facebook*,
   394 F. Supp. 3d (N.D. Cal. 2019) ......................................................... 7, 9, 12, 20

*Beecher v. Google*,
   2018 WL 4904914 (N.D. Cal. Oct. 9, 2018) ........................................................ 9

*Beluca Ventures v. Einride Aktiebolag*,
   622 F. Supp. 3d 806 (N.D. Cal. 2022) ............................................................... 14

*Bird v. Globus Med.*,
   2020 WL 5366300 (E.D. Cal. Sept. 8, 2020) ..................................................... 15

*Brodsky v. Apple*,
   445 F. Supp. 3d 110 (N.D. Cal. 2020) ............................................................... 14

*Castillo v. Seagate Tech.*,
   2016 WL 9280242 (N.D. Cal. Sept. 14, 2016)................................................... 16

*Claridge v. RockYou*,
   785 F. Supp. 2d 855 (N.D. Cal. 2011) ............................................................... 21

*Dang v. Samsung Elecs. Co.*,
   2018 WL 6308738 (N.D. Cal. Dec. 3, 2018) ..................................................... 18

*Darnaa, LLC v. Google*,
   756 F. App'x 674 (9th Cir. 2018).......................................................................... 8

*Davis v. HSBC*,
   691 F.3d 1152 (9th Cir. 2012).............................................................................. 19

*Dent v. Nat'l Football League*,
  902 F.3d 1109 (9th Cir. 2018) ........................................................................................ 15

*Dugas v. Starwood Hotels & Resorts Worldwide*,
  2016 WL 6523428 (S.D. Cal. Nov. 3, 2016) .................................................................. 16

*EM Gen. v. Elec. Commerce*,
  2021 WL 6618660 (C.D. Cal. Mar. 17, 2021) ................................................................ 10

*Estate v. Am. Brokers Conduit*,
  2017 WL 412527 (N.D. Cal. Jan. 31, 2017) ................................................................... 23

*Ewert v. eBay*,
  602 F. App'x 357 (9th Cir. 2015) ..................................................................................... 9

*Fabozzi v. StubHub*,
  2012 WL 506330 (N.D. Cal. Feb. 15, 2012) .................................................................. 20

*In re Facebook Privacy Litig.*,
  572 F. App'x 494 (9th Cir. 2014) ............................................................................... 21, 23

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020) ....................................................................................... 9, 10

*Feamster v. Gaco W.*,
  2023 WL 2134382 (N.D. Cal. Feb. 21, 2023) ................................................................ 14

*Feitelberg v. Credit Suisse First Bos.*
  134 Cal. App. 4th 997 (2005) ......................................................................................... 22

*Food Safety Net Servs. v. Eco Safe Sys.*,
  209 Cal. App. 4th 1118 (2012) ......................................................................................... 8

*Gardiner v. Walmart*,
  2021 WL 2520103 (N.D. Cal. Mar. 5, 2021) ............................................................... 7, 8

*Gonzales v. Uber Techs.*,
  305 F. Supp. 3d 1078 (N.D. Cal. 2018) .......................................................................... 21

*In re Google Assistant Priv. Litig.*,
  546 F. Supp. 3d 945 (N.D. Cal. 2021) ............................................................................ 18

*Groves v. Kaiser Found. Health Plan*,
  32 F. Supp. 3d 1074 (N.D. Cal. 2014) ............................................................................ 11

*Hadley v. Kellogg Sales.*,
  324 F. Supp. 3d 1084 (N.D. Cal. 2018) .......................................................................... 21

*Hammerling v. Google*,
  615 F. Supp. 3d 1069 (N.D. Cal. 2022) ...................................................................... 9, 19

*Hart v. TWC Prd. & Tech.*,
  526 F. Supp. 3d 592 (N.D. Cal. 2021) ............................................................................ 21

*Haskins v. Symantec*,
   654 F. App'x 338 (9th Cir. 2016) .................................................................. 18

*Holly v. Alta Newport Hosp.*,
   612 F. Supp. 3d 1017 (C.D. Cal. 2020) ....................................................... 13

*I.C. v. Zynga*,
   600 F. Supp.3d 1034 (N.D. Cal. 2022) ........................................................ 12

*In re iPhone App. Litig.*,
   2011 WL 4403964 (N.D. Cal. Sep. 20, 2011) .............................................. 21

*Ivie v. Kraft Foods*,
   2015 WL 183910 (N.D. Cal. Jan. 14, 2015) ................................................. 21

*Janda v. T-Mobile*,
   378 F. App'x 705 (9th Cir. 2010) ................................................................ 20

*Jensen v. Quality Loan Serv.*,
   702 F. Supp. 2d 1183 (N.D. Cal. 2010) ....................................................... 23

*Kearns v. Ford Motor*,
   567 F.3d 1120 (9th Cir. 2009) ..................................................................... 18

*Lee v. Luxottica Retail*,
   65 Cal. App. 5th 793 (2021) ........................................................................ 14

*Legalforce RAPC Worldwide v. Upcounsel*,
   2019 WL 160335 (N.D. Cal. Jan. 10, 2019) ................................................ 11

*Lewis v. YouTube*,
   244 Cal. App. 4th 118 (2015) ........................................................................ 8

*Low v. LinkedIn Corp.*,
   900 F. Supp. 2d 1010 (N.D. Cal. 2012*)* ................................................ 12, 13

*Madrid v. Perot Sys.*,
   130 Cal. App. 4th 440 (2005) .................................................................. 21, 22

*Markborough Cal., Inc. v. Sup. Ct.*,
   227 Cal. App. 3d 705 (1991) ......................................................................... 8

*Moore v. Apple, Inc.*,
   73 F. Supp. 3d 1191 (N.D. Cal. 2014) ......................................................... 20

*Moore v. Centrelake Medical Grp.*,
   83 Cal. App. 5th 544 (2022) ........................................................................ 16

*Murphy v. Twitter*,
   60 Cal. App. 5th 12 (2021) ......................................................................... 7, 8

*Newton v. Am. Debt Servs.*,
   75 F. Supp. 3d 1048 (N.D. Cal. 2014) ......................................................... 17

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS

*Peterson v. Cellco P'ship,*
   164 Cal. App. 4th, 1583, 1587 (2008) ................................................................ 14. 15

*Prakashpalan v. Engstrom, Lipscomb & Lack,*
   223 Cal. App. 4th 1105 (2014) ............................................................................. 17

*Reid v. Johnson & Johnson,*
   780 F.3d 952 (9th Cir. 2015) ............................................................................... 20

*Rojas-Lozano v. Google,*
   159 F. Supp. 3d 1101 (N.D. Cal. 2016) .......................................................... 20, 23

*Rothman v. Equinox Holdings,*
   2021 WL 124682 (C.D. Cal. Jan. 31, 2021) ........................................................ 19

*Ruiz v. Gap,*
   622 F. Supp. 2d 908 (N.D. Cal. 2009) ........................................................ 11, 12, 16

*Schmitt v. SN Servicing,*
   2021 WL 5279822 (N.D. Cal. Nov. 12, 2021) ..................................................... 17

*Scripps Health v. Marin,*
   72 Cal. App. 4th 324 (1999) ................................................................................. 22

*Sheen v. Wells Fargo,*
   12 Cal. 5th 905 (2022) .......................................................................................... 15

*Sion v. SunRun,*
   2017 WL 952953 (N.D. Cal. Mar. 13, 2017) ................................................. 13, 17

*Song Fi v. Google,*
   2016 WL 1298999 (N.D. Cal. Apr. 4, 2016) ....................................................... 23

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.,*
   903 F. Supp. 2d 942 (S.D. Cal. 2012) ...................................................... 18, 19, 21

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.,*
   996 F. Supp. 2d 942 ............................................................................................. 16

*Streets v. Space Sys.,*
   2021 WL 4146962 (N.D. Cal. Sep. 13, 2021) ..................................................... 22

*Sun Microsystems v. Microsoft,*
   188 F.3d 1115 (9th Cir. 1999) ............................................................................. 22

*Svenson v. Google,*
   65 F. Supp. 3d 717 (N.D. Cal. 2014) ................................................................... 12

*Ting v. AT & T,*
   319 F.3d 1126 (9th Cir. 2003) ............................................................................. 22

*In re Tobacco Cases II,*
   240 Cal. App. 4th 779 (2015) .............................................................................. 21

*Tsai v. Wang*,
    2017 WL 2587929 (N.D. Cal. June 14, 2017) .................................................. 14

*Tyson v. Nationstar Mortg.*,
    2016 WL 39903 (N.D. Cal. Jan. 4, 2016) ...................................................... 23

*Vess v. Ciba-Geigy Corp.*,
    317 F.3d 1097 (9th Cir. 2003) ...................................................................... 18

*Wesch v. Yodlee*,
    2021 WL 1399291 (N.D. Cal. Feb. 16, 2021) ............................................... 20

*Whitesides v. E*TRADE Sec.*
    2021 WL 930794 (N.D. Cal. Mar. 11, 2021) ................................................ 15

*Williams v. Apple, Inc.*,
    449 F. Supp. 3d 892 (N.D. Cal. 2020) ......................................................... 19

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) .............................................. 22

*Yunker v. Pandora Media*,
    2013 WL 1282980 (N.D. Cal. Mar. 26, 2013) .............................................. 23

*In re Zynga Privacy Litig.*,
    2011 WL 7479170 (N.D. Cal. June 15, 2011) ............................................... 21

### **Statutes**

Cal. Bus. & Prof. Code § 17535 ........................................................................... 20

Cal. Bus. & Prof. Code § 22576 ........................................................................... 18

Cal. Civ. Code § 1761(b) ...................................................................................... 23

Cal. Civ. Code § 1770(a) ...................................................................................... 22

Cal. Civ. Code § 1780(a) ...................................................................................... 20

Cal. Civ. Code § 1798.81.5 ................................................................................... 18

28 U.S.C. § 2201 ................................................................................................... 23

15 U.S.C. § 45(a) .................................................................................................. 17

### **Other Authorities**

16 C.F.R. § 1.5 ...................................................................................................... 17

Federal Rule of Civil Procedure 9 .............................................................. 2, 18, 19

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This action arises out of a 2021 bug in Twitter's API that allowed a person to input a user's email address or phone number already in the person's possession to obtain the user's Twitter user ID. Based on this event, Plaintiffs advance two core theories of liability to support their seven causes of action. They claim that the bug: (1) disclosed certain personally identifying information ("PII") in addition to their Twitter user IDs, such as their "names, email addresses, and phone numbers," AC ¶ 1; and (2) allowed threat actors to "de-anonymize" certain pseudonymous Twitter accounts[1] using the Twitter user ID by linking it to an email address or phone number the threat actors already had in their possession.

Plaintiffs' Consolidated Amended Complaint ("AC") fails to adequately allege a claim under either theory of liability because it is based on conclusory and implausible allegations. Plaintiffs fail, for example, to plausibly allege that the bug exposed any of *their* information, or that their accounts were not already "de-anonymized"—*before* the bug occurred—because anyone can input a user's email address or phone number into the Twitter search bar to look up their account username if they did not disable the default discoverability setting. Indeed, Plaintiff Weitzman does not even allege that she used a pseudonym on Twitter and thus tacitly concedes that her identity on Twitter was *always* discoverable.[2] Plaintiffs cannot cure these pleading defects by amendment because their own allegations and the documents they incorporate by reference squarely contradict their theories of liability.

The AC is rife with legal defects and should be dismissed with prejudice. *First*, Plaintiffs' claims are barred by the contractual disclaimer in Twitter's Terms of Service ("ToS"), which Plaintiffs incorporate by reference and admit is a valid and enforceable contract between them and Twitter. Although Twitter is committed to safeguarding users' information, under the ToS, users specifically acknowledge and agree that Twitter is provided "as is" and that Twitter cannot

---

[1] A pseudonymous account is one for which the user chooses a pseudonym as their Twitter handle and display name.
[2] *See* AC ¶¶ 18, 22, 25-26, 104.

guarantee the security of their information. The ToS also includes a limitation of liability that bars the remedies that Plaintiffs seek. These contractual provisions are fatal to Plaintiffs' case.

*Second*, Plaintiffs fail to state a claim for breach of contract (Count I) because they do not identify an explicit promise that Twitter allegedly breached, and they fail to adequately allege causation and damages.

*Third*, Plaintiffs fail to state a claim for unjust enrichment (Count V)—or alternatively, a claim for quasi-contract—because Plaintiffs admit the parties' relationship is governed by a valid and enforceable contract, and they fail to allege Twitter was unjustly enriched.

*Fourth*, Plaintiffs fail to state claims for negligence, negligence *per se*, and gross negligence (Counts II, III, and IV) because these claims are barred by the economic loss rule, and Plaintiffs fail to adequately plead the causation and damages elements of these claims.

*Fifth*, Plaintiffs fail to state claims under the California Unfair Competition Law ("UCL") and the California Consumers Legal Remedies Act ("CLRA") (Counts VI and VII) because they fail to allege (i) the details required by Rule 9(b), (ii) a basis for equitable relief, and (iii) the "economic loss" required for statutory standing. The CLRA claim also fails for the independent reason that Plaintiffs are not "consumers" of "services" under the CLRA.

*Finally*, Plaintiffs' declaratory judgment claim (Count VIII) fails because it is predicated entirely on Plaintiffs' other defective causes of action.

## II.    BACKGROUND[3]

### A.    The Twitter Platform and Twitter Accounts

Twitter is a social media platform that allows users to post short form messages ("Tweets"). AC ¶ 28. To post on Twitter, users must create an account and link it to either a phone number or email address. *Id.* ¶ 32. Plaintiffs allege they are Twitter users, AC ¶¶ 17, 21, 25, but fail to identify their Twitter accounts.

When creating an account, users choose a username or "handle" (preceded by the @ symbol), and a "display name," which are always public. AC ¶¶ 32, 36, 69. "Most activity on Twitter

---

[3] The "Background" summarizes Plaintiffs' relevant allegations. Twitter does not necessarily agree with the truth of these allegations, but takes them at face value for purposes of its motion to dismiss.

is public, including your profile information . . . when you created your account . . . [and] people you follow and who follow you[.]" Ex.[4] 1 at 5 (Privacy Policy § 1.2).[5] Each account is associated with an identifier called a Twitter user ID or "TwitterID." AC ¶ 60(A). Plaintiffs do not allege that Twitter promised their TwitterIDs would be kept private. It did not.

### B.    Twitter's Default "Discoverability" Feature

During the account creation process, users agree to be bound by Twitter's ToS and Privacy Policy, which Plaintiffs allege constitute a contract. *Id.* ¶ 33. The Privacy Policy informs users that "[w]e use your contact information to help others find your account if your settings permit, including through third-party services and client applications." AC ¶ 126 (citing Privacy Policy § 2.1). This setting is known as "discoverability," and it is on by default. *See* Exs. 12-14. Twitter explains on its website that discoverability allows other users to "discover" a Twitter account by inputting a person's email address or phone number into the Twitter search bar.[6] Ex. 12 at 3. None of the Plaintiffs alleges they disabled their discoverability setting.

### C.    Bad Actors Exploit a Bug in Twitter's API

Plaintiffs base their claims on news articles (incorporated by reference in the AC) reporting that, in 2021, "a Twitter API vulnerability . . . allowed users to input email addresses and phone numbers to confirm whether they were associated with a Twitter ID." AC ¶ 60(A); Ex. 9 at 2.

Plaintiffs do not allege that the API bug exposed Plaintiffs' sensitive personal information— such as social security numbers, bank account, credit card, home address, or medical data. Nor do Plaintiffs plausibly allege that bad actors obtained their email addresses or phone numbers *from Twitter's systems*. Most news articles Plaintiffs cite speak vaguely of unspecified "stolen" data that has not been "independently verif[ied] . . . [to be] authentic [or] c[o]me from Twitter." AC ¶ 60(D). In fact, the sole news article Plaintiffs cite that even attempts to explain the API bug in any detail

---

[4] "Ex._" refers to the Exhibits attached to the June 6, 2023 Declaration of Stephen A. Broome.
[5] A version of this disclosure appears in all three of the Privacy Policy versions incorporated into Plaintiffs' complaint, *see* Ex. 1 at 2-3 (June 18, 2020 Privacy Policy); Ex. 2 at 3-4 (Aug. 19, 2021 Privacy Policy); Ex. 3 at 5-6 (June 10, 2022 Privacy Policy).
[6] Users' accounts can be "discovered" via their email address and phone numbers in other ways too. For example, Twitter invites users to upload their address book contacts so that Twitter can suggest they follow their contacts' Twitter accounts based on their phone numbers or email addresses (assuming they did not turn off the default discoverability setting). Exs. 12-14.

clearly states that threat actors could exploit the API bug only if they *already possessed* a phone number or email address associated with a Twitter account: "[T]he threat actors created massive lists of email addresses and phone numbers that were exposed *in previous data breaches*. The scrapers then fed these lists into the API bug to see if your number or email address was associated with a corresponding Twitter ID." AC ¶ 60(A); Ex. 9 at 6. The email addresses and phone numbers thus did not come *from* the API bug. As the article states, "[i]f your email is only used at Twitter or was not in many [prior] data breaches, it would not have been fed into the API bug." *Id.*

### D.  Twitter Promptly Fixes the API Bug

Twitter learned of the API bug through its "Bug Bounty" program in January 2022, and immediately investigated and fixed it. AC ¶ 62; Ex. 7.[7] At the time, Twitter "had no evidence to suggest someone had taken advantage of the vulnerability." *Id.* (cited in AC ¶ 62).

In July 2022, there were unverified reports of an individual attempting to sell a data set of information associated with 5.4 million Twitter accounts supposedly assembled by exploiting the API bug. AC ¶ 60, 62. Twitter investigated and, on August 5, 2022, publicly addressed those reports. Ex. 7 (cited in AC ¶ 62). Twitter also directly notified all affected users. Ex. 8 at 1 (cited in AC ¶ 66-68). Plaintiffs allege they did not receive a notification. AC ¶ 63.

In Fall 2022 and early 2023, the media reported that bad actors had assembled additional data sets using the same API bug. AC ¶ 60. As stated in documents incorporated in the AC, Twitter investigated these reports and reported its findings that the datasets were either duplicates of the original 5.4 million data set or contained data that could not be correlated with data originating from an exploitation of Twitter systems. Ex. 8 (cited in AC ¶ 66).

### E.  Plaintiffs' Bare-Boned Allegations of Damages

Plaintiffs claim their "PII was compromised in connection with the" API bug. AC ¶ 109. They claim that the API bug allowed bad actors to (1) obtain "Twitter user PII, including email

---

[7] The Bug Bounty, or "Vulnerability Reporting Program," encourages independent security researchers to notify Twitter about any potential issues they spot in the service so that they can be corrected. Eligible reporters of qualifying vulnerabilities may be provided a monetary reward. *See* Ex. 6 at 6 (ToS § 4).

addresses and telephone numbers," and (2) "link that PII to the respective Twitter usernames and display names." AC ¶ 46.

As to the first claim, Plaintiffs allege no facts showing that any of *their* information was obtained from Twitter's systems as a result of the API bug. AC ¶ 60(A); Ex. 9. Plaintiffs' conclusory allegation that the API bug "allowed" bad actors to obtain "email addresses and phone numbers"[8] is unsupported by Plaintiffs' allegations and is directly contradicted by the documents they incorporate by reference. AC ¶ 60(A) ("These data sets were created in 2021 by exploiting a Twitter API vulnerability that allowed users to *input* email addresses and phone numbers [i.e., that they already had] to confirm whether they were associated with a Twitter ID."); Ex. 9 at 3 (emphasis added).

As to the second claim, Gerber and Cohen (but not Weitzman) allege that they used pseudonyms on Twitter so that they could express themselves "without fear of retribution, retaliation, or embarrassment," and that the API bug de-anonymized their accounts. AC ¶¶ 18, 22. But, as noted above, unless Plaintiffs turned off the default discoverability setting (which they do not allege they did), other users could already look up their accounts via their email address or phone number on Twitter regardless of the API bug. Nor do Plaintiffs allege *how* they know that their identities were de-anonymized via the API bug, or that they actually faced any losses, retribution, retaliation, or embarrassment as a result. Plaintiffs do not even allege that their "de-anonymized" accounts actually contain any "embarrassing details" that could be linked to them. *See* AC ¶ 18 (no allegation about subject matter of Gerber's Tweets); *id.* ¶ 22 (same for Cohen).

Although Plaintiffs generally allege that the API bug caused "Plaintiffs and Class Members" to incur "costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII," AC ¶ 131(F), Plaintiffs do not specifically allege that they incurred any out-of-pocket costs or losses as a result of Twitter's alleged conduct. Weitzman (but not Gerber or Cohen) alleges that she "has been required to spend her valuable time monitoring her

---

[8] Plaintiffs define the "PII extracted" as "usernames, display names, email addresses, phone numbers, follower counts, and account creation data." AC ¶ 46. However, usernames, display names, follower counts, and account creation dates are all publicly available on Twitter (*see supra* § II.A-B) and could not have been affected by the API bug.

various accounts in an effort to detect and prevent any misuses of her PII" (AC ¶ 26), but she fails to allege *any* details regarding the amount of time spent or actions taken.

That is the extent of Plaintiffs' allegations of actual damage. Plaintiffs allege a litany of *potential* harms they claim may befall them—such as spear phishing attacks, blackmail, stalking, doxing, social media hacking, or identity theft (AC ¶ 99)—but they do not allege that they experienced any of these harms.

### F.   Whistleblower Claims and the FTC Consent Order

Plaintiffs devote entire pages of their AC to irrelevant accusations of wrongdoing by former Twitter employees, like Peiter Zatko, *see* AC ¶¶ 70-82, and the 2011 FTC Consent Order (AC ¶¶ 83-90). Plaintiffs fail to plausibly connect the substance of these allegations to the API bug that forms the basis of their claims. Nor could they. The former employees' allegations and the FTC Consent Order focus on unrelated risks like controlling threats from *inside* the company (AC ¶ 75(a)), registering and tracking data for deletion (*id.* ¶ 75(f)), purported "server vulnerabilities" (*id.* ¶ 76(A)), mobile device management protocols for Twitter employee phones (*id.* ¶ 76(C)), and "internal controls, including with respect to employee access to information" (*id.* ¶ 88). None of the allegations even mentions the API bug at issue in this case or its causes.

## III.   ARGUMENT

### A.   Plaintiffs' Common Law Claims (Counts I through V) Are Barred by the ToS's Disclaimer and Limitation of Liability Clauses

Plaintiffs' claims arise out of Twitter's alleged "failure to comply with its duties to secure sensitive user data." AC ¶ 1. But Plaintiffs admit they consented to the ToS and contractually agreed that: (1) they would use Twitter on an "AS IS" basis, "at [their] own risk," and that Twitter would *not* be responsible for the "security or reliability of the Services," and (2) Twitter would not be liable for the types of damages they seek. Ex. 6 at 8-9 (ToS § 5);[9] AC ¶ 35 (alleging ToS is part of the "User Agreement"), ¶¶ 107, 119-21. These provisions defeat Plaintiffs' breach of contract, negligence, and unjust enrichment (or quasi-contract) claims as a matter of law.

---

[9] An identical provision exists in each of the ToS versions Plaintiffs allege were part of the contract. Ex. 4 at 7-9; Ex. 5 at 8-9; Ex. 6 at 8-9.

Plaintiffs claim Twitter breached its duties to secure their personal information. But Section 5 of the ToS expressly disclaims such duty:

> Your access to and use of the Services or any Content are at your own risk. . . . [T]he Services are provided to you on an "AS IS" . . . basis. The Twitter Entities make no warranty or representation and disclaim all responsibility and liability for: (i) the . . *security or reliability of the Services* or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any content; . . . and (iv) whether the Services will meet your requirements or be available on an uninterrupted, *secure, or error-free basis*.

Ex. 6 at 8-9 (ToS § 5) (emphasis added). Twitter is committed to safeguarding user information, but no company can *guarantee* security in this modern age. The disclaimer is thus consistent with the acknowledged facts that data breach incidents have "occurred across a wide range of entities, including federal, state, and local government agencies; retailers; financial institutions; colleges and universities; and medical facilities." Ex. 11 at 2 (cited in AC ¶ 53).

"Waivers of liability that are 'clear, unambiguous and explicit' bar claims that expressly fall within their scope." *Murphy v. Twitter*, 60 Cal. App. 5th 12, 35 (2021) ("The clear terms of Twitter's user agreement preclude a claim for breach of contract[.]"). Courts routinely enforce disclaimers against claims arising out of data breaches where, as here, the disclaimer "provides that information sent or received while using the [defendant's] website 'may not be secure and may be intercepted or otherwise accessed by unauthorized parties." *Gardiner v. Walmart*, 2021 WL 2520103, at *9 (N.D. Cal. Mar. 5, 2021) (dismissing contract claims); *Bass v. Facebook*, 394 F. Supp. 3d, 1024, 1037 (N.D. Cal. 2019) (finding Facebook's disclaimer that its platforms are provided "'as is,' and we make no guarantees that they always will be safe, secure, or error-free," barred breach of contract and quasi-contract/unjust enrichment claims arising out of a data breach); *Adkins v. Facebook*, 2019 WL 3767455, at *2-3 (N.D. Cal. Aug. 9, 2019) (same).

Plaintiffs also contractually agreed that Twitter would not be liable for the kinds of consequential and intangible harms they claim they suffered, such as "lost time and expenses related to mitigating the harms caused by the [API bug], increased risk of harm, diminished value of their PII, [and] loss of privacy." AC ¶ 2. The ToS provides:

> TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE TWITTER ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR ANY LOSS OF PROFITS OR

REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA . . . OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (ii) ANY CONDUCT OR CONTENT OF ANY THIRD PARTY ON THE SERVICES, INCLUDING WITHOUT LIMITATION, ANY DEFAMATORY, OFFENSIVE OR ILLEGAL CONDUCT OF OTHER USERS OR THIRD PARTIES; (iii) ANY CONTENT OBTAINED FROM THE SERVICES; OR (iv) UNAUTHORIZED ACCESS, USE OR ALTERATION OF YOUR TRANSMISSIONS OR CONTENT.

Ex. 6 at 8-9 (ToS § 5).[10] This unequivocal language applies to the "fullest extent permitted by applicable law," expressly includes theories based on "CONTRACT" and "NEGLIGENCE," and encompasses "conduct . . . of any third party," such as the threat actors alleged here. *Id.*

"Limitation of liability clauses have long been recognized as valid in California." *Lewis v. YouTube*, 244 Cal.App.4th 118 (Cal. App. 2015) (internal citations omitted). California courts have held that "[l]imitation of liability provisions are particularly important where," as here, "the beneficiary of the clause is involved in a high-risk, low-compensation service." *Markborough Cal., Inc. v. Sup. Ct.*, 227 Cal. App. 3d 705, 714 (1991); *see also Darnaa, LLC v. Google*, 756 F. App'x 674, 676 (9th Cir. 2018) (affirming dismissal of breach of contract claim based on limitation of liability provision and explaining that "[b]ecause YouTube offers its video streaming services at no cost to the user, it has a valid commercial need to limit liability for actions taken to regulate its platform"); *Murphy*, 60 Cal. App. 5th at 36 (2021) (recognizing that Twitter, like other "service providers that offer free services to Internet users[,] may have a legitimate commercial need to limit their liability"); *Lewis*, 244 Cal. App. 4th at 125-26 (limitation of liability provision "appropriate when one party is offering a service for free to the public"); *Food Safety Net Servs. v. Eco Safe Sys.*, 209 Cal. App. 4th 1118, 1126 (2012) (limitation of liability clauses "have long been recognized as valid in California").

Courts have also routinely enforced limitation of liability clauses in similar data security cases where, as here, they undercut the heart of plaintiffs' allegations. *See Gardiner*, 2021 WL 2520103, at *9 (finding limitation of liability provision barred contract claim for harm caused by data breach and noting that such "limitation of liability provisions … are routinely upheld by

---

[10] An identical provision exists in each of the ToS versions Plaintiffs allege were part of the contract. Ex. 4 at 7-9; Ex. 5 at 8-9; Ex. 6 at 8-9.

courts"); *Bass*, 394 F. Supp. 3d at 1037 (dismissing contract and quasi-contract/unjust enrichment claims as barred by a limitation of liability clause); *Adkins*, 2019 WL 3767455, at *2-3 (same). Plaintiffs' common law claims should thus be dismissed because the limitation of liability clause bars the relief they seek.

**B.    Plaintiffs' Contract Claim (Count I) Should be Dismissed**

Even if the ToS did not bar Plaintiffs' common law claims, their contract claim should still be dismissed because they fail to identify a specific provision in the contract that they claim Twitter breached. Plaintiffs also fail to allege that the purported breach was the cause of any cognizable damages to them.

*1.    Plaintiffs Fail to Identify a Breached "Promise"*

Without identifying the "explicit promise" that Twitter allegedly breached, Plaintiffs cannot allege "the existence of a contract that was subject to breach." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 611 (9th Cir. 2020) (affirming dismissal of contract claim because contract did "not contain an explicit promise not to track logged-out users"); *Ewert v. eBay*, 602 F. App'x 357, 359 (9th Cir. 2015) (affirming dismissal of contract claim because plaintiffs "failed to identify a provision in the User Agreement that []expressly prohibited" the challenged conduct); *Hammerling v. Google*, 615 F. Supp. 3d 1069, 1095 (N.D. Cal. 2022) (dismissing contract claim because "[t]he question is whether Google breached anything that it promised, not whether Google did anything it did not promise"); *Beecher v. Google*, 2018 WL 4904914, at *2 (N.D. Cal. Oct. 9, 2018) (dismissing contract claim where plaintiffs failed to "point to specific contractual terms which were allegedly breached").

Plaintiffs allege they "provided Twitter PII on the strength of Twitter's promise . . . that this PII would remain private, and that Twitter would protect and secure the privacy of such information." AC ¶ 97. However, despite five lengthy paragraphs of selective quotations from various iterations of Twitter's Privacy Policy (AC ¶¶ 122-26), Plaintiffs do not identify a single

1  contractual provision in which Twitter made this alleged "promise"[11] or otherwise guaranteed data

2  security against external threats, including bad actors. Nor could they plausibly allege this given it

3  is contradicted by the express language of ToS § 5. *See* Ex. 6 at 8-9.

4  Instead, Plaintiffs seem to suggest that such a promise may be *implied* from the grab-bag of

5  Privacy Policy quotations they cite. *See* AC ¶¶ 122-26. Even if Plaintiffs were correct—they are

6  not—"'implicit duties' are insufficient to state a cause of action for breach of contract." *EM Gen. v.*

7  *Elec. Commerce*, 2021 WL 6618660, at *3 (C.D. Cal. Mar. 17, 2021); *see also Facebook Tracking*,

8  956 F.3d at 610.

9  Judge Koh's decision in *In re Anthem, Inc., Data Breach Litig.*, 162 F. Supp. 3d 953 (N.D.

10  Cal. 2016), is instructive. Like Plaintiffs here, the *Anthem* plaintiffs alleged the defendants breached

11  the parties' contract by failing to "take reasonable measures to keep [plaintiffs'] PII secure and

12  confidential and did not comply with the applicable laws, regulations, and industry standards." *Id.*

13  at 978; *compare* AC ¶ 97 (alleging Twitter promised it "would protect and secure the privacy of

14  [Plaintiffs'] information[.]"). Judge Koh dismissed the contract claim because "Plaintiffs have failed

15  to identify the specific contractual provisions that were breached, as Plaintiffs must do in order to

16  bring a breach of written contract claim under California law." *Id.* at 982. The Court should do the

17  same here.

18      2.   *Plaintiffs Fail to Allege the Purported Breach Caused Plaintiffs Damage*

19  Even if Plaintiffs had adequately alleged that Twitter contractually promised it would keep

20  data secure from external threats, Plaintiffs fail to plausibly allege that Twitter's breach of this

21  supposed promise caused their alleged damages. Plaintiffs allege that the API bug (1) exposed their

22  email addresses and phone numbers (AC ¶ 6); and (2) allowed unidentified third parties to link

23  Gerber and Cohen with their pseudonymous Twitter handles, thereby "de-anonymizing" their

24  accounts. AC ¶ 8. These conclusory allegations, however, are unsupported by any facts and

25  contradicted by the documents Plaintiffs incorporate by reference in the AC. They are therefore not

26

27

28

[11] Twitter could not make such a promise because usernames, display names, follower counts, and account creation dates are all public information. *See* AC ¶¶ 36, 69 (alleging that Twitter usernames and display names are public); Ex. 2 at 3-4 (Privacy Policy § 1.2).

well-pleaded and should be disregarded. *See Legalforce RAPC Worldwide v. Upcounsel*, 2019 WL 160335, at \*5 (N.D. Cal. Jan. 10, 2019) ("the Court does not accept as true plaintiffs' allegations . . . as they are contradicted by the documents attached to, and incorporated by reference in, the FAC"); *Groves v. Kaiser Found. Health Plan*, 32 F. Supp. 3d 1074, 1080 n.4 (N.D. Cal. 2014) (while "a court generally is obligated to regard the well-pleaded facts of a complaint as true when deciding a Rule 12(b)(6) motion, that principle gives way when the allegations contradict documents attached to the complaint or incorporated by reference").

*First*, Plaintiffs' conclusory allegation that the API bug allowed bad actors to obtain *their* phone numbers or emails *from Twitter* is contradicted by the article on which they base their claims. *See* AC ¶ 60(A). The article explains that, to exploit the API bug, a bad actor needed to have already possessed a phone number or email address that they could then "input" to check for the associated TwitterID. *Id.*; Ex. 9 at 2. Plaintiffs do not allege any additional facts from which the Court could infer that the API bug exposed Plaintiffs' email addresses and phone numbers.

*Second*, Plaintiffs fail to plausibly allege the API bug "de-anonymized" their Twitter accounts. Weitzman does not even claim that she used a pseudonym on Twitter, or that her account was "de-anonymized." *See* AC ¶¶ 16-26, 49, 104 (alleging only Gerber and Cohen, but not Weitzman, used pseudonyms). And neither Gerber nor Cohen claims that he disabled the default discoverability setting that allows *anyone* to look up their publicly available Twitter usernames, display names, follower counts, and account creation dates by inputting their email address or phone number into Twitter's search bar. Thus, even if the Court were to credit Plaintiffs' conclusory allegation that Gerber's and Cohen's accounts were "de-anonymized," Plaintiffs fail to plausibly allege that the API bug—as opposed to their own choice to leave discoverability enabled—caused this result.

### 3.   *Plaintiffs Do Not Plead Cognizable Damages*

Nor do Plaintiffs allege any cognizable damages. Plaintiffs speculate that *if* their contact information was exposed or linked to their Twitter account, it would result in a litany of harms. AC ¶ 99. But none of the alleged harms rises to the level of "appreciable and actual damage" required for a breach of contract claim. *Ruiz v. Gap,* 622 F. Supp. 2d 908, 917 (N.D. Cal. 2009) ("Under

California law, a breach of contract claim requires a showing of appreciable and actual damage."). And even if the alleged harms *were* sufficient to satisfy the damages element of their claim, Plaintiffs fail to plausibly allege they experienced any of them.

*"Potential" Risk of Identity Theft and Other Fraud:* Plaintiffs vaguely allege that they *may* suffer harms such as "*potential* phishing attacks and other types of targeted, email-centric privacy intrusions," and "*potential* identity theft." AC ¶ 99 (emphasis added). Their admission that these are merely "potential" harms is fatal on its own. *Svenson v. Google*, 65 F. Supp.3d 717, 725 (N.D. Cal. 2014) (dismissing contract claims because allegation that defendant's disclosure of plaintiff's data "increased her risk of identity theft" was "too speculative" to plausibly allege actual damage); *Ruiz*, 622 F. Supp. 2d at 917 (holding California contract law does not permit a plaintiff "to show he was actually damaged by pointing to his fear of future identity theft").[12]

In another data breach case involving a social platform, Judge Gonzalez Rogers found it implausible that "criminals would be able to use e-mail addresses, Zynga usernames and Zynga passwords, Facebook username, phone numbers, and dates of birth, even collectively, to commit identity theft." *I.C. v. Zynga,*, 600 F. Supp.3d 1034 (N.D. Cal. 2022) (dismissing complaint, including breach of contract claims). To credit these allegations would require the court "to speculate that plaintiffs will be successfully duped by a phishing attack and that the additional information turned over as a result can be used to commit identity theft[.]" *Id.*; *see also Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1032 (N.D. Cal. 2012*)* (dismissing contract claim because allegations that information disclosed by a social media platform could be used by third parties to de-anonymize plaintiffs' accounts and link them to "embarrassing details of [their] personal browsing patterns[]" was "too theoretical"); *Bass*, 394 F. Supp. 3d at 1036 (dismissing plaintiff's

---

[12] To bolster their allegation that the API bug increased their risk of identity theft, Plaintiffs cite a blog post discussing a 2013 study by Al Pascual, and incorrectly claim that the study found that "28% of consumers affected by a data breach become victims of identity fraud" and that "[w]ithout a data breach, the likelihood of identity fraud is only about 3%." AC ¶ 100. But Plaintiffs mischaracterize the study's findings. The statistics they cite apply only to breaches that exposed credit card information. *See* Ex. 10 at 1-3. Plaintiffs do not allege that the API bug exposed their credit card information or any other sensitive financial information. In any event, even if Plaintiffs faced a 28 percent chance of identity theft as a result of the API bug, that risk remains insufficient to allege damages for purposes of a contract claim.

breach of contract claim where "no reasonable inference can be drawn connecting [the alleged harms] to the data breach").

_Diminution in Value of PII:_ Nor have Plaintiffs sufficiently alleged that the API bug "diminished [the] value" of Plaintiffs' contact information—which they claim is "[a]mong the most immediate" of the damages they face. AC ¶ 99. Plaintiffs do not plausibly allege that their email addresses and phone numbers, or the anonymity of their Twitter accounts, have economic value to them or anyone else, let alone that this value was somehow "diminished." And they fail to plausibly allege that the *API bug* devalued that information. *See Holly v. Alta Newport Hosp.*, 612 F. Supp. 3d 1017, 1027 (C.D. Cal. 2020) (dismissing plaintiff's contract claim because mere allegations that the accidental disclosure of her information "decreased [the] value of [her] personal data" were "conclusory and vague" and lacked sufficient "supporting facts").

_"Concern, Anxiety, and Unease":_ Plaintiffs' bare-boned, group-pled allegation that "Plaintiffs and Class members have suffered … significant concern, anxiety, and unease arising from the public dissemination of sensitive private information" (AC ¶ 99), should be disregarded because Plaintiffs fail to allege any facts to support the claim that *they* experienced any such emotional distress. *Sion v. SunRun*, 2017 WL 952953, at *2 (N.D. Cal. Mar. 13, 2017) (dismissing negligence claim because plaintiff failed to "support her claim [that she suffered emotional distress] with something more than [her] own conclusory allegations"); *see also Low*, 900 F. Supp. 2d at 1028 (plaintiffs' conclusory allegation that they suffered "embarrassment and humiliation caused by the disclosure of their personally identifiable browsing histories" was insufficient to state a claim for breach of contract). For example, Plaintiffs do not allege they posted content on Twitter that might reasonably cause them emotional distress if they were revealed as the authors. AC ¶ 18 (failing to allege content Gerber posted on the account); *id.* ¶ 22 (same for Cohen).

_"Lost Time":_ Only one Plaintiff—Weitzman—claims that she spent "time monitoring her various accounts," (AC ¶ 26)—but she fails to support the allegation with specific facts as to time spent or actions taken, which is insufficient. *See Holly*, 612 F. Supp. 3d at 1027(dismissing contract claim because allegations of increased risk of identity theft are "too speculative to satisfy the pleading requirement[s]," and mere allegations about mitigation or remediation efforts are

insufficient without factual allegations plausibly showing why "any credit monitoring was reasonable and necessary").

### C.     Plaintiffs' Unjust Enrichment Claim (Count V) Should Be Dismissed

Although unjust enrichment is not a standalone cause of action under California law, courts may construe unjust enrichment claims as quasi-contract claims for restitution. *Astiana v. Hain Celestial Grp.*, 783 F.3d 753, 762–63 (9th Cir. 2015). However, "a plaintiff may not plead the existence of an enforceable contract and maintain a quasi-contract claim at the same time, unless the plaintiff has pled facts suggesting that the contract may be unenforceable or invalid." *Beluca Ventures v. Einride Aktiebolag*, 622 F. Supp. 3d 806, 813 (N.D. Cal. 2022).[13] Plaintiffs' unjust enrichment claim fails because they allege the existence of a valid contract, AC ¶¶ 107, 119-121, and plead no "facts suggesting that the contract may be unenforceable or invalid." *Tsai v. Wang*, 2017 WL 2587929, at *8 (N.D. Cal. June 14, 2017).

Plaintiffs also fail to plausibly allege that Twitter was unjustly enriched "through mistake, fraud, coercion, or request," as required to plead a quasi-contract claim for restitution. *Astiana,* 783 F.3d at 762. Plaintiffs admit they did not pay any money to use Twitter. AC ¶ 31 (Twitter is free). And they cannot seek restitution of amounts Twitter allegedly "saved" by "failing to incur the costs required to implement adequate data security measures." AC ¶ 166; *see Lee v. Luxottica Retail*, 65 Cal. App. 5th 793, 802 (2021) ("Any award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took directly from plaintiff."); *Peterson v. Cellco P'ship*, 164 Cal. App. 4th, 1583, 1587 (2008) (plaintiffs may "not seek a windfall under the guise of restitution.").

Moreover, Twitter disclosed (and Plaintiffs agreed in the ToS) that Twitter could not guarantee security. Ex. 6 at 8-9 (ToS § 5). Plaintiffs therefore got the benefit of their bargain: use of

---

[13] *See also Feamster v. Gaco W.*, 2023 WL 2134382, at *9 (N.D. Cal. Feb. 21, 2023) ("Unjust enrichment is not cognizable when there is a valid and enforceable contract between the parties, as it is an action in quasi-contract."); *Brodsky v. Apple*, 445 F. Supp. 3d 110, 133 (N.D. Cal. 2020) ("Courts have repeatedly held that a plaintiff may not plead the existence of an enforceable contract and simultaneously maintain a quasi-contract claim unless the plaintiff also pleads facts suggesting that the contract may be unenforceable or invalid.").

1   the Twitter platform, without charge. "There is no equitable reason for invoking restitution when

2   the plaintiff gets the exchange which he [or she] expected." *Peterson*, 164 Cal. App. 4th at 1593.

**D.     Plaintiffs' Negligence Claims (Counts II through IV) Should Be Dismissed**

4           As shown supra in § III.A, Plaintiffs' negligence claims are barred by the ToS's disclaimer

5   and limitation of liability provisions. The claims should also be dismissed for the independent

6   reasons that they are barred by the economic loss rule and because Plaintiffs' fail to allege causation

7   and damages.

*1.     The Economic Loss Rule Defeats Plaintiffs' Negligence Claims*

9           The economic loss rule bars each of Plaintiffs' three negligence claims.[14] This rule

10  "functions to bar claims in negligence for pure economic losses in deference to a contract between

11  litigating parties." *Ace Am. Ins. Co. v. Accellion, Inc.*, 2022 WL 2341155, at *6 (N.D. Cal. Apr. 11,

12  2022) (quotations omitted); *see also Sheen v. Wells Fargo*, 12 Cal. 5th 905, 923 (2022) (economic

13  loss rule bars "tort claims for monetary losses between contractual parties" that "arise from—or are

14  not independent of—the parties' underlying contracts").

15          *First*, Plaintiffs allege Twitter had a duty to "exercise reasonable care in obtaining, retaining,

16  securing, safeguarding, deleting, and protecting their PII in its possession." AC ¶ 136. But the ToS

17  expressly disclaims such a duty, *see supra* § III.A; Ex. 6, at 8-9 (ToS § 5), and California law is

18  clear that the economic loss rule bars claims for negligence "based on an asserted duty that is

19  contrary to the rights and obligations clearly expressed in the [parties'] contract." *Sheen*, 12 Cal. 5th

20  at 925. In addition, Plaintiffs specifically allege that the purported duty arises from their contract

21  with Twitter. AC ¶ 97 (alleging that Plaintiffs "provided their PII in order to become Twitter users

22  … on the strength of Twitter's promise (and with the users' expectation) that this PII would remain

---

[14] Negligence per se and gross negligence are not independent causes of action, but rather doctrines of the tort of negligence. *See Dent v. Nat'l Football League*, 902 F.3d 1109 (9th Cir. 2018) ("under California law, negligence per se is a doctrine, not an independent cause of action."); *Architectural Res. Grp. v. HKS, Inc.*, 2013 WL 568921, at *5 (N.D. Cal. Feb. 13, 2013) ("California courts do not recognize a separate cause of action for gross negligence"). The economic loss rule bars claims for gross negligence and negligence per se in the same way and to the same extent that it bars ordinary claims for negligence. *See Whitesides v. E*TRADE Sec.* 2021 WL 930794, at *8 (N.D. Cal. Mar. 11, 2021) (finding gross negligence claim barred by economic loss rule); *Bird v. Globus Med.*, 2020 WL 5366300, at *6 (E.D. Cal. Sept. 8, 2020) (finding negligence per se claim barred by economic loss rule).

private, and that Twitter would protect and secure the privacy of such information … *as specified by the User Agreement.*") (emphasis added); *see also id.* ¶¶ 33, 107, 119-121. The economic loss rule bars negligence claims between contracting parties in precisely these circumstances. *Moore v. Centrelake Medical Grp.*, 83 Cal. App. 5th 544, 536 (2022) (affirming dismissal with prejudice of negligence claim in data breach case because the economic loss rule bars claims where plaintiffs allegedly "provided their PII to [defendant] pursuant to the contracts . . . and [plaintiffs'] asserted injuries arose from [defendant's] failure to provide data security allegedly promised in their contracts.").

*Second*, under the economic loss rule, "plaintiffs asserting negligence claims ordinarily may not recover purely economic damages unconnected to physical injury or property damage." *Castillo v. Seagate Tech.*, 2016 WL 9280242, at *5 & n.2 (N.D. Cal. Sept. 14, 2016) (economic loss rule barred negligence claims relating to data breach where Plaintiffs failed to plausibly allege physical injury or property damage); *Dugas v. Starwood Hotels & Resorts Worldwide*, 2016 WL 6523428, at *12 (S.D. Cal. Nov. 3, 2016) (same); *Moore*, 83 Cal. App. 5th at 536 (approving of *Castillo* and *Seagate*). Here, too, Plaintiffs fail to plausibly allege the API bug caused them physical injury or property damage, providing yet another reason the economic loss rule bars their negligence claims.

### 2.   *Plaintiffs Fail to Allege Causation or Damages*

For the same reasons discussed *supra* § III.B.2, Plaintiffs fail to adequately plead the required causation for their negligence claims. *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 965 (holding that a negligence claim requires plaintiff to allege harm "proximately caused by" the breach of duty). Nor do Plaintiffs plead the "appreciable, nonspeculative, present harm" that is "an essential element of a negligence cause of action." *Ruiz*, 622 F. Supp. 2d at 913. Courts have repeatedly held that the "potential" identity theft, diminution in value of PII, and "concern, anxiety, and unease" Plaintiffs allege here are insufficient to state a negligence claim. *See, e.g., id.* at 913 (dismissing negligence claim because "increased risk of future identity theft . . . does not rise to the level of appreciable harm necessary to assert a negligence claim under California law." *Razuki*, 2018 WL 6018361, at *1 (dismissing negligence claim "alleging diminution of value of [plaintiff's] personal data" for failure to "allege enough facts to establish

how his personal information is less valuable as a result of the breach"); *Sion*, 2017 WL 952953, at

*2 (dismissing negligence claim because allegations that plaintiff suffered "mental and emotional

distress . . . are too sparse and conclusory to support [a] negligence claim" absent "specific facts

about *how* [plaintiff] suffered those damages") (emphasis in original); *see also supra* § III.B.3.

**E.      Plaintiffs' UCL and CLRA Claims (Counts VI and VII) Should Be Dismissed**

Plaintiffs claim Twitter's conduct violated the "unlawful" and "unfair" prongs of the UCL,

and the CLRA, but they fail to plead any of these claims adequately.

*1.      Plaintiffs Fail to Plead a Claim Under the UCL's "Unlawful" Prong*

"To state a cause of action based on an unlawful business act or practice under the UCL, a

plaintiff must allege facts sufficient to show a violation of some underlying law." *Prakashpalan v.*

*Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1133 (2014). Plaintiffs have not done so.

Plaintiffs allege that Twitter violated the FTC Act, 15 U.S.C. § 45(a). They claim the FTC's

cybersecurity guides establish "that a company's failure to maintain reasonable and appropriate data

security for consumers' sensitive personal information is an 'unfair practice' in violation of the FTC

Act." AC ¶ 85. But courts in this District have rejected this exact argument because there is "no

indication that [the cybersecurity guide alleged] constitutes a law or federal regulation, nor carries

the weight of such." *Schmitt v. SN Servicing,* 2021 WL 5279822, at *6 (N.D. Cal. Nov. 12, 2021)

(rejecting argument that FTC cybersecurity guide is a valid "predicate for [an] unlawful UCL claim"

and dismissing complaint); *see also* 16 C.F.R. § 1.5 (FTC guides are "administrative

interpretations," not notice and comment rules).

Plaintiffs also conclusorily allege that Twitter violated the FTC's 2011 consent order, AC ¶

147, but they fail to allege *what* Twitter conduct in relation to the API bug violated *what* part of the

consent order. In any event, courts have dismissed claims under the UCL's "unlawful" prong that

are based on alleged violations of orders issued by federal agencies because such claims ask a court

to adjudicate violations of "a complicated regulatory order" in the guise of a UCL claim "without

the benefit of an administrative record or the expertise" of the relevant agency. *Newton v. Am. Debt*

*Servs.*, 75 F. Supp. 3d 1048 (N.D. Cal. 2014) (dismissing UCL claim based on alleged violation of

FDIC order).

Finally, Plaintiffs fail to adequately allege violations of the California Customer Records Act, Cal. Civ. Code § 1798.81.5(b) ("CRA"), or Cal. Bus. & Prof. Code § 22576. AC ¶¶ 182-83. The CRA provision applies to certain sensitive "personal information," which does not include email addresses, phone numbers, website display names, or other data Plaintiffs allege the API bug exposed. *See* Cal. Civ. Code § 1798.81.5(d)(1). Section 22576 merely requires Twitter to adhere to its own Privacy Policy, and Plaintiffs fail to plausibly allege that Twitter has not done so. *See supra* § III.A-B.

> 2.     *Plaintiffs Fail to Plead Their UCL "Unfair" Prong and CLRA Claims with the Particularity Required by Rule 9(b)*

Plaintiffs' claims under the UCL's "unfair" prong[15] (AC ¶¶ 178-79) and the CLRA (AC ¶¶ 187-92) are based on alleged misrepresentations and omissions, and therefore must meet the heightened pleading standard of Rule 9(b). *See Kearns v. Ford Motor*, 567 F.3d 1120, 1125 (9th Cir. 2009) (affirming dismissal of CLRA claim under Rule 9(b)); *In re Google Assistant Priv. Litig.*, 546 F. Supp. 3d 945, 970 (N.D. Cal. 2021) (dismissing CLRA claim because alleging that "Defendants promised 'adequate security measures' is vague to the point of meaninglessness"); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 968 (S.D. Cal. 2012) (dismissing CLRA and UCL claims because alleged security assurances were insufficiently pleaded).

Plaintiffs fail to plausibly allege the "who, what, when, where, and how" of any statement or omission they claim is misleading. *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003). For example, although Plaintiffs allege that Twitter's public blog posts updating users about the API bug contained misrepresentations or omissions (AC ¶¶ 61-71, 179), they fail "to spell out when they encountered these statements, where they did so, or how it affected them," and "they have not even pleaded *if* they encountered them" as required to adequately allege reliance. *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1019 (N.D. Cal. 2020); *see also Haskins v. Symantec*, 654 F.

---

[15] To the extent Plaintiffs' UCL unfair prong claim is based on the same statutory violations as the unlawful prong (AC ¶¶ 175-77), it should be dismissed for the same reasons discussed *supra* § III.E.1. *See Dang v. Samsung Elecs. Co.*, 2018 WL 6308738, at *10 (N.D. Cal. Dec. 3, 2018) (dismissing UCL "unfair" prong claim because it "entirely overlap[ped]" with the inadequately pled UCL "unlawful" prong claim).

App'x 338, 339 (9th Cir. 2016) (affirming dismissal of UCL and CLRA claims because plaintiff failed to allege that she "read and relied on a specific misrepresentation by [defendant]," as required by Rule 9(b)); *Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 913 (N.D. Cal. 2020) ("this Court has consistently held that plaintiffs in misrepresentation cases must allege that they actually read the challenged representations"); *Rothman v. Equinox Holdings*, 2021 WL 124682, at *5 (C.D. Cal. Jan. 31, 2021) (dismissing UCL and CLRA claims because plaintiff's "conclusory allegation, which specifies neither when–if at all–plaintiff viewed the alleged misrepresentation nor what actions he took as a result, is insufficient to plead that plaintiff actually relied on [that] misrepresentation."). As the cases cited above make clear, Plaintiffs' conclusory allegation that they "detrimentally relied on [Twitter's] misrepresentations and omissions" (AC ¶ 179) is insufficient.

Indeed, Plaintiffs could not possibly allege the misrepresentation or reliance elements given the ToS expressly disclaims Twitter's responsibility to provide the level of security Plaintiffs claim they expected. *See supra* § III.A. The ToS disclosed that Plaintiffs' "access to and use of the Services or any Content are at your own risk," the services "are provided to you on an 'AS IS'" basis, and Twitter makes "no warranty or representation" as to the "security" of its services or that they will "be available on an uninterrupted, secure, or error-free basis." Ex. 6, at 8-9 (ToS § 5); *see* AC ¶¶ 107, 119-20 (alleging Plaintiffs agreed to the ToS). Plaintiffs therefore cannot allege that Twitter's representations led them to expect the level of security that they claim Twitter should have provided. *Hammerling*, 615 F. Supp. 3d at 1082 ("Under the CLRA and UCL, the omission or misrepresentation must be likely to mislead or deceive a reasonable consumer.").

Where, as here, "a defendant truthfully and clearly discloses an alleged misrepresentation or omission, a plaintiff cannot plausibly state a claim for relief" under the UCL or CLRA. *Hammerling*, 615 F. Supp. 3d at 1082. That is because "in the presence of clear admonitory language that [a defendant's] security was not 'perfect,' no reasonable consumer could have been deceived." *In re Sony*, 903 F. Supp. 2d at 968 (finding disclaimer barred CLRA claim relating to data breach); *see also Davis v. HSBC*, 691 F.3d 1152, 1158, 1163-64 (9th Cir. 2012) (affirming dismissal of UCL

claim based on defendant's allegedly fraudulent charging of annual credit card fee because the card's terms and conditions disclosed the fee).[16]

### 3. Plaintiffs Fail to Plead the Required Economic Injury

To plead a UCL claim, Plaintiffs must allege that Twitter caused them to lose "money or property." Cal. Bus. & Prof. Code § 17535. Similarly, to plead a CLRA claim, Plaintiffs must allege that they suffered "economic injury." Cal. Civ. Code § 1780(a). Because the AC fails to satisfy these statutory standing requirements, the UCL and CLRA claims should be dismissed.[17] *See Rojas-Lozano v. Google*, 159 F. Supp.3d 1101, 1114, 1120 (N.D. Cal. 2016) (dismissing UCL and CLRA claims because, *inter alia*, Plaintiffs failed to plausibly allege economic injury).

Plaintiffs paid Twitter nothing to use its platform, so they cannot claim to have lost money. *See* AC ¶ 31; *Wesch v. Yodlee*, 2021 WL 1399291, at *6 (N.D. Cal. Feb. 16, 2021) (dismissing UCL claim where plaintiffs "had not paid Yodlee any money"). Their allegations that they lost "the independent monetary value of their PII" (AC ¶ 185) also fails because they do not allege there is a "market for the personal information or the impairment of the ability to participate in that market." *Bass*, 394 F. Supp. 3d at 1040. "This lack of specificity is fatal." *Id.* Plaintiffs' bare allegations of "out-of-pocket expenses," (AC ¶¶ 100, 102), are insufficient because no Plaintiff alleges that he or she actually incurred any such expenses (*see* AC ¶¶ 16–26).

And although Plaintiffs allege they suffered losses of "property" in the form of their "PII," (AC ¶¶ 185, 192), information like the data at issue here—emails, phone numbers, TwitterIDs—cannot be "lost" and, in any event, does not constitute "property" for purposes of the UCL and

---

[16] *See also Janda v. T-Mobile*, 378 F. App'x 705, 707 (9th Cir. 2010) (affirming dismissal of UCL and CLRA claims because consumers could not be deceived where T-Mobile "explicitly disclosed" an allegedly deceptive fee in its customer agreements); *Fabozzi v. StubHub*, 2012 WL 506330, at *6 (N.D. Cal. Feb. 15, 2012) (dismissing UCL claim where ticket reseller did not fraudulently omit that it sold its tickets at a "premium" compared to the ticket's face value because the ticket reseller disclosed numerous times on its website that its tickets "may be . . . above face value" or different from face value).

[17] Although the requirements of these statutes are not identical, courts have generally treated the claims together for purposes of the economic injury inquiry. *See, e.g.*, *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015) ("To establish standing to bring a claim under [UCL and CLRA] statutes, plaintiffs must meet an economic injury-in-fact requirement[.]"); *Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1200 (N.D. Cal. 2014) (Plaintiffs must plausibly allege that they "suffered economic injury" to support a UCL or CLRA claim)

CLRA. *See, e.g.*, *In re Facebook Privacy Litig.*, 572 F. App'x 494, 494 (9th Cir. 2014) ("personal information" allegedly disclosed by Facebook does not constitute "lost money or property" under the UCL); *In re Zynga Privacy Litig.*, 2011 WL 7479170, at *2 (N.D. Cal. June 15, 2011) ("personal information does not constitute property for purposes of a UCL claim"), *aff'd* 750 F.3d 1098 (9th Cir. 2014); *Hart v. TWC Prd. & Tech.*, 526 F. Supp. 3d 592, 603-04 (N.D. Cal. 2021) ("private geolocation data" is not "lost money or property"); *In re Sony*, 903 F. Supp. 2d at 965 (holding that loss of "property value in one's information" does not "suffice as injury" under the UCL or CLRA).[18]

### 4.    *Plaintiffs Fail to Plead a Basis for Restitution or Injunctive Relief*

Plaintiffs seek "equitable relief" (restitution or injunctive relief) under the UCL (AC ¶ 185), and injunctive relief under the CLRA (AC ¶ 193), but they fail to plead a basis for either.

<u>*Restitution*</u>. Plaintiffs seek "restitution damages. . . . consisting of the monetary benefits that have been unjustly conferred upon Twitter." AC ¶ 167. Under California law, this is not restitution, but rather non-restitutionary disgorgement, because it is measured by Twitter's alleged unjust enrichment rather than by any loss to plaintiffs. *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 800 (2015). Nonrestitutionary disgorgement is not a remedy under the UCL or CLRA. *Hadley v. Kellogg Sales.*, 324 F. Supp. 3d 1084, 1113 (N.D. Cal. 2018); *Ivie v. Kraft Foods*, 2015 WL 183910, at *2 (N.D. Cal. Jan. 14, 2015). The only restitution Plaintiffs can seek under these statutes is for money they paid to Twitter. *See Madrid v. Perot Sys.*, 130 Cal. App. 4th 440, 453 (2005) ("in the context of the UCL, 'restitution' is limited to the return of property or funds in which the plaintiff has an ownership interest"). But they admit Twitter is free. AC ¶ 31. And they fail to identify any other property or funds that they claim Twitter should "return" to them.

---

[18] *See also Gonzales v. Uber Techs.*, 305 F. Supp. 3d 1078, 1093 (N.D. Cal. 2018) ("[S]haring of names, user IDs, location and other personal information does not constitute lost money or property for UCL standing"); *Claridge v. RockYou*, 785 F. Supp. 2d 855, 863 (N.D. Cal. 2011) (plaintiff's "PII—e.g., his login and password information" was not lost under UCL because it "did not cease to belong to him, or pass beyond his control"); *In re iPhone App. Litig.*, 2011 WL 4403964, at *14 (N.D. Cal. Sep. 20, 2011) ("Numerous courts have held that a plaintiff's 'personal information' does not constitute money or property under the UCL.").

*Injunctive Relief*. Plaintiffs also fail to plead a basis for injunctive relief, which "lies only to prevent threatened injury and has no application to wrongs that have been completed." *Scripps Health v. Marin*, 72 Cal. App. 4th 324, 332 (1999); *Sun Microsystems v. Microsoft*, 188 F.3d 1115, 1123 (9th Cir. 1999) ("California law . . . provides that a plaintiff cannot receive an injunction for past conduct unless he shows that the conduct will probably recur."), *abrogated on other grounds by eBay v. MercExchange*, 547 U.S. 388 (2006). This is because "an injunction must seek to prevent harm, not to punish the wrongdoer." *Feitelberg v. Credit Suisse First Bos.* 134 Cal. App. 4th 997, 1012 (2005).

Plaintiffs fail to plausibly allege that Twitter's "alleged misconduct is ongoing or likely to recur," or a "concrete, non-speculative threat that [they] will be similarly injured in the future." *Madrid*, 130 Cal. App. 4th at 440; *Streets v. Space Sys.*, 2021 WL 4146962, at *10 (N.D. Cal. Sep. 13, 2021). To the contrary, the documents Plaintiffs incorporate in their complaint explain that Twitter fixed the API bug in January 2022. Ex. 7 (cited in AC ¶ 62). In any event, an injunction *against Twitter* would not mitigate the risks and future harms Plaintiffs seek to avoid—phishing attacks, robocalls, identity theft, etc.—because *third parties*, not Twitter, allegedly pose such risks and harms.

### 5. Plaintiffs Fail to Allege They Entered Into a "Transaction" for the Sale or Lease of "Services" as Required Under the CLRA

Plaintiffs' CLRA claim fails for the independent reason that they fail to allege the parties engaged in a *transaction* for the "*sale* or *lease* of *goods* or *services* to any consumer."[19] Cal. Civ. Code § 1770(a) (emphases added); *see also Ting v. AT & T*, 319 F.3d 1126, 1148 (9th Cir. 2003) ("The CLRA only applies to a limited set of consumer transactions, and is not a law of 'general applicability.'").

*First*, Plaintiffs fail to plausibly allege that they entered a "transaction" for the "sale or lease of goods or services" because they admit that "Twitter does not charge users for signing up for or for using a Twitter account." AC ¶ 31. Courts hold that the mere allegation that users provided

---

[19] Similarly, a "consumer" is defined as "an individual who seeks or acquires, *by purchase or lease*, any goods or services for personal, family or household purposes." Cal. Civ. Code § 1761(d) (emphasis added).

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS

"valuable data" (AC ¶ 31) in exchange for use of a free service is insufficient to allege a "sale" or "lease" under the CLRA. *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, at *33 (N.D. Cal. Aug. 30, 2017) (rejecting plaintiffs' argument that alleged transfer of PII to defendant to use free platform is a "purchase" or "lease" under the CLRA); *In re Facebook*, 572 F. App'x at 494 (dismissing CLRA claim because plaintiffs failed "to allege that they obtained anything from Facebook 'by purchase,' or by a 'consumer transaction'" within the meaning of the CLRA); *Yunker v. Pandora Media*, 2013 WL 1282980, at *12 (N.D. Cal. Mar. 26, 2013) (rejecting allegation that plaintiff "purchased the defendant's services with his PII" as insufficient to allege that plaintiff was a consumer).

*Second*, online platforms like Twitter (AC ¶ 28) are not "services" under the CLRA. The statute defines "services" as "work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods." Cal. Civ. Code § 1761(b); *see Rojas-Lozano*, 159 F. Supp. 3d at 1117 (dismissing CLRA claim because "Plaintiff has cited to no case, and indeed the Court is unaware of even one, that holds that software utilized entirely online constitutes a CLRA good or service"); *see Song Fi v. Google*, 2016 WL 1298999, at *11 (N.D. Cal. Apr. 4, 2016) (dismissing CLRA claim because "Plaintiffs' use of the YouTube website" did not qualify as a "service" under the CLRA).

### F.      Plaintiffs' Declaratory Judgement Claim (Count VIII) Should Be Dismissed

Plaintiffs' claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, should be dismissed because they fail to state a predicate claim for the reasons discussed above. *Estate v. Am. Brokers Conduit,* 2017 WL 412527, at *10 & n.13 (N.D. Cal. Jan. 31, 2017) ("where the plaintiff's underlying claims fail, so too does his declaratory relief claim"). The claim should also be dismissed as "duplicative" because it would not resolve any issues not already encompassed by Plaintiffs' legal claims. *See Tyson v. Nationstar Mortg.*, 2016 WL 39903, at *5 (N.D. Cal. Jan. 4, 2016); *Jensen v. Quality Loan Serv.,* 702 F. Supp. 2d 1183, 1189 (N.D. Cal. 2010).

1  **IV.     Conclusion**

2        For the reasons above, the Consolidated and Amended Complaint should be dismissed in its

3  entirety and with prejudice.

4  DATED:  June 6, 2023                        QUINN EMANUEL URQUHART &
                                               SULLIVAN, LLP
5

6

7                                       By _____/s/ Stephen A. Broome_____
                                             Stephen A. Broome
8                                            *Attorney for Defendant X Corp.,*
                                             *successor in interest to Twitter, Inc.*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28