**SCOTT+SCOTT ATTORNEYS
AT LAW LLP**
Joseph P. Guglielmo (*pro hac vice* admitted)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
jguglielmo@scott-scott.com

*Co-Lead Counsel and Attorneys for Plaintiff Casey
Weitzman*

[Additional counsel appear on signature page.]

**ISRAEL DAVID LLC**
Israel David (*pro hac vice* admitted)
Blake Hunter Yagman (*pro hac vice* admitted)
17 State Street, Suite 4010
New York, NY 10004
Telephone: (212) 739-0622
israel.david@davidllc.com
blake.yagman@davidllc.com

*Co-Lead Counsel and Attorneys for Plaintiffs
Stephen Gerber and Eric Cohen*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| STEPHEN GERBER, ERIC COHEN, and CASEY WEITZMAN, Individually and on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>TWITTER, INC. and X CORP., as Successor in Interest to Twitter, Inc.,<br><br>Defendants. | Case No. 4:23-cv-00186-KAW<br><br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Stephen Gerber, Eric Cohen, and Casey Weitzman (collectively, "Plaintiffs"), on behalf of themselves and all other persons similarly situated, bring this Consolidated Second Amended Class Action Complaint against Defendant Twitter, Inc. and its successor in interest, X Corp. ("Twitter" or "Defendants"). Plaintiffs allege, upon personal knowledge as to Plaintiffs' own actions, upon the investigation of counsel, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This action stems from Twitter's failure to comply with its duties to secure sensitive user data. For years, Twitter has chosen profits over user privacy. Twitter knowingly ignored dangerous inadequacies in its data security infrastructure, including a 2011 Decision and Order of the Federal Trade Commission ("FTC"). Twitter falsely represented that it would protect Plaintiffs' and the Class' personally identifiable information and protect their privacy interests.

2.      As a result, a 2021 breach of Twitter's systems placed approximately 200 million users' valuable and sensitive personal identifying information, including names, email addresses, and phone numbers ("PII") in the hands of cybercriminals (the "Data Breach"). Moreover, as set forth in detail herein, as a result of the Data Breach, certain Plaintiffs' and the Class' anonymity has been compromised.

3.      Twitter's actions, detailed below, have injured Plaintiffs and the Class, and caused them to suffer damages and have placed Plaintiffs and the Class at imminent risk of serious identity theft. Plaintiffs and Class Members have incurred, and will continue to incur, damages in the form of, among other things, out of pocket costs, lost time and expenses related to identifying and mitigating the harms caused by the Data Breach, monitoring their accounts for suspicious activity, increased spamming and spoofing activity against them, and attempted fraud on themselves and their accounts, including the increased risk of future harm, loss of anonymity, loss of privacy, and additional damages as described below.

4.      Twitter is a social media platform where users can post and engage with short-form commentary, called "Tweets." Twitter has positioned itself as a modern-day public square – a platform to "to serve the public conversation" by offering a "free and safe space to talk." Many

1

tens of millions of individuals have accepted this invitation from Twitter. These Twitter users collectively deliver enormous value (and profits) to Twitter through advertising and data licensing revenues. These revenue streams – generated directly by user engagement and activity on the platform – are the basis for Twitter's recent valuation of over $40 billion.

5.      As Twitter has grown to become one of the largest social media and networking platforms in the world, so has the volume and value of sensitive user data that it holds. Twitter acknowledged and represented that it was and is required to protect the information that users shared with it and that it was further required to provide meaningful privacy to users who communicated on Twitter's platform anonymously. Twitter understood its obligations and represented that it would protect users' ability to use Twitter pseudonymously and that it would offer meaningful privacy and security controls. Twitter's Code of Business Conduct and Ethics also specifically acknowledged that Twitter was required to ask users to trust Twitter with users' personal data. Despite this understanding, Twitter failed to live up to its representations.

6.      Twitter further represented in its Privacy Policy – and repeated such statements on its website and public blog – that it would respect and protect the privacy and security of users' information as well as other confidential information that Twitter received from users. As detailed below, Twitter represented that it had implemented security procedures to strictly limit access to and use of users' personal information to protect Plaintiffs' and the Class' user data from unauthorized access. However, despite such representations, Twitter failed to live up to its promises thereby resulting in the Data Breach that is the subject of this litigation.

7.      Twitter's former head of security, Peiter Zatko ("Zatko") testified in 2022 before Congress that, among other stunning revelations, Twitter's cybersecurity systems are a decade behind industry standards and Twitter has consistently failed to take any action in response to internal alarm bells regarding dangerous and egregious inadequacies in its systems that left Twitter extremely vulnerable to **both** internal and external threats, as detailed below.

8.      The natural result of Twitter's failures is the Data Breach at issue in this Action which began in 2021, when a dangerous defect in Twitter's application programming interface ("API") allowed internal or external cybercriminals to access and obtain Twitter users' PII. The

compromised information included users' Twitter usernames, email addresses, and phone numbers associated with (*i.e.*, connected to) the specific Twitter accounts. The API vulnerability then allowed cybercriminals to use scrapers to determine whether phone numbers or email addresses had a corresponding Twitter ID which would disclose the identity of anonymous users. The data was stolen, offered for sale, and leaked by cybercriminals on the "dark web."

9.     The Data Breach was foreseeable and preventable. Twitter has been subject to a series of prior data breaches over the past decade due to its lax data security measures. In 2011, Twitter and the FTC entered into a Consent Order whereby the FTC would impose substantial financial penalties if Twitter continued to misrepresent "the extent to which [Twitter] maintains and protects the security, privacy, confidentiality, or integrity of any nonpublic consumer information." Moreover, the 2011 Consent Order required Twitter to "establish and implement, and thereafter maintain, a comprehensive information security program that is reasonably designed to protect the security, privacy, confidentiality, and integrity of nonpublic consumer information."

10.     Twitter agreed that the Consent Order would terminate 20 years from the filing date of its issuance and that it would provide the FTC with biennial assessments for 10 years after service of order. Had Twitter been in compliance with the 2011 Consent Order and heeded the repeated warnings levied to management and its Board of Directors by Zatko and others, Plaintiffs and the Class would not have suffered the harms caused by the Data Breach. Twitter, however, repeatedly chose profits over user privacy. As a result, an unfathomably large trove of private user data is now in the hands of cybercriminals and millions of users have been harmed and will continue to suffer harm into the foreseeable future.

11.     Twitter knowingly failed to implement and maintain reasonable or adequate data security measures to protect its users' PII and related data. These data security failures are not isolated incidents. Rather, they are part of Twitter's long track record over the past decade of failing to protect users' data and privacy. As noted, Twitter has been subject to an FTC consent order since 2011 for failing to take proper measures to maintain reasonable or adequate data security measures to protect users' data and for making false statements regarding those failures. In fact, Twitter was

required to pay a fine of $150 million in 2022 for violating the Consent Order arising out of Twitter's further mishandling of users' PII and related data (the "2022 FTC Settlement").

12.     In a blog post announcing the 2022 FTC settlement, Twitter emphasized that "[*k]eeping data secure and respecting privacy is something we take extremely seriously*,"[1] and in reaching the 2022 FTC settlement, Twitter "paid a $150M USD penalty, and [] have aligned with the agency on operational updates and program enhancements *to ensure that people's personal data remains secure and their privacy protected*."[2]  Notably, Twitter claimed in this 2022 blog post that: "Twitter's commitment to security and privacy is not a point-in-time exercise for us but a core value we constantly enhance by updating our practices to meet the evolving needs of our customers." *Id.* Regrettably, the 2022 blog representations were completely contrary to reality – Twitter failed to take data security seriously and did not ensure that users' privacy was protected.

13.     The Data Breach not only exposed Plaintiffs and the Class to serious harms generally associated with disclosure of sensitive PII, such as phishing attacks and risk of identity theft, the combined set of compromised information also deanonymized tens of millions of Twitter users – like Plaintiffs Gerber and Cohen and millions of members of the putative Class – who believed Twitter's claims that Twitter was safeguarding users' privacy by allowing users to post, share, and access information on Twitter anonymously.

14.     In particular, at the very core of Twitter's business model is its invitation to would-be users to share information and views on a myriad of subjects, including politics, religion, sports, fashion, pets, food, sexuality, and everything in between.  Unlike a public square or other prominent social media platforms, however, Twitter users are invited to do so anonymously by operating on the platform with pseudonymous usernames.  These users may express themselves and access information on Twitter without fear of retaliation, embarrassment, or other repercussions from their employers, family, friends, colleagues, acquaintances, neighbors, or government.  As Twitter itself

---

[1]     Emphasis is added and citations are omitted unless otherwise noted.

[2]     Press Release, *FTC settlement: Our commitment to protecting your privacy and security*, TWITTER (X) (May 25, 2022), https://blog.x.com/en_us/topics/company/2022/ftc-settlement-twitter ("FTC Settlement Press Release").

stated in April 2021, "there is no greater tool to empower people to speak freely than the ability to create pseudonymous accounts or to allow people to control who sees their Tweets." Thus, Twitter's pseudonymous users were led by Twitter to believe that they were safely and anonymously sharing and accessing information on Twitter but, as a result of the Data Breach, their pseudonymous accounts are now publicly linked to their personally-identifying information, in effect 'de-anonymizing' these users.

15.     Against this backdrop, Plaintiffs, on behalf of themselves and all others similarly situated, bring this Action against Twitter for breach of contract, breach of implied contract, negligence, gross negligence, unjust enrichment, violation of California's unfair competition statute, and declaratory relief.   Plaintiffs seek damages, restitution, equitable, declaratory relief, and injunctive relief, including an order of the Court compelling Twitter to adopt reasonably adequate security practices to safeguard the PII in Twitter's custody in order to prevent incidents like the Data Breach from reoccurring in the future, together with reasonable costs and attorneys' fees, and pre- and post-judgment interest.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §1332(d), as provided by the Class Action Fairness Act, because:  this is a civil action filed under Rule 23 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P." or the "Rules"); the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and members of the Class are citizens of a State different from Defendants.  Specifically, Plaintiffs Gerber and Cohen are citizens of the State of New York and Defendants are citizens of the State of California and/or the State of Nevada.

17.     This Court has personal jurisdiction over Defendants because Defendants' principal place of business is in California and a substantial part of Defendants' conduct giving rise to this Action substantially took place in the State of California.

18.     Venue is proper in the Northern District of California (the "District") pursuant to 28 U.S.C. §1391(b)(1), because Twitter is a resident in this District pursuant to 28 U.S.C. §1391(c)(2).

Venue is also proper in this District pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events and omissions giving rise to this Action occurred in this District.

19.    In addition, the agreements at issue with respect to Plaintiffs' breach of contract claims asserted in this Action provide that any dispute arising from the contract or Plaintiffs' use of Twitter's platform and related services "will be brought solely in the federal or state courts located in San Francisco County, California, United States," and further state that the parties "consent to personal jurisdiction and waive any objection as to inconvenient forum."  Terms of Service (as that term is defined below), §6.

## LOCAL RULE 3-5 DIVISIONAL ASSIGNMENT

20.    Pursuant to Local Rule 3-2(c) and 3-2(d) of the United States District Court, Northern District of California Civil Local Rules ("L.R." or the "Local Rules"), assignment of this Action to the Oakland Division is proper because a substantial part of the events and omissions giving rise to this Action occurred in San Francisco County where Defendant Twitter resides.

## PARTIES

### *Plaintiff Stephen Gerber*

21.    Plaintiff Gerber is, and at all times relevant to this Action was, a resident of the State of New York.

22.    Plaintiff Gerber was an active Twitter user for several years prior to terminating his account in 2022.  When creating his account, Plaintiff Gerber provided Twitter with PII, including his name, address, email address, phone number, date of birth, and other information.  The email address that Plaintiff Gerber provided to Twitter (in order to establish his account) reflects his identity.

23.    During the time period in which Plaintiff Gerber used Twitter, Plaintiff Gerber used a pseudonym as his Twitter username and display name in order to protect his identity so that he could express himself and his thoughts on Twitter anonymously and without fear of retribution, retaliation, or embarrassment.

24.    Through Twitter's actions and inactions, Plaintiff Gerber's PII was disclosed by the Data Breach.  As a result of the Data Breach Plaintiff Gerber has suffered anxiety, mental and

emotional anguish as a result of his data being exposed and specifically the deanonymization of his Twitter identity.  Had Plaintiff Gerber been aware that Twitter did not maintain adequate data security systems to prevent the disclosure and use of his PII, he would not have provided Twitter his PII and would not have used Twitter at all.  Had Plaintiff Gerber been aware that Twitter did not maintain adequate data security systems to protect his anonymity, he either would not have provided an email address with identifying information and would not have provided his phone number to Twitter in order to register, or he would not have used Twitter at all.

**Plaintiff Eric Cohen**

25.     Plaintiff Cohen is, and at all relevant times to this Action was, a resident of the State of New York.

26.     Plaintiff Cohen is an active Twitter user.  When creating his account, Plaintiff Cohen provided Twitter with PII, including his name, address, email address, phone number, date of birth, and other information.

27.     During the time period relevant to this Action, Plaintiff Cohen used a pseudonym as his Twitter username and display name in order to protect his identity so that he could express himself and his thoughts on Twitter anonymously and without fear of retribution, retaliation or embarrassment.

28.     Through Twitter's actions and inactions, Plaintiff Cohen's PII was disclosed by the Data Breach.  As a result of the Data Breach, Plaintiff Cohen has suffered anxiety, mental and emotional anguish as a result of his data being exposed and specifically the deanonymization of his Twitter identity.  Had Plaintiff Cohen been aware that Twitter did not maintain adequate data security systems to protect his anonymity and to prevent the disclosure and use of his PII, he would not have provided Twitter his PII and would not have used Twitter at all.

**Plaintiff Casey Weitzman**

29.     Plaintiff Weitzman is, and at all relevant times to this Action was, a resident of the State of California.

30.     Plaintiff Weitzman is a Twitter user.  When creating her account, Plaintiff Weitzman provided Twitter with PII, including her name, address, email address, phone number, date of birth, and other information.

31.     Through Twitter's actions and inactions, Plaintiff Weitzman's PII was disclosed by the Data Breach.  Since one or more threat actors announced the Data Breach, Plaintiff Weitzman has incurred out-of-pocket expenses and required to spend approximately six hours each week of her valuable time monitoring her various accounts in an effort to detect and prevent any misuses of her PII, monitoring her accounts for suspicious activity, having to deal with increased spamming and spoofing, and attempted fraud on her accounts, time which she would not have had to expend but for the Data Breach.  In addition, Plaintiff Weitzman was required to hire a social media specialist to monitor her accounts, at an additional weekly cost, to deal with the increased spamming and spoofing she has suffered as a result of the Data Breach.  This was an expense she would not have incurred but for the Data Breach.  Had Plaintiff Weitzman been aware that Twitter did not maintain adequate data security systems to prevent the disclosure and use of her PII, she would not have provided Twitter her PII and would not have used Twitter at all.

**Defendants Twitter, Inc. and X Corp.**

32.     At all relevant times until on or about March 15, 2023, Twitter, Inc. was a corporation existing and organized under the laws of the State of Delaware.  According to defense counsel in this Action, on or about March 15, 2023, Twitter, Inc. merged into (and has been replaced by its successor in interest) X Corp., a Nevada corporation.  As indicated above in the preamble to this pleading, Twitter, Inc. and its successor in interest X Corp. are collectively referred to herein as "Twitter."  Twitter maintains its principal place of business at 1355 Market Street, San Francisco, California.

## FACTUAL ALLEGATIONS

**A.      Twitter and Its Business Model**

33.     Twitter is a popular online social media platform on which users communicate in short posts called "Tweets."  Twitter is accessible to the public, including its registered users, via a

mobile application (as may be used, for example, on an iPhone, Android phone, or any smart device) or by visiting Twitter's website (www.twitter.com) on a web browser.

34. The way that Twitter works is rather simple: after creating a Twitter account, a user is able to publicly post Tweets, which may include text, images, and/or video. The Twitter platform also allows for users to engage with each other. Namely, users may "like," comment on, or "retweet" (post themselves) Tweets that are posted by other users and may exchange direct messages with other registered users.

35. To facilitate user engagement, the Twitter platform allows a user to search for information that interests them and also employs an algorithm to present users with targeted information and advertising. More specifically, upon logging into the platform, Twitter users are displayed a "mini-feed" of Tweets by other users that they either have chosen to "follow" or that Twitter's algorithm finds to be relevant to the user's particular interests and online activities. Twitter users may also use a search tool to find particular users, content, or information, including news, trending topics, or any other subject matter. While this full range of functionality is limited to registered Twitter users, any person can view publicly posted Tweets.

36. Twitter operates on a so-called freemium model: meaning, Twitter does not charge users for signing up or for using a Twitter account. Although Twitter users generally do not pay Twitter directly for the ability to use Twitter, these users collectively deliver enormous value (and profits) to Twitter through the valuable data that they provide to Twitter and generate while using Twitter. Put simply, Twitter users and their data are Twitter's revenue-generating mechanism. Twitter generates billions of dollars in annual revenues from the targeted-advertisements that appear in users' mini-feeds. This digital advertising 'space,' is particularly valuable because advertisers are able to target specific demographic(s) of Twitter users based on their activity across the platform. Twitter also generates billions in annual revenues through licensing valuable user data.

**B. Twitter Represented It Would Protect User's PII and Privacy**

37. To establish a Twitter account and operate on the platform, an individual must provide certain information required by Twitter, including the name, email address, phone number, and date of birth of the user associated with the account. Each Twitter user must also create a

username and display name, which are displayed publicly on the Twitter platform and identify the user and their activity across the Twitter platform.  For example, each Tweet, re-Tweet, like, comment, or direct message by a particular user is labelled with their chosen username and/or display name, similar to a digital signature specific to the Twitter platform.

38.    In order to register, a user must also agree "to form a binding contract with [Twitter] governing use of the Twitter platform – the Twitter User Agreement.  Terms of Service, §1.  The Twitter User Agreement incorporates three components: the Terms of Service, the Privacy Policy, and the Twitter Rules and Policies, and all incorporated policies.  Terms of Service, Summary of Our Terms.  Twitter's landing page and cover pages provide links to these documents although they do not specifically identify or describe what is contained in such documents.

39.    Twitter's User Agreements generally provide that Twitter may revise the terms of the User Agreement from time to time, but such changes are not retroactive, the most current version of the User Agreement will govern the parties relationship, and that by continuing to access or use the Twitter platform and related services after any such revisions become effective, the user agrees to be bound by the revised terms of the User Agreement then in effect.  *See*, *e.g.*, 2022 Terms of Service, §6; *see also*, *e.g.*, 2022 Privacy Policy, §8 ("The most current version of this Privacy Policy governs our processing of your personal data and we may revise this Privacy Policy from time to time as needed.  If we do revise this Privacy Policy and make changes that are determined by us to be material, we will provide you notice and an opportunity to review the revised Privacy Policy before you continue to use Twitter.").

40.    As relevant to the Action, three separate versions of the Terms of Service and the Privacy Policy, respectively, of the User Agreement were effective:  Terms of Service, effective June 10, 2022 through the date of this Consolidated Second Amended Class Action Complaint (the "2022 Terms of Service"); Terms of Service, effective as of August 19, 2021 and labeled as Version 16 in Twitter's Terms of Service Archive (the "2021 Terms of Service"); Terms of Service, effective as of June 18, 2020 and labeled as Version 15 in Twitter's Terms of Service Archive (the "2020 Terms of Service"); Privacy Policy, effective June 10, 2022 through the date of this Consolidated Second Amended Class Action Complaint (the "2022 Privacy Policy"); Privacy Policy, effective as

of August 19, 2021 and labeled as Version 17 in Twitter's Policy Archive (the "2021 Privacy Policy"); and the Privacy Policy, effective as of June 18, 2020 and labeled as Version 16 in Twitter's Policy Archive (the "2020 Privacy Policy").[3]  The operative provisions of the Terms of Service and Privacy Policies that are relevant to this Action are substantially and materially similar or identical.

41.    Twitter requires users to provide their identifying PII in order to establish an account, including their name, email address, phone number, date of birth, and other information.  While an individual's chosen display name and username are public, Twitter promises its registered users that their PII, including their email addresses and phone numbers – which are required to be provided to Twitter in order to register – will never be publicly disclosed or publicly displayed on Twitter.  As detailed below, this PII is valuable, sensitive information.

42.    Importantly, the Privacy Policies address the use and disclosure of Twitter user data, including PII, among other user privacy matters, which each user must agree to in order to establish a Twitter account.  Twitter's Privacy Policy describes how Twitter uses the information that it collects from users, including the PII provided when users initially register.  All user data, including data provided to Twitter by a registered user, such as PII, content generated by a user, or data otherwise generated by a user in the course of their respective use of the Twitter platform is governed by the operative Privacy Policy.

---

[3]    The 2022 Terms of Service, 2021 Terms of Service, and 2020 Terms of Service are referred to collectively herein as the "Terms of Service."  The 2022 Privacy Policy, 2021 Privacy Policy, and 2020 Privacy Policy are referred to collectively herein as the "Privacy Policies."  Unless specifically stated otherwise, the term "User Agreements" refers collectively to all contracts, in their entirety, between Twitter on the one hand and Plaintiffs and Class Members on the other, in effect during the period relevant to the Data Breach (as that term is defined above) and this Action including, the Terms of Service, the Privacy Policy as well as the representations made on Twitter's website and public blog, including representations which cite, link or refer or reference the Privacy Policy.

43.    Twitter's landing page entitled "Our Priorities" is a cover page with the heading "Security and privacy."   On this landing page, under the heading "About Twitter / Security and Privacy," "Security and Privacy" Twitter specifically represented that it was "***committed to protecting the information you share with us.***"[4]   An image of that landing page obtained from the WayBackMachine shows the landing page.



[4]    *Security and Privacy*, Twitter (X), https://web.archive.org/web/20210220230141/https://about.twitter.com/en/our-priorities/security-and-privacy (last visited Apr. 17, 2024).

44.     Twitter's landing page (image of page above) further represents "[o]ur commitment to serve the public conversation is also a ***commitment to protect the information you share with us and to provide meaningful privacy controls***."  *Id.*  These representations were set forth in each version of Twitter's landing page during the 2021 and 2022 time period.

45.     A copy of the this landing page in 2022[5] continues to make the same representation:

Our commitment to serve the public conversation is also a commitment to protect the information you share with us and to provide meaningful privacy controls. Transparency matters to us — so we want you to know what data we collect, how we use it, when we share it, and what we do to protect it.

## Looking for more details?

- Check out more about our **privacy work and your data controls**.

- Learn how to manage **your privacy settings**.

46.     The landing page in the 2021 and 2022 time period then provided a further statement on the privacy landing page under the heading "Looking for more details?" links to entitled "privacy work and your data controls" and "your privacy settings."  *Id.*

---

[5]     *Security and Privacy*, TWITTER (X) (last visited Apr. 17, 2024), https://web.archive.org/web/20220307162606/https://about.twitter.com/en/our-priorities/security-and-privacy.

47.    A user who clicks on that link is then directed to the Privacy Center landing page where Twitter states: "Control your Twitter experience" and represents that it wanted to make users' experiences better and more secure[6]:



48.    Following the preceding statement, Twitter then provides a link to a landing page which contains a further link to Twitter's Privacy Policy.  On that landing page, Twitter represents that it wishes to make users' experience better and more secure:



---

[6]    *Twitter Privacy Center*, TWITTER (X), https://web.archive.org/web/20210303143754/https://privacy.twitter.com/en (last visited Apr. 17, 2024).

49.     The Twitter Privacy Policy landing page then provides the following heading: "We believe you should always know what data we collect from you and how we use it, and that you should have meaningful control over both.  We want to empower you to make the best decisions about the information that you share with us.  That's the basic purpose of this Privacy Policy."[7]



50.     Twitter's Privacy Policies as of 2021 and 2022 represented that the data users shared with Twitter would be used to provide data security and to keep users' accounts secure: "When you use Twitter, even if you're just looking at Tweets, we receive some personal information from you like the type of device you're using and your IP address.  You can choose to share additional information with us like your email address, phone number, address book contacts, and a public profile.  *We use this information for things like keeping your account secure* and showing you more relevant Tweets, people to follow, events, and ads."  *Id.*  An image of the statement on the Twitter website at the time appears below:

---

[7]     *Privacy Policy*, TWITTER (X), https://web.archive.org/web/20210224033618/https://twitter.com/en/privacy (last visited Apr. 17, 2024).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

When you use Twitter, even if you're just looking at Tweets, we receive some personal information from you like the type of device you're using and your IP address. You can choose to share additional information with us like your email address, phone number, address book contacts, and a public profile. We use this information for things like keeping your account secure and showing you more relevant Tweets, people to follow, events, and ads.

51.     Twitter represented that it limited what data it shared with third parties, which would necessarily include prohibiting access to threat actors.  Twitter acknowledged in its Privacy Policy that its ability to share Plaintiffs' and the Class' PII was limited to those instances where Plaintiffs and the Class **consented to sharing such information,** and noted that this limitation was in place either because it was "important" to Twitter or because it was "required by law."  Specifically, Twitter's Privacy Policy further represented that "[i]n the limited circumstances where we disclose your private personal data, *we do so subject to your control, because it's important for operating our services, or because it's required by law*."  *Id.*



52.    Plaintiffs and the Class did not consent to Twitter allowing hackers to access their PII through Twitter's API.  Nor did they consent to Twitter to violate the terms of its Privacy Policies or violate the law by failing to implement reasonable security measures to protect such data from hackers who were able to access and steal Plaintiffs' and the Class' PII.

53.    Indeed, Twitter represented in its Privacy Policies that it would limit access to Plaintiffs' and the Class' PII to only those individuals or entities to whom users expressly consented. Specifically, on the Privacy Policy landing page, Twitter represented under the heading "Sharing You Control" that it would "*share or disclose your personal data with your consent or at your direction*, such as when you authorize a third-party web client or application to access your account or when you direct us to share your feedback with a business." *Id.*, §3.2.

54.    Additionally, Twitter represented that it only disclosed non-personal information to third parties in limited circumstances.  Specifically, in its Privacy Policy, Twitter stated: "Non-Personal Information – We share or disclose non-personal data, such as aggregated information like the total number of times people engaged with a Tweet, demographics, the number of people who clicked on a particular link or voted on a poll in a Tweet (even if only one did), the topics that people are Tweeting about in a particular location, some inferred interests, or reports to advertisers about how many people saw or clicked on their ads." *Id.*, §3.5.

55.    Twitter further acknowledged on its website, through its Global Impact Statement, that it was obligated to protect Plaintiffs' and the Class' PII and privacy.  Twitter also acknowledged the real and foreseeable threat of cybersecurity incidents and represented that it took steps to protect the security and privacy of users' information:

> At Twitter, we're aware of the role we play in society and we take our responsibility seriously.  In the 15 years since our founding, the threat landscape has grown significantly.  We continuously improve our processes, including strengthening authorization checks, improving our detection and monitoring capabilities, and investing in tools and training for Tweeps and contractors.
>
> The required annual compliance certification training for all Tweeps includes data privacy and data security.  We've also enhanced training content on secure coding, threat modeling, privacy impact assessments, and how to integrate privacy into everything we design and build.  We continue to invest in and scale the processes in place to review products for security and privacy concerns before they launch.

1    In addition to our information security and privacy professionals we have a novel
2    internal network of Tweeps across a wide range of our teams — Twitter Doves. They
     dedicate 10-20% of their time to championing data privacy, security, and
3    management, and act as their team's day-to-day point of contact for questions about
     these areas. This helps distribute security awareness and focus throughout the
4    organization rather than simply within expected verticals.

5    This cross-functional team receives best practices training and direct support from
     the privacy, security, and data management teams. Doves also have opportunities to
6    pursue professional certifications related to privacy, security, and data management
     (like Certified Information Privacy Professional (CIPP) and Certified Information
7    Systems Security Professional (CISSP)). They meet as a group at least once a month
     to discuss cross-functional data privacy, security, and management alignment and
8    best practices, helping us build great products that respect, protect, and keep personal
     data secure.[8]

9        56.    Twitter's representations regarding its obligations and commitments to protect users'

10   PII and their privacy were further explained in Twitter's Code of Business Conduct & Ethics, which

11   referenced Twitter's Privacy Policy, and represented that Twitter had implemented the necessary

12   security procedures to protect users' PII from unauthorized access:

13   **Twitter Code of Business Conduct & Ethics (Way Back Machine Captured
     April 7, 2020)**

14
15   Our users value Twitter not only for our great product, but also because we hold
     ourselves to a high standard in how we treat our users. Always remember that we
16   are asking our users to trust us with their personal information. ***Preserving that trust
     requires that each of us respect and protect the privacy and security of that
17   information as well as other confidential information that Twitter may have. Our
     security procedures strictly limit access to and use of users' personal information,
18   and require that each of us take measures to protect user data from unauthorized
     access.*** Know your responsibility under these procedures and collect, use and access
19   user information only as authorized by our security policies, as permitted by local
     law, our Privacy Policy and applicable data protection laws.[9]

20       57.    Similarly, referencing and echoing Twitter's Privacy Policy, Twitter further

21   represented that it would not share PII without user consent:

22   **Twitter Statement About Profile Visibility Settings**

23

24

25   ---
     [8]  *See*  2020  Global  Impact  Report,  TWITTER  (X)  (Apr.  7,  2021),
26   https://about.twitter.com/content/dam/about-twitter/en/company/global-impact-2020.pdf, at 12; *see
     also Introducing Twitter's Global Impact Report*, TWITTER (X) (Apr. 7, 2021),
     https://blog.x.com/en_us/topics/company/2021/introducing-twitters-global-impact-report.
27   [9]    *Code of Business Conduct & Ethics*, TWITTER (X) (last visited Apr. 17, 2024),
     https://web.archive.org/web/20200407080802/https://legal.twitter.com/en/code-of-business-
28   conduct.html.

Twitter takes privacy very seriously and does not share your non-public personal information, including your contact information, without your consent, or in the limited ways outlined in our Privacy Policy.[10]

58.    Twitter also communicated with users through its public blog where it reaffirmed many of the statements made in its Privacy Policies and website above – including its commitment, as stated in its Privacy Policies, to protect users' privacy.  Specifically, from 2019 through 2022, Twitter repeatedly posted on its public blog statements designed to reassure its users that it would protect their PII and privacy.  For example, in 2019, Twitter posted under the heading:

**What We Have Been Doing to Protect Privacy and Data (Dec. 2019):**

It's so common to hear tech companies say: "Privacy is not a privilege; it is a fundamental right" that those words have become a cliché.  People have become desensitized to hearing companies say, "we value your privacy," and are worn out from being asked to accept privacy policies that they rarely, if ever, even read.  Many companies make these declarations without even showing people what actions they are taking to protect their privacy.  And let's be honest, we have room for improvement too.

***We believe companies should be accountable to the people that trust them with their personal information, and responsible not only to protect that information but to explain how they do it***.

\*        \*        \*

**How we think about Privacy and Data Protection at Twitter**

People's right to privacy and data protection is something we have fought to protect since Twitter was created in 2006.  From the beginning, we have offered a range of ways for people to be part of the conversation on Twitter on their terms – from creating pseudonymous accounts to protect their identity to letting people control who sees their Tweets.  But what people see externally is not the sum of our work.  ***Behind the scenes, teams across the company are constantly working to protect your privacy and data***.  This work has three areas of focus:

\*        \*        \*

**Build privacy into the products we launch.**  Privacy by design is a priority with every product we build.  To achieve this, we continue to build out our processes to review the products we launch.  This process involves our Information Security, Product and Privacy Counsel teams, and our independent Office of Data Protection.  This is critical work that we're continuing to invest in.  Every new employee goes through data privacy, security, and management training.  ***We launched an internal group called Twitter Doves, which is designed to cultivate the best data privacy, security and management practices for everyone at the company.  The Doves' motto, "trust is earned, not given," guides best practices we adhere to across Twitter***.  Finally, we're speaking with people around the world to better understand

---

[10]    *About profile visibility settings*, TWITTER (X) (last visited Apr. 17, 2024), https://help.twitter.com/en/safety-and-security/birthday-visibility-settings.

how different cultures and groups think about privacy and what they expect when they share their information with a company like ours.  For example, through the initial findings from this research, we've learned that "meaningful controls" have different connotations depending on where you're from.  This kind of feedback is critical to us as we build the privacy and data controls people want when they use Twitter.

**Keep ourselves accountable to the people that trust us with their data.**  We know that there is no silver bullet that will make people trust us with their data.  However, we also know that to keep your trust we have to show you we're accountable.  We have already taken a variety of steps to weave accountability into how we operate.  Our Data Protection Officer, Damien Kieran, provides an independent assessment of all privacy and data protection-related work to our board of directors on a quarterly basis to make sure we're appropriately discussing any issues and concerns we have and to drive alignment on what matters from a data protection perspective.  We are continuing to invest in our Data Management Organization so that we can always account for the data we have, how it is used, and when it is shared.  ***To make sure everyone at Twitter is accountable, privacy and data protection is the heart of our 2020 company-wide priority to build products that earn the trust of people who use them.***  Also, launching the Twitter Privacy Center provides a central place to keep you updated on our privacy and data protection work and aid us in being accountable to you through transparency.[11]

59.    In response to a separate data breach, Twitter issued a statement in July 2020 on its public blog reaffirming its representations regarding Twitter's duty to protect Plaintiffs' and the Class' PII and privacy:

**Twitter Responses to 2020 Data Breach (July 2020):**

We're always investing in increased security protocols, techniques and mechanisms – it's how we work to stay ahead of threats as they evolve.  Going forward, we're accelerating several of our pre-existing security workstreams and improvements to our tools.  ***We are also improving our methods for detecting and preventing inappropriate access to our internal systems and prioritizing security work across many of our teams.***  We will continue to organize ongoing company-wide phishing exercises throughout the year.[12]

60.    Later in 2020, Twitter again represented on its blog, with links to the Safety and Security landing page, that it would protect the data and privacy of its users' accounts:

**Twitter's Work to Keep it Secure (Sept. 2020):**

At Twitter, we're acutely aware of the role we play in society and we take that responsibility seriously.  We have been, and will continue to be, focused on empowering the public conversation.  To do this, we must protect the security and

---

[11]    Damien Kieran & Kayvon Beykpour, *What we have been doing to protect your privacy and data*, TWITTER (X) (Dec. 2, 2019), https://blog.twitter.com/en_us/topics/company/2019/privacy_data_protection.

[12]    *An update on our security incident*, TWITTER (X) (July 18, 2020), https://blog.x.com/en_us/topics/company/2020/an-update-on-our-security-incident.

privacy of the people who use our service.  You can see some of this work on Twitter, such as in the privacy and account security settings and controls we offer you, but a lot of it happens behind the scenes.  We want to share more on the work we're doing to protect your account and keep Twitter secure.[13]

61.    In November of 2021, again refencing and linking back to its Privacy Policy, Twitter posted on its blog its commitment to protect users' PII and privacy and the specific measures Twitter was taking to ensure that its users' information was secure:

**Twitter's continued promise to data security (Nov. 2021):**

We're committed to keeping you informed on our work to protect your privacy and the data you share with Twitter.  Today we're sharing an update on recent improvements to our internal processes, teams, and infrastructure so you understand the continued investment we're making in protecting the security and privacy of the people who use our service around the world.

**Launching a new Data Governance Committee**

To strengthen the implementation of our privacy and security policies and standards, we're establishing an internal Data Governance Committee (DGC).  This committee will ensure we are making consistent and balanced decisions around how we use and protect your data.  The Committee will oversee all decisions to collect, maintain, use, disclose, or provide access to customer data internally.  They will also review and approve updates to our Privacy Policy, ensure that teams are adhering to those policies, and make the decisions on what is and is not acceptable use of your data.

**Infusing security and privacy into everything we build**

Keeping your data secure and respecting your privacy will always be ongoing work for us.  In collaboration with teams across Twitter and external partners, some of our most recent efforts include:

- Expanding the privacy and security reviews conducted before a product or service can be launched to include a mandatory assessment of our Software Development lifecycle;

- Revamping our proactive internal audits of systems and services to ensure that they happen more frequently;

- Expanding our privacy and security teams; and

---

[13]    Parag Agrawal & Damien Kieran, *Our continued work to keep Twitter secure*, TWITTER (X) (Sept. 24, 2020), https://blog.x.com/en_us/topics/company/2020/our-continued-work-to-keep-twitter-secure.

- Providing annual reports from our CISO and CPO to our full Board of Directors to drive awareness, alignment and accountability on privacy and security.

This work builds on our efforts to improve the security of our internal tools and systems which includes strengthening our access management processes and authentication systems for support tools, improving our detection and monitoring capabilities, and investing in additional penetration testing and scenario planning to help secure Twitter from a range of possible threats. It also goes hand in hand with our ongoing work to tackle technical debt and build security and privacy into everything we launch.

We believe that, ultimately, this work and these changes will keep the data you trust us with secure and private.

**What's next**

Twitter's commitment to strengthening our privacy and security practices continues to expand and is a top priority for the company. While much of the work we're doing in this space is not visible on Twitter, we will continue to communicate about these efforts.

With transparency and accountability as the backbone of this work, we'll share lessons learned and update you on the latest work to protect your privacy and security on Twitter.[14]

62.     Twitter further represented that users' privacy and their ability to post anonymously was a fundamental right for users and that Twitter would protect its users' anonymity:

**Twitter 2020 Global Impact Report Released April 7, 2021**

We believe privacy is a fundamental human right. From protecting people's ability to use the service pseudonymously to offering meaningful privacy and security controls, to our overall commitment to transparency — these fundamental principles are built into our DNA.

People's right to privacy and the protection of their data is something we've fought for since Twitter was founded in 2006. From the beginning, we've offered various ways for people to join the conversation on Twitter on their own terms — there is no greater tool to empower people to speak freely than the ability to create pseudonymous accounts or to allow people to control who sees their Tweets. We also partner with civil society, standing up to governments and evolving our efforts to document our work. Teams across the company are constantly working to protect people's privacy and data.[15]

---

[14]     Damien Kieran & Rinki Sethi, *Our continued work to protect your privacy and security*, TWITTER (X) (Nov. 10, 2021), https://blog.x.com/en_us/topics/company/2021/our-continued-work-to-protect-your-privacy-and-security.

[15]     *See 2020 Global Impact Report*, *supra* n.8, at 11.

63.     Recently, in response to the 2022 FTC Settlement, Twitter posted on its blog its commitment to protect the security and privacy of users' PII and that it was actively investing and improving these areas:

**Twitter's Response to 2022 FTC Settlement (May 2022):**

On May 25, 2022, Twitter reached a settlement with the Federal Trade Commission (FTC) regarding a privacy incident disclosed in 2019 when some email addresses and phone numbers provided for account security purposes may have been inadvertently used for advertising. This issue was addressed as of September 17, 2019, and today we want to reiterate the work we'll continue to do to protect the privacy and security of the people who use Twitter.

Keeping data secure and respecting privacy is something we take extremely seriously, and we have cooperated with the FTC every step of the way. In reaching this settlement, we have paid a $150M USD penalty, and we have aligned with the agency on operational updates and program enhancements to ensure that people's personal data remains secure and their privacy protected.

***Twitter's commitment to security and privacy is not a point-in-time exercise for us but a core value we constantly enhance by updating our practices to meet the evolving needs of our customers.*** The recently announced Data Governance Committee is an embodiment of our dedication to strengthen the implementation of our privacy and security policies and standards, as well as to expand our internal privacy and security review processes during the product development life cycle.

Moving forward, ***we will continue to make investments in this work, including building and evolving processes, implementing technical measures, and conducting regular auditing and reporting to ensure we are mitigating risk at every level and function at Twitter.*** We will also continue to partner with the FTC, and our security and privacy regulators around the world, on our shared mission of building useful products and services that meet our customers' needs while keeping the information they share with us secure and respectful of their privacy.[16]

64.     Prior to the Data Breach, Twitter made explicit representations on its website – under its Rules and Policies landing page – that it would protect and safeguard its API from improper access and would further protect users' PII. Specifically, Twitter posted on its Privacy page policies and rules related to its APIs:

**About APIs (Wayback Machine Captured April 2020)**

***Across all of our APIs and data products, we take our responsibility to protect our users' data seriously. We maintain strict policies and processes to assess how developers are using Twitter data, and restrict improper use of this data.*** When we learn that a developer violates our policies, we will take appropriate action, which

---

[16]     FTC Settlement Press Release, *supra* n.2.

can include suspension and termination of access to Twitter's APIs and data products.[17]

65.    Twitter further represented that it restricted what data could be obtained from its APIs and understood that users had a reasonable expectation of privacy regarding the data they shared:

> ***At Twitter, protecting and defending the privacy of our users is built into the core DNA of our company – and our developer and data products reflect that commitment***.  We believe that Twitter data can be a powerful force for good in the world – from saving lives during flooding in Jakarta to helping the USGS track earthquakes to working with the UN to achieve the Sustainable Development Goals. ***However, we prohibit the use of Twitter data and the Twitter APIs by any entity for surveillance purposes, or in any other way that would be inconsistent with our users' reasonable expectations of privacy.  Period.***
>
> We describe prohibited uses of our data and developer products in the Developer Agreement, including prohibitions on investigating or tracking Twitter users or their content, as well as tracking, alerting, or monitoring sensitive events (such as protests, rallies, or community organizing meetings).[18]

66.    In response to the API issue that was allegedly the cause of the Data Breach, Twitter posted on its blog, acknowledging that it was responsible to protect users' data and their privacy:

> **Response to 2022 API Issue (Aug. 2022):**
>
> We want to let you know about a vulnerability that allowed someone to enter a phone number or email address into the log-in flow in the attempt to learn if that information was tied to an existing Twitter account, and if so, which specific account.  ***We take our responsibility to protect your privacy very seriously and it is unfortunate that this happened***.  While there's no action for you to take specific to this issue, we want to share more about what happened, the steps we've taken, and some best practices for keeping your account secure.[19]

67.    Indeed, Twitter continues to make these representations today on its website:

---

[17]    *About Twitter's APIs*, TWITTER (X),    https://web.archive.org/web/202 00403002937/https://help.twitter.com/en/rules-and-policies/twitter-api (last visited Apr. 17, 2024).

[18]    *More about restricted uses of the Twitter APIs*, TWITTER, https://developer.twitter.com/en/developer-terms/more-on-restricted-use-cases (last visited Apr. 17, 2024).

[19]    *An incident impacting some accounts and private information on Twitter*, TWITTER (X) (Aug. 5, 2022), https://privacy.x.com/en/blog/2022/an-issue-affecting-some-anonymous-accounts (the "August Statement").



68.    Twitter's Privacy tab on its website during the period of the Data Breach stated: "We want you to know how to make your Twitter experience better – and more secure.  So whether its initiatives we're driving, announcements about new settings and controls, or communications about security incidents, you'll find it all here."[20]

69.    Twitter further represented in its Privacy Policy that it would "inform you of . . . any personal data breach (or analogous concept) under Applicable Data Protection Law relating to Your

---

[20]    *Everything you need to know about privacy on Twitter*, TWITTER    (X), https://web.archive.org/web/20210224032759/https://privacy.twitter.com/en (last visited Apr. 17, 2024).

Data ('Security Incident').''[21]  Twitter failed to notify individuals of this Data Breach and failed to provide sufficient details regarding PII that was stolen by the threat actors during the Data Breach.

70.    Twitter continues to make affirmative representations regarding its commitment to data security and privacy.  On its website, Twitter specifically states: "Protecting and defending user privacy is at the heart of our work.  From protecting user anonymity, to offering meaningful privacy and security controls . . . ."



71.    As demonstrated above, Twitter made a number of representations and promises in its Privacy Policies, website pages, and its public blog to protect users' PII and their privacy.  Twitter specifically represented and promised that it had adequate data security measures in place to protect users' PII and their anonymity.  Twitter further represented and promised that it would only share users' PII with their consent and would limit sharing their PII to certain third parties whom Plaintiffs and the Class authorized and consented to Twitter doing so for legal and legitimate reasons.

---

[21]    *Data Processing Addendum*, Twitter (X),  https://privacy.twitter.com/en/for-our-partners/global-dpa (last visited Apr. 17, 2024).

Plaintiffs and the Class did not authorize or consent to Twitter sharing their PII with threat actors who seek to inflict personal and financial harm upon them. Nor did Plaintiffs and the Class who utilized Twitter anonymously authorize or consent to Twitter sharing or disclosing their identities to threat actors and nation states who seek to inflict personal and financial harm upon them.

72. Twitter's representations and promises contained in its Privacy Policies, website pages, and its public blog explicitly represented that Twitter would keep Plaintiffs and the Class' PII secure (*see* 2022 Privacy Policy, §2; 2021 Privacy Policy, §1; 2020 Privacy Policy, §1). Twitter also promised to limit any sharing of Plaintiffs' and Class Members' data (*see* 2022 Privacy Policy, §3; 2021 Privacy Policy, §3; 2020 Privacy Policy, §3).[22]

73. Twitter's representations and promises contained in its Privacy Policies, website pages, and its public blog represented and promised that Twitter would limit the use and disclosure of all user data – and further represented and promised that the permissible use and disclosure of the specific, sensitive PII at issue in this Action is even more limited. Specifically, Twitter represented that it would only use or disclose Plaintiffs' and the Class' user email addresses or telephone numbers to ensure the security of Twitter's systems (*see* 2022 Privacy Policy, §2.2; 2021 Privacy Policy, §1.3; 2022 Privacy Policy, §2.1).

74. At no point did Twitter disclose in the Privacy Policies, website pages, and/or public its blog, that it did not or would not implement reasonable data security measures or protect users' PII and their privacy. In fact, as shown above, Twitter did the opposite – it repeatedly represented and promised that it would protect users' PII and privacy. Twitter likewise failed to disclose that it would leave dangerous data security vulnerabilities unaddressed and thus allow internal or external cybercriminals to scrape sensitive user PII from Twitter, or that the categories of user PII disclosed in the Data Breach may be made available through its API or may be publicly disclosed.

---

[22]        *See also* Privacy Policy, *supra* n.7; *What we have been doing to protect your privacy and data*, *supra* n.11; *An update on our security incident*, *supra* n.12; *An update on our security incident, supra n.13*; 2020 Global Impact Report, *supra* n.8; *About Twitter's APIs*, *supra* n.18; *Everything you need to know about privacy on Twitter*, *supra* n.20.

75.     Nor do Twitter's statements on its Privacy Policies, website pages, and public blog provide for any other exception to the limits Twitter claimed to have in place to restrict the scope of permitted use and the disclosure of user data, and related conditions, as specifically provided therein.

**C.     Twitter Represented that It Would Protect Users' Anonymity**

76.     In addition to the representations above by Twitter regarding its commitment to protect the privacy and security of users' PII, a key component of Twitter's brand identity is a "free and safe space to talk." Twitter prominently offers its users the opportunity to use and engage anonymously on its platform and, in turn, the ability to disseminate and access information without being identified.

77.     As noted above, in order to create a Twitter account, an individual must create a username and display name. Users who wish to operate anonymously on Twitter may do so by creating a unique pseudonym(s) for the username and display name associated with their Twitter account. As such, the selected pseudonym associated with the information the user posts and accesses on Twitter will not reveal the true identity of the user.

78.     The ability to operate anonymously on Twitter is unique among the prominent social media platforms. Facebook, by way of example, enforces what is referred to as a "real-name policy," requiring users to use their real names on the platform. Twitter's lack of a real-name policy uniquely positions Twitter to serve prospective social media users that, for a myriad of reasons, wish to engage anonymously.

79.     As such, Twitter users may use a pseudonym in order to express themselves and their opinions freely and anonymously, and without fear of retaliation, embarrassment, or other repercussions from employers, family, friends, colleagues, acquaintances, neighbors, or governments. Other users may choose to engage anonymously based on more general privacy concerns. For example, privacy advocates have criticized real-name policies as eroding online freedom by letting services tie user interests (as reflected by their online actions) to their names, thereby generating a treasure trove of information. Twitter responds to this concern by proudly offering its anonymous users additional privacy protection on their platform. As Twitter publicly

stated on its website in April 2021, "there is no greater tool to empower people to speak freely than their ability to create pseudonymous accounts . . . ."

80.    Many Twitter users, such as Plaintiffs Gerber and Cohen, have elected to protect their diverse collective privacy interests in the information that they share and access by operating anonymously on Twitter.  In one study, approximately 26% of Twitter accounts analyzed were anonymous, in so far as the name of the user was not ascertainable by the username and display name associated with the account.[23]

**D.    The Data Breach**

81.    Plaintiffs, like millions of other registered Twitter users, entrusted Twitter with their PII in order to create a Twitter account.  However, despite Twitter's representations that Plaintiffs' and Class Members' PII would remain private, Twitter allowed at least one threat actor to scrape PII from tens of millions of registered Twitter users' accounts, including Plaintiffs.

82.    From approximately June 2021 through January 2022, a vulnerability existed in Twitter's system, specifically, its API, which allowed internal or external threat actors to access, and obtain, or "scrape," Twitter users' PII, including email addresses and telephone numbers, and also to link that PII to the respective Twitter usernames and display names.[24]  On at least one occasion during the existence of the API vulnerability, one or more threat actors took advantage of the vulnerability in order to scrape a massive trove of PII associated with reportedly over 200 million Twitter users, including Plaintiffs and the Class.  The user PII extracted includes: usernames, display names, email addresses, phone numbers, follower counts, and account creation data.  This data was in turn offered for sale and leaked via platforms on the dark web in a series of incidents which occurred in or around July 2022, August 2022, November 2022, December 2022, and January

---

[23]    Sai Teja Peddinti, et al., *User Anonymity on Twitter*, 15 IEEE SEC. & PRIVACY 84 (2017), https://ssl.engineering.nyu.edu/papers/peddinti_ieeemag_2017.pdf.

[24]    "Threat actor" is a term generally used to describe a person or organization that acts intentionally to cause harm in the cyber or digital realm by, for example, exploiting vulnerabilities in hardware, software, or network to cause disruptions or misappropriate data.

2023.[25]  As noted above, this series of occurrences pursuant to which PII associated with Plaintiffs and the Class was compromised and leaked is referred to herein collectively as the "Data Breach."

83.    Alon Gal, co-founder of Israeli cybersecurity-monitoring firm Hudson Rock, wrote on LinkedIn that the Data Breach is "one of the most significant leaks I've seen"[26]  He further stated that the breach "will unfortunately lead to a lot of hacking, targeted phishing and doxxing,"[27]

84.    The PII belonging to Plaintiffs and Class Members that has been compromised as a result of the Data Breach is highly sensitive and valuable and, in the hands of cybercriminals, can be readily weaponized to extract exponential value from that information, including by way myriad commonplace identity theft and related hacking techniques, and, in turn, cause serious harm to Plaintiffs and the Class.

85.    In addition, it is particularly problematic to leak users' Twitter usernames in combination with email addresses and/or phone numbers as here, because that combination gives the person interpreting (or, more aptly, the cybercriminal abusing) the data the ability to link an otherwise anonymous username on Twitter with that particular user's generally not anonymized email address and/or phone number.  It is further problematic that such data was disclosed for those Plaintiffs who used anonymous Twitter usernames and display names which were compromised in this incident in combination with their non-anonymous email address (which contains elements of their actual names) or non-anonymous phone numbers.  As a result, anyone who comes into possession of the information compromised by the Data Breach can relatively simply connect a respective user with their heretofore anonymous Twitter account and related activity.  As such, the Data Breach has caused the harmful effect of deanonymizing Twitter users who had wished to stay anonymous while using Twitter.  Moreover, even for those pseudonymous Twitter users whose

---

[25]    The dark web refers to a part of the internet that is only accessible by way of specialized software or other access.  A person's online activity on the dark web may remain anonymous.  The dark web is used by a range of criminal actors to facilitate illegal activity, including, as is the case here, threat actors marketing and selling improperly obtained PII.

[26]    Raphael Satter, *Twitter hacked, 200 million user email addresses leaked, researcher says*, REUTERS (Jan. 5, 2023, 8:52 PM), https://www.reuters.com/technology/twitter-hacked-200-million-user-email-addresses-leaked-researcher-says-2023-01-05/.

[27]    *Id.*

email address does not in and of itself reveal its owner's identity, or whose phone number is anonymous, these pseudonymous users are still suffering from a heightened risk that acquaintances who otherwise know their email address and/or phone number can now – by virtue of the Data Breach – associate them with their heretofore pseudonymous Twitter account and see the Tweets (and personal views and interests) that they had been led to believe by Twitter would remain private.

86.   In order to more fully appreciate the significance of the Data Breach, the inadequacy of Twitter's response, and the gravity of Twitter's failure to prevent the Data Breach, it is critical to understand the value of PII and the lasting effects of its disclosure on affected consumers.

87.   "Personal Data is currency in the Information Age and is being traded to the tune of billions of dollars globally – and increasing each year as the more personal data analysed, categorised and linked."[28]  PII carries immense value to not only companies and social media platforms, but also to cybercriminals who seek to steal and use PII for a variety of reasons including blackmail, identity theft, extortion, phishing attacks, distribution of malware, and sale to other cybercriminals on the dark web.[29]

88.   PII has considerable value and constitutes an enticing and well-known target to hackers.  Hackers easily can sell stolen data as there has been "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[30]

89.   Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.  According to the U.S. Government Accountability Office, which conducted a study regarding data breaches, "in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on

---

[28]   *The Value of Personal and Private Data*, DIGITAL CONTROL ROOM, https://www.digitalcontrolroom.com/the-value-of-personal-and-private-data/ (last visited Apr. 17, 2024).

[29]   *How Much is Your Data Worth? The Complete Breakdown for 2021*, INVISIBLY (July 13, 2021), https://www.invisibly.com/learn-blog/how-much-is-data-worth/; Ravi Sen, *Here's How Much Your Personal Information is Worth to Cybercriminals – and What They Do With It*, PBS NEWSHOUR (May 14, 2021), https://www.pbs.org/newshour/science/heres-how-much-your-personal-information-is-worth-to-cybercriminals-and-what-they-do-with-it.

[30]   Brian Krebs, *The Value of a Hacked Company*, KREBS ON SECURITY (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

the [Dark] Web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[31]

90.    Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft.  Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing.  In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

91.    As *Wired* has explained, specifically with respect to Twitter:

> A breach of Twitter could expose the company or users in myriad ways.  Of particular concern would be an incident that endangers users who are activists, dissidents, or journalists under a repressive regime.  With more than 230 million users, a Twitter breach would also have far-reaching potential consequences for identity theft, harassment, and other harm to users around the world.  And from a government intelligence perspective, the data has already proved valuable enough over the years to motivate government spies to infiltrate the company . . . .[32]

92.    Specifically, an email address (alone) has exponential harmful and valuable uses in the hands of cybercriminals who can readily gain access to the email account through various techniques once the email address is in hand.  And, once that access is obtained, cybercriminals can use it to steal the account holder's identity and access their financial accounts, among other things.  Likewise, a personal phone number is valuable in the hands of threat actors and may be used in numerous harmful ways to extract additional value.  For example, a phone number can be used to link its holder to additional personal data, including their name, address, and family members, which information can, in turn be used for blackmail, stalking, doxing, social media hacking, or identity theft.

---

[31]    U.S. Gov't Accountability Office, *Report to Congressional Requesters, Personal Information* (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited Apr. 17, 2024).

[32]    Lily Hay Newman, *Here's How Bad a Twitter Mega-Breach Would Be*, WIRED (Nov. 17, 2022), https://www.wired.com/story/twitter-mega-breach-what-if/.

93.     The ramifications of Twitter's failure to keep Plaintiffs' and Class Members' PII secure are long lasting and severe.  Once PII is stolen, cybercriminals can make the information publicly available on the internet and often trade stolen PII on the cyber black-market for years following a breach.  As such, fraudulent use of stolen personal information and damage to victims can continue for years.

94.     Twitter, however, failed entirely to timely or adequately respond to the Data Breach, reflecting a dangerous continuation of its well-documented pattern of disregard for user data privacy and security.  Meanwhile, PII belonging to victims of the Data Breach is being disseminated and sold on the dark web by cybercriminals.

95.     An example of a dark web posting to access the sale of the Twitter user data exposed in connection with the Data Breach and the related data set is seen as follows, with appropriate redactions to identifying information:



96.    Not surprisingly, given the nearly unprecedented volume and sensitivity of the PII compromised, the Data Breach received significant media attention – including at least one headline observing that "Twitter is 'almost certainly lying' about being faultless for 200[Million Victim] data leak." For example, among many others:

**BLEEPING COMPUTER:** "Since July 22nd, 2022, threat actors and data breach collectors have been selling and circulating large data sets of scraped Twitter user profiles containing both private (phone numbers and email addresses) and public data on various online hacker forums and cybercrime marketplaces. These data sets were created in 2021 by exploiting a Twitter API vulnerability that allowed users to input email address and phone numbers to confirm whether they were associated with a Twitter ID. The threat actors then used another API to scrape the public Twitter data for the ID and combined this public data with private email addresses/phone numbers . . . [t]hough Twitter fixed this flaw in January 2022, multiple threat actors have recently begun to leak the data they collected over a year ago for free."[33]

**CNN:** "Email addresses linked to more than 200 million Twitter profiles are currently circulating on underground hacker forums, security experts say. The apparent data leak could expose the real-life identities of anonymous Twitter users and make it easier for criminals to hijack Twitter accounts, the experts warned, or even victims' accounts on websites. The trove of leaked records also includes Twitter users' names, account handles, follower numbers and the dates the accounts were created . . . Bad actors have won the jackpot . . . previously private data such as emails, handles, and creation date can be leveraged to build smarter and more sophisticated hacking, phishing, and disinformation campaigns."[34]

**REUTERS:** "Hackers stole the email addresses of more than 200 million Twitter users and posted on an online hacking forum . . . the breach will unfortunately lead

---

[33]    Lawrence Abrams, *200 million Twitter users' email addresses allegedly leaked online*, BLEEPING COMPUTER (Jan. 4, 2023, 3:16 PM), https://www.bleepingcomputer.com/security/200-million-twitter-users-email-addresses-allegedly-leaked-online/.

[34]    Brian Fung, *Hackers post email addresses linked to 200 million Twitter accounts, security researchers say*, CNN (Jan. 5, 2023, 3:18 PM), https://www.cnn.com/2023/01/05/tech/twitter-data-email-addresses/index.html.

to a lot of hacking, targeting phishing and doxxing. . . . Twitter has not commented on the report. . . . first posted. . . . on Dec. 24, nor responded to inquiries about the breach since that date.  It is not clear what action, if any, Twitter has taken to investigate to remediate the issue."[35]

**FORBES:**  "Twitter essentially ignored the calls for ransom to be paid after data from hundreds of millions of users was stolen following the breach. . . . After . . . Musk bought Twitter, and dumps of these started showing up for sale as hackers were looking to get paid for their efforts . . . [i]t appears as though someone collected a bunch of these and tried to get Musk to pay up for them."[36]

**MASHABLE:**  "[T]he obvious worry here is that malicious actors could potentially expose the identities of people who like to post anonymously . . . [i]n countries that crack down hard on political dissent, for example, that could be a huge problem for online activists."[37]

**LOS ANGELES TIMES:**  "Although account passwords were not leaked, malicious hackers could use the email addresses to try to reset people's passwords or guess them . . . That's especially a risk if the accounts are not protected by two-factor authentication . . . People who use Twitter anonymously should have a Twitter-dedicated email address that does not disclose who they are and is solely for Twitter . . . In November [2022], a group of Democratic lawmakers asked federal regulators to investigate possible violations by the platform of consumer-protection laws or of its data security commitments. . . . The FTC said at the time it is tracking recent developments at Twitter with deep concern."[38]

**LAPTOP MAG:**  "The anon behind Twitter's 200 million+ data dump on Breached (a hacker's forum) reached out . . . to tell us that Twitter [is almost certainly responsible for the breach] … [because] there is a link between the emails and the Twitter accounts in the data dump."[39]

---

[35]    Raphael Satter, *Twitter hacked, 200 million user email addresses leaked, researcher says*, REUTERS (Jan. 5, 2023, 8:52 PM), https://www.reuters.com/technology/twitter-hacked-200-million-user-email-addresses-leaked-researcher-says-2023-01-05/.

[36]    Peter Suciu, *Cybersecurity Experts Warn Twitter Breach Will Have Lasting Ramifications*, FORBES (Jan. 5, 2023, 3:12 PM), https://www.forbes.com/sites/petersuciu/2023/01/05/cybersecurity-experts-warn-twitter-breach-will-have-lasting-ramifications/?sh=29ceaa162032.

[37]    Alex Perry, *235 million Twitter accounts were leaked in a huge data breach*, MASHABLE (Jan. 6, 2023), https://mashable.com/article/twitter-data-breach-elon-musk-january-2023.

[38]    Barbara Ortutay, *Twitter leak exposes 235 million email addresses from hack*, LOS ANGELES TIMES (Jan. 6, 2023, 1:48 PM), https://www.latimes.com/business/story/2023-01-06/twitter-leak-exposes-235-million-email-addresses-from-hack.

[39]    Kimberly Gedeon, *Twitter is 'almost certainly lying' about being faultless for 200M data leak – here's why*, LAPTOP MAG (Jan. 18, 2023), https://www.laptopmag.com/news/twitter-is-almost-certainly-lying-about-being-faultless-for-200m-data-leak-insider-tells-us-why.

97.    Bleeping Computer also reported in November 2022 that 5.4 million Twitter users' data had been stolen and leaked online.[40]  The article reported that a threat actor began selling the private information on a hacking forum for $30,000.  *Id.*  The data consisted of Twitter IDs, names, login names, location, verified status, as well as phone numbers and email addresses.  The article further reported that this data was collected in December 2021 using a Twitter API vulnerability and that multiple threat actors were using the bug to steal private information from Twitter.  *Id.*  In response to an inquiry from Bleeping Computer, Twitter confirmed that it has suffered a data breach and claimed to have fixed the bug in January 2022.  *Id.*  The article went on to note this data vulnerability was used by other threat actors to collect tens of millions of Twitter records.  *Id.*  The article warned that the exposed data could "be potentially used for targeted phishing attacks to gain access to login credentials" and that it was essential for users to scrutinize any email that claims to come from Twitter as it could likely be a phishing attempt.  *Id.*

**E.    Twitter Fails to Reasonably Respond to or Remediate the Data Breach and Does Not Notify Impacted Users of the Breach**

98.    Rather than exercising reasonable diligence to identify issues related to the Data Breach and timely self-report to its impacted users, the existence of the Data Breach and related PII leaks were disclosed to the public by media reports, not by Twitter.  Twitter only made statements regarding the Data Breach in response to these reports, not on the basis of its own accord or diligence.  Twitter's statements regarding the Data Breach reflect Twitter's dangerous refusal or inability to acknowledge or appreciate their responsibility for user privacy.

99.    Following the initial PII leaks in connection with the Data Breach, which occurred in July and August of 2022, Twitter made a statement, dated August 5, 2022 (the August Statement).  Twitter admitted that it became aware of the API vulnerability giving rise to the Data Breach in January 2022, but claimed that, at that time, Twitter "had no evidence to suggest someone had taken advantage of the vulnerability."  In that statement, Twitter professed that it only became aware "that

---

[40]    Lawrence Abrams, *5.4 million Twitter users' stolen data leaked online — more shared privately.*  BLEEPING COMPUTER (Nov. 22, 2022), https://www.bleepingcomputer.com/news/security/54-million-twitter-users-stolen-data-leaked-online-more-shared-privately/.

a bad actor had taken advantage of the issue before it was addressed" after it conducted a review of leaked data in response to a July 2022 press report.

100. The August Statement appears to be contrary to the blog post by Twitter in which it stated that its systems were compromised by a:

> [V]ulnerability that allowed someone to enter a phone number or email address into the log-in flow in the attempt to learn if that information was tied to an existing Twitter account, and if so, which specific account.

101. Twitter further stated in this post:

> ***We take our responsibility to protect your privacy very seriously and it is unfortunate that this happened.*** While there's no action for you to take specific to this issue, we want to share more about what happened, the steps we've taken, and some best practices for keeping your account secure.

102. Nonetheless, Twitter failed to issue a formal data breach notification, and further failed to identify and directly notify any Twitter users whose PII was stolen as a result of the Data Breach, including Plaintiffs.

103. Twitter claims that it initially discovered the vulnerability when it was informed of the issue in January of 2022. Rather than inform users immediately that this vulnerability could be exploited (*i.e.*, user data could have been mined from Twitter and could be disseminated or sold by threat actors), Twitter sat on its hands for at least the next seven months. While Twitter failed to take action, the vulnerability was exploited by internal or external cybercriminals. Even still, only after media began reporting on these leaks, did Twitter finally disclose to the public that user PII was at risk.

104. Twitter's August Statement recognized the specific and significant potential harm of the Data Breach to its anonymous users, stating that: "[We] are particularly mindful of people with pseudonymous accounts who can be targeted by state or other actors . . . . If you operate a pseudonymous Twitter account, we understand the risks an incident like this can introduce and deeply regret that this happened." Nonetheless, Twitter also failed to identify and directly notify these particularly vulnerable users of the Data Breach and attendant risks to their anonymity on the platform.

105.    Twitter's next public statement regarding the Data Breach was issued on January 11, 2023 (the "January Statement").    This statement followed a flurry of media reports regarding additional leaks connected to the Data Breach, which are reported to have included data associated with 200+ million users and occurred in November 2022, December 2022, and January 2023.    This statement was again made, not based on Twitter's own exercise of diligence, but "[i]n response to recent media reports of Twitter users' data being sold online[.]"[41]

106.    In the January Statement, Twitter attempted to disclaim any responsibility for the latter leaks of data, stating that "there is no evidence that data recently being sold was obtained by exploiting a vulnerability of Twitter systems."    Later in the statement, Twitter's attempt to deny responsibility for the leaks connected to the Data Breach was (tellingly) more carefully worded, explaining that certain data leaks "could not be correlated with the previously reported incident, nor with any new incident . . . . or any data originating from an exploitation of Twitter systems."    *Id.*

107.    Twitter's apparent denial of any connection between the originating API vulnerability and the latter leaks of user PII is not credible.    First, the January Statement, purportedly based on a fulsome internal investigation, was issued within days of news breaking regarding the dissemination and sale on the dark web of a massive trove of Twitter users' PII, involving over 200 million Twitter users.    It strains credulity that an adequate investigation reaching the broad conclusions of the January Statement could take place in such a short span of time, given that a typical data breach investigation often requires months to ascertain the source of a particular data breach or leak.    Moreover, the January Statement fails to offer any explanation for the origin of the breach or how the particular data set could have possibly originated from any source besides Twitter.

108.    In addition, due to the nature of the leaked data, it defies common sense to suggest that the breach of Twitter's data did not emanate from Twitter.    Twitter handles or usernames (which are public) were compromised in tandem with user PII that Twitter required users to provide in order to create accounts – information that was known only to Twitter in relation to the user's username.

---

[41]    *Update about an alleged incident regarding Twitter user data being sold online*, TWITTER (X)    (Jan.    11,    2023),    https://privacy.x.com/en/blog/2023/update-about-an-alleged-incident-regarding-twitter-user-data-being-sold-online.

This pairing of information could not have occurred without the exfiltration of data from Twitter, because there is virtually no other conceivable means by which this combination of public and non-public information – exclusively associated with Twitter users – particularly, in such a large quantity.

109.    Moreover, as detailed below, a high-ranking former Twitter employee in charge of cyber security at Twitter has publicly disclosed – including at a recent Senate Judiciary Committee hearing – a series of staggering data security failures at Twitter, which call into question Twitter's ability to make any well-informed statements (much less any denials) regarding the Data Breach.

110.    To this day, Twitter has inexplicably failed to directly notify or contact the victims of the Data Breach.  Twitter has admittedly failed to even attempt to identify the totality of users affected by the Data Breach.  Twitter's statements on this matter were simply posted in the Privacy Center on Twitter's website, not distributed as a notification to users.  Accordingly, Twitter users, such as Plaintiffs and the Class, generally would not even know of the existence of the Data Breach absent media reports or electing to review (or, in many cases, re-review) the privacy section of Twitter's website.

**F.    Whistleblower Testimony Establishes that Twitter Knowingly and Egregiously Disregarded Dangerous Inadequacies in Its Data Security Systems**

111.    Unfortunately, the Data Breach appears to merely be the latest consequence of a historic dereliction of duty at Twitter.  Twitter consistently failed to employ adequate data security infrastructure and to safeguard user privacy interests despite numerous red flags raised by its internal data security team, FTC enforcement actions, and high-profile hacking incidents, including one incident in which Twitter accounts belonging to former President Barack Obama and President Joe Biden, and other prominent users were compromised and used to post tweets promoting a cryptocurrency scam.[42]

---

[42]    Rishi Iyengar, *Twitter Blames "Coordinated" Attack on its Systems for Hack of Joe Biden, Barack Obama, Bill Gates, and Others*, CNN (July 16, 2022), https://www.cnn.com/2020/07/15/tech/twitter-hack-elon-musk-bill-gates/index.html.

112.     Zatko, the head of security for Twitter from November 2020 to January 2022, testified in September 2022 before the Senate Judiciary Committee, following his July 2022 submission of an 84-page whistleblower complaint to the Department of Justice ("DOJ"), the Securities and Exchange Commission ("SEC"), and the FTC.  Zatko presented a comprehensive and disturbing picture of the data security inadequacies at Twitter *at the very same time that the Data Breach occurred*.

113.     Zatko's testimony revealed a pervasive and dangerous disregard for data privacy at Twitter perpetuated by the highest levels of management and the board of directors – a culture that prioritized profits over security at any cost.  In his opening statement before the Senate Judiciary Committee, Zatko stated that Twitter leadership ignored its engineers and that Twitter leadership prioritized profits over security.  Zatko predicted that Twitter's lax data security measures would cause Twitter to be a prime target for both internal and external cybercriminals:

> "The *company's cyber security failures make it vulnerable to exploitation causing real harm to real people* and when an influential media company can be compromised by teenagers, thieves, and spies, and the company repeatedly creates security problems on their own, this is a big deal for all of us. . . . *Twitter leadership ignored its engineers because key parts of leadership lacked competency to understand the scope of the problem.  But more importantly, their executive incentives lead them to prioritize profits over security*. . . .  I discovered two basic issues.  First, they don't know what data they have, where it lives, or where it came from and so unsurprisingly, they can't protect it.  And this leads to the second problem, which is the employees then have too much access to too much data and too many systems.  You can think of it this way, it doesn't matter who has keys if you don't have any locks on the doors."[43]

114.     Other key disturbing revelations from Zatko's testimony, included:

a.     During Zatko's tenure at Twitter, he repeatedly sounded alarms to Twitter's senior-most executives and board without avail.  Among other instances, Zatko's complaint alleges that, in 2021, Zatko (along with Twitter's head of privacy engineering and chief privacy officer) provided a detailed report to the board concerning a number of data privacy concerns, including a high degree of operational risk related to inappropriate employee access to data and unnecessary retention of private data.[44]

---

[43]     *Data Security at Risk: Testimony from a Twitter Whistleblower*, 117th Cong., (Sep. 13, 2022) (testimony of Peiter "Mudge" Zatko, Independent Security Consultant), https://www.judiciary.senate.gov/committee-activity/hearings/data-security-at-risk-testimony-from-a-twitter-whistleblower.

[44]     Peiter Zatko, *Issues and Objections Regarding Twitter InfoSec Information and the Q4 2021 Twitter Risk Committee* (the "February 2022 Board Report"), https://www.judiciary.senate.gov/

b.   Twitter had virtually no system to manage internal access to data, including user PII.  Twitter did not log, or know, who at Twitter accesses data at Twitter or what any such Twitter employees did once inside the system.

c.   During Zatko's tenure at Twitter, a severe security breach occurred – on average – every week.

d.   Twitter was over a decade behind industry standards related to cybersecurity.

e.   Twitter had only 20% of its vast trove of data registered and, therefore, was only capable of securing that 20% of the information.  As for the other 80% of data held by Twitter, Zatko explained that Twitter did not know what the data is, why Twitter has the data, or where the data came from, but that a sampling of this data revealed it to largely be PII.

f.   Twitter unnecessarily retained user data associated with terminated accounts, such that not only current but former user data was vulnerable because, once a user leaves the site, the user's data was not deleted.

g.   Twitter was simply unable to internally search for or identify inappropriate access within its own systems.  Namely, Twitter had a lack of centralized logging – meaning that the company did not log what was happening within its system, who tried to log in, and who was doing what inside the system.  Zatko identified this as a critical failure of Twitter's ability to control and assess the misappropriation of data, stating that he discovered that thousands of attempts to access internal systems were occurring weekly without detection and that Twitter did not have capabilities to ascertain who was making these attempts to access internal systems and whether they were successful.

h.   Despite Zatko's pleas to the Twitter executive team to push basic cyber hygiene, Twitter's executives were focused on profits, not remediating existing problems.  Further, the patches and security updates recommended to Twitter executives would be a relatively low-cost way to mitigate a great deal of risk.

115.   Materials provided by Zatko in conjunction with his Congressional testimony contain further damning details on Twitter's inadequate data security regime.  In a whistleblower disclosure originally sent to the DOJ, SEC, and the FTC (with its exhibits, the "Whistleblower Disclosure"), Zatko described massive vulnerabilities existing at Twitter at the time of his hiring, and a continued unwillingness at Twitter to acknowledge or address major security issues.[45]  Zatko's internal review of Twitter's security systems revealed massive deficiencies.  Shockingly, Zatko's direct reports

_____

imo/media/doc/Exhibit%201_20220214_Twitter%20Q4%202021%20Risk%20Committee%20Issues_redacted_sanitized_opt.pdf.

[45]   Whistleblower Disclosure (July 6, 2022), https://www.judiciary.senate.gov/imo/media/doc/Alpha%202.0%20Twitter%2020220706_Protected%20Whistleblower%20Disclosure_redacted_sanitized_opt.pdf.

informed him that "***Twitter had never been in compliance*** with the 2011 FTC Consent Order, and was ***not on track to ever achieve full compliance.***" Some of these shortcomings included:

1.   server vulnerabilities, with over 50% of Twitter's data servers with non-compliant kernels or operating systems;

2.   30% of employees reporting they had disabled software and security updates on their work devices;

3.   no mobile device management of employee phones whatsoever;

4.   insufficient data center redundancy;

5.   awareness of/potential complicity in foreign state actor access to sensitive Twitter data;

6.   repeated stonewalling by Twitter CEO Parag Agarwal and members of the Board in acknowledging and addressing security problems; and

7.   repeated misleading and false statements made by Twitter to regulators and the public regarding the state of Twitter's security apparatus.

*Id.*

116.   The report by Zatko given to the Twitter Board in February 2022, and attached to the Whistleblower Disclosure in partially redacted form, revealed that false or incomplete information had been provided to Twitter's Risk Committee in the fourth quarter of 2021, which Zatko sought to correct by submission of his report to the Board. In addition to many items also addressed in the Whistleblower Disclosure and Congressional testimony, Zatko's February 2022 report to the Twitter Board stated that:

Below is the accurate assessment of the state of Twitter's current security, as should have been conveyed to the Q4 Risk Committee of the Board.

- Twitter is grossly negligent in several areas of information security.

- If these problems are not corrected, regulators, media, and users of the platform will be shocked when they inevitably learn about Twitter's severe lack of security basics. They will lose confidence in Twitter and this will have real world impact to the platform and to the company.

\*       \*       \*

There are 4 critical areas that have not been accurately represented to the Board:

•   Out-of-date software and the lack of basic security configuration in existing software (Software and Security Versions/Configurations/Patches)

- Gross problems around access control to systems and data (Access Control)

- Lack of basic processes and compliance such as software development lifecycles, line-managers being allowed to unilaterally overrule security and privacy findings, and a prioritization of running products with known violations over compliance with regulatory requirements (Processes and Compliance)

- A volume and frequency of security incidents impacting a large number of users' data that is frankly stunning (Incidents).[46]

117.    Specifically, as to the second bullet point, access control, Zatko's report to the Twitter Board warned that "Twitter is an outlier in this area of risk and not in a good way.  Most companies work to restrict access to productions systems to only a small handful of people because production systems contain extremely sensitive data and issue in production directly impact customers. . . .  By comparison, Twitter engineers and developers perform work directly in production or interfacing directly with production systems and data . . . . Contrary to what may have been heard or read: ***Twitter's access control risk is growing, not shrinking.***" *Id.* at 9.

118.    Additional troubling revelations in the February 2022 Board Report included:

- "There are several known insider threats (KNITs) at Twitter.  Because of the ubiquitous access to production systems and/or data and the lack of isolation environments and logging, this risk is significant.  Combine this with ~30 offboardings per week, each of which represents periods of enhanced concern for insider threat, and the lack of access control and ubiquitous access grants are critical problems."  *Id.* at 11.

- "Almost 40% of [Twitter's] ~ 10,000 computers (aka endpoint systems aka the client fleet) are not in compliance with basic security settings."  *Id.* at 12.

- "30% of the total endpoint systems report that they <u>do not have automatic</u> <u>updates</u> enabled."  *Id.*

- "Of the approximately 500,000 servers in Twitter data centers ~60% of them are running outdated Operating Systems and. therefore, are non-compliant even with Twitter's own Engineering standards."  *Id.* at 13.

- "[These operating systems] are also not capable of supporting encryption at rest, a critical compliance and Privacy obligation[]." *Id.*

- "In addition to the security and privacy issues, any engineering outage or security event that revealed that the majority of Twitter's production systems are running out of date, and even unsupported, software would likely result in a significant distraction to the company."  *Id.* at 14.

---

[46]    February 2022 Board Report at 5.

- "Twitter does not have an industry-appropriate Software Development Life Cycle (SDLC) and Twitter has thus far operated largely without one at all." *Id.* at 15.

- "Twitter has an unacceptable and near continuous, number of security and privacy incidents. I estimate that there were more than 50 Incidents in 2021 . . . . H2 2021 had 11 Incidents that were required to be reported to regulators, 5 of which happened in Q4. The Incidents were predominantly related to areas where Twitter has systemic, long lived problems: 'Access Control' and `Security Configuration and Bugs.' Together these problems accounted for more than 80% of the Incidents." *Id.* at 16.

119.    Zatko's testimony and related written submission to the DOJ, SEC, and FTC establish that, contemporaneous with the Data Breach, a complete and total lack of reasonable data security systems and controls existed at Twitter to prevent, detect, or adequately address the Data Breach, and that Twitter's Board and the highest levels of management were aware of these gross and dangerous inadequacies.

120.    Despite numerous opportunities, Twitter has done essentially nothing to address these serious inadequacies in its data security systems and, in turn, essentially nothing to secure its user data and prevent occurrences such as the Data Breach.

121.    Zatko is not the only former Twitter employee that has felt compelled to raise alarm bells concerning data security at Twitter. In October 2022, a former Twitter engineer filed a complaint with the FTC supporting Zatko's complaint and further alleging that Twitter had still failed to resolve the defect in its system that led to a 2020 incident in which teenage hackers were able to Tweet as high-profile persons, including former President Barack Obama – a problem which Twitter had long ago promised was "fixed." Reporting on this second whistleblower complaint focuses on a major security vulnerability at Twitter: the ability of any Twitter engineer to access an internal program known as "GodMode" or "privileged mode," which allows employees to access internal systems and user data, and enables them to delete or restore tweets on behalf of users without their knowledge.[47] The whistleblower alleges that Twitter does not have the capability to record

---

[47]    Joseph Menn, *Ex-Twitter engineer tells FTC security violations persist after Musk*, THE WASHINGTON POST (Jan. 24, 2023), https://techpolicy.press/wp-content/uploads/2022/08/risk_committee_issues.pdf.

who has been using GodMode, and that it essentially relies on the honor system, with the code that allows a tweet to be deleted merely warning, "THINK BEFORE YOU DO THIS."

122.    Most recently, on March 24, 2023, another former Twitter employee filed an arbitration demand against Twitter in which the former employee detailed his own "whistleblower report" regarding disturbing data security lapses at Twitter.  In particular, the arbitration demand alleges that, in February 2023, the then-employee:

> reported in a meeting [at Twitter] that he found clear evidence in Twitter source code that the company is not protecting user privacy.  He explained that any software can retrieve a user's phone number, and email and time of one's last log in.  Twitter enables this privacy breach by intentionally disabling the "Authorization Decider" for the PSS Read API and the ESS Read API, which enabled any team or developer at Twitter to access the phone numbers or emails of Twitter users without being "Allowed-Listed" by the Security team/Legal team to access this sensitive data.  In other words, today, all software engineers (even interns) at Twitter can access users' personal information whenever they want, and use it in whatever way they want.  This was all done in order to cut costs.

123.    The arbitration demand further alleges that, in response to the then-employee's whistleblower report, a lead Twitter team member responded, "Who cares?  There are lots of fires already [in production]." (brackets in original).  The arbitration demand further alleges that Twitter unlawfully retaliated against this whistleblower for reporting internally regarding the foregoing severe data security lapses at Twitter.

124.    In yet another recent high-profile matter highlighting the utter lack of data security and internal controls at Twitter, a significant portion of Twitter's source code (the proprietary computer code which underpins the entire Twitter platform) was publicly leaked in March 2023 – an apparent act of unlawful revenge by a current or former Twitter employee.  Data security experts consider proprietary source code to be extremely sensitive information because, if leaked, as here, the source code could allow cybercriminals to identify and exploit latent vulnerabilities to hack and steal information, including PII, and to otherwise harm a company's competitive advantages and reputation.  As set forth in a lawsuit filed by Twitter in this District on March 24, 2023, seeking to enjoin any further publication of the leaked Twitter source code, Twitter admitted that, to date, it is unable to identify the person within its own organization that accessed, misappropriated, and leaked its most valuable intellectual property.  This recent incident further underscores the concerns raised

by former employee whistleblowers concerning virtually unfettered internal access of Twitter employees to sensitive data.

**G.    Twitter Has Violated and Continues to Violate Section 5(a) of the FTC Act**

125.    Twitter's persistent failures to adequately protect its users' privacy interests (despite repeated warnings) are further demonstrated by its sordid history of failing to comply with the FTC Act, including with respect to the Data Breach.

126.    Twitter is prohibited by the FTC Act, 15 U.S.C. §45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce."  The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

127.    The FTC has promulgated numerous cybersecurity guides for businesses, like Twitter, regarding what is required for compliance.  These guidelines require the protection of personal customer information, proper disposition of personal information that is no longer needed, encryption of information stored on networks, understanding of network vulnerabilities, and implementation of policies to correct security problems.  The FTC further recommends that companies maintain PII for no longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

128.    Twitter's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII, including the malfeasance testified to by Zatko and Twitter's extreme negligence (or, more aptly, recklessness) resulting in the Data Breach, constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

129.    Given that Twitter has been the subject of two prior FTC enforcement actions, directly addressed to these matters, Twitter was well aware of its obligations under the FTC Act.

130.    In 2010, the FTC filed a complaint against Twitter for violation of Section 5 of the FTC Act, alleging that Twitter mishandled private user information and failed to maintain internal

controls, including with respect to employee access to information. This complaint was resolved by the Consent Order, in which Twitter vowed to clean up its act, including by creating and maintaining a comprehensive information security program. In the years following, Twitter continued to misrepresent the security and privacy of its users' data in violation of the Consent Order and Section 5(a) of the FTC Act. Most recently, in May 2022, following the filing of a new complaint, the FTC fined Twitter $150 million for violating the Consent Order. The 2022 FTC settlement entered into between Twitter and the FTC required Twitter to pay a $150 million fine in connection with further violations of the Consent Order prohibited Twitter from using "any telephone number or email address obtained from a [u]ser before the effective date of this Order for the purpose of enabling an account security feature."[48] While the Consent Order did not prohibit Twitter from doing so in the future, it requires Twitter to first comply with specified notice, disclosure, and consent requirements. The 2022 complaint filed by the FTC in connection with violations of the Consent Order alleged that from May 2013 through September 2019, Twitter continued to misrepresent "the extent to which [Twitter] maintains and protects the security, privacy, confidentiality, or integrity of any nonpublic consumer information, including, but not limited to, misrepresentations related to its security measures to: (a) prevent unauthorized access to nonpublic consumer information; or (b) honor the privacy choices exercised by users."[49]

131.    The FTC complaint further alleged that, "while Twitter represented to users that it collected their telephone numbers and email addresses to secure their accounts, Twitter failed to disclose that it also used user contact information to aid advertisers in reaching their preferred audiences."[50]

132.    The Data Breach is merely the latest culmination of Twitter's failure to observe its obligations under the FTC Act, the 2011 Consent Order and subsequent 2022 FTC Settlement.

---

[48]    *United States of America v. Twitter, Inc.*, Case No. 2:22-vc-3070 TSH (N.D. Cal.), Stipulated Order for Civil Penalty, Monetary Judgement, and Injunctive Relief, ECF No. 11 at 11.

[49]    *United States of America v. Twitter, Inc.*, Case No. 2:22-vc-3070 TSH (N.D. Cal.), Complaint for Civil Penalties, Permanent Injunction, Monetary Relief, and Other Equitable Relief, ECF No. 1 at 2.

[50]    *Id.*

1
2

**H.      Twitter Breached Its Duty to Safeguard User PII Resulting in Existing and Continuing Harm to Plaintiffs and Class Members**

3

133.    Twitter has an affirmative duty to protect the privacy interests of its users by securing

4

their data, including user PII.  This duty requires Twitter to exercise a reasonable degree of care to

5

ensure that the PII entrusted to Twitter by its users was protected by adequate security measures,

6

including as specifically required by the FTC.

7

134.    As one of the largest social media companies in the world, Twitter has acknowledged

8

its duties and obligations to protect users' PII and privacy.  As detailed above, Twitter has repeatedly

9

acknowledged its obligations because it maintains vast amounts of user PII, and the vast trove of

10

user PII specifically held by Twitter is a prime target for internal and external cybercriminals.

11

Nevertheless, as detailed above, Twitter acquiesced to, knew of, and consciously ignored critical

12

deficiencies in its data privacy infrastructure allowing for the Data Breach to occur.

13

135.    The unaddressed glaring vulnerabilities giving rise to the Data Breach and Twitter's

14

response to the Data Breach, as detailed above, demonstrate a dangerous and extreme departure

15

from the applicable (or, for that matter, any) standard of care, particularly for a social media and

16

technology company of Twitter's size, sophistication, and cultural import.  The Data Breach is the

17

direct and natural consequence of inadequacies in Twitter's data security infrastructure of which

18

Twitter was fully aware of and consciously determined to ignore, going so far as to oust its head of

19

security rather than heed his warnings and implement industry standard data security measures.

20

136.    Twitter prioritized profits over security, ignored the red flags raised by Twitter

21

security staff, and disregarded the FTC Consent Order.  Twitter created the conditions ripe for a

22

significant security incident leading to the Data Breach and privacy injury suffered by many millions

23

of Twitter users.

24

137.    All the while, Twitter has realized billions of dollars in profits from its users and the

25

data that they generate while using the Twitter platform.  Twitter has wrongfully declined to use

26

even a small portion of those substantial revenues that would be required to adequately protect its

27

users' PII and their privacy interests.

28

138.    Twitter knew that prioritizing profits over security would cause precisely the type of harm as has been inflicted on Plaintiffs and Class Members as a result of the Data Breach.  The numerous warnings from Twitter security staff, occurrence of prior security breaches, and the FTC Consent Order collectively show that Twitter was on f notice of the grave flaws within its systems that gave rise to the Data Breach and that it was foreseeable to Twitter that these unresolved deficiencies in its systems could and would foreseeably cause user PII to become compromised. Moreover, given the serious security issues arising from Twitter's lack of internal controls, as detailed by Zatko, and Twitter's failure to provide any substantive explanation for the Data Breach, it is difficult to determine at this point whether the Data Breach was caused by internal or external threat actors.  Indeed, as detailed above, there has been at least one recent incident in which a current or former Twitter employee is believed to have intentionally orchestrated a significant data security breach at Twitter.

139.    All Plaintiffs and Class Members provided their PII in order to become Twitter users. In each case, this PII was provided to Twitter on the strength of Twitter's promise (and with the users' expectation) that this PII would remain private, and that Twitter would protect and secure the privacy of such information, including as specified by the User Agreement.  As a result of the Data Breach, this PII, including user email addresses and phone numbers has been publicly disclosed and released on the dark web.

140.    The harm caused to Plaintiffs and Class Members is the direct result of Twitter's breaches of duty and the User Agreement.  Twitter's actions with respect to the Data Breach breached Twitter's contractual obligations and representations made in the Privacy Policy, Terms of Service, and Twitter's website and public blog posts.  Twitter's actions with respect to the Data Breach violate Section 5 of the FTC Act, and the 2011 FTC Consent Order.

141.    As a result of Twitter's wrongdoing, Plaintiffs and Class Members have suffered significant harm, and have suffered and will continue to suffer injuries as alleged above, which include spending multiple hours of their valuable time monitoring their various accounts in an effort to detect and prevent any misuses of their PII, monitoring their accounts for suspicious activity,

having to deal with increased spamming and spoofing, and potential fraud on their accounts, time which they would not have had to expend but for the Data Breach.

142.    The Class has suffered similar harms such as: being subjected to potential phishing attacks and other types of targeted, email-centric privacy intrusions; being subjected to unwanted robocalls and texts and other types of targeted, phone-centric privacy intrusions; the loss of time and productivity through efforts to ameliorate, mitigate, and deal with the existing and future consequences of the Data Breach; the cost of out-of-pocket expenses to monitor, identify, and address potential identity theft; being subject to substantial risk of future identity theft; and, significant concern, emotional distress, anxiety, and unease arising from the public dissemination of sensitive private information.  Furthermore, Twitter has unjustly retained the significant benefit and value of user data without incurring the reasonable costs of data security to protect it.  Among the most immediate of these injuries is the diminished value of Plaintiffs' and Class Members' PII as a result of the Data Breach.

143.    The ramifications of Twitter's failure to keep users' PII secure are long lasting and severe.  Once PII is stolen, fraudulent use of that information and damage to victims may continue for years because, once PII is exposed, there is virtually no way to ensure that the information has been fully recovered or protected from future misuse.  Namely, Plaintiffs and Class Members are at a substantially increased risk of suffering identity theft and fraud or misuse of their PII as a result of the Data Breach.  A recent study found that 28% of consumers affected by a data breach become victims of identity fraud.  This is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud.  Without a data breach, the likelihood of identify fraud is only about 3%.[51]  Besides the monetary damage sustained in the event of identity theft, Plaintiffs and Class Members may have to spend hours trying to resolve identity theft issues.

---

[51]    Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KNOWBE4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited Apr. 18, 2024).

CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 4:23-CV-00186-KAW

The FTC estimates that it takes consumers an average of 200 hours of work over approximately six months to recover from identity theft.[52]

144.    Plaintiffs and Class Members are also at a continued risk because their information remains in Twitter's systems, which have already been shown to be vulnerable, particularly in light of Twitter's documented unwillingness to address significant data security issues when they are raised internally.  User PII held by Twitter will remain susceptible to compromise and attack so long as Twitter fails to undertake the necessary and appropriate measures to address the dangerous inadequacies of its data security infrastructure.

145.    Plaintiffs and Class Members now face years of constant surveillance of their personal records, monitoring, and loss of rights.  For this reason, Plaintiffs and Class Members may need to maintain heightened credit and identity theft monitoring measures for years, and possibly their entire lives as a result of Twitter's malfeasance (in addition to damages that may be incurred from any specific fraudulent use of their PII in the future).  The Class is incurring and will continue to incur such damages in the form of, among other things, lost time and expenses related to mitigating the harms caused by the Data Breach, increased risk of harm, diminished value of their PII, loss of privacy, and/or additional damages as described herein.

146.    It is always dangerous as a general matter for PII such as personal email addresses and phone numbers to appear on the dark web with respect to how that information may be used.  Plaintiffs and Class Members are now at imminent risk of serious and crippling identity theft, among other injuries that Plaintiffs and Class Members have incurred and will continue to incur.

147.    In addition, given that Twitter's API exploitation in the Data Breach allowed cybercriminals to link the Twitter persona of a respective user to their PII, this intrusive privacy violation is all the more dangerous under these unique circumstances.  Here, Plaintiff Gerber and Class Members that used their email addresses, which contain components of their full names, to create an anonymous Twitter username in order to protect their privacy interests by operating anonymously on the Twitter platform have been harmed by the disclosure of their identities.  As a

---

[52]    Cepeda Cheeks, *How to Report Identity Theft*, CONSUMER AFFAIRS (July 25, 2023), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html.

result of the Data Breach, Twitter users who accepted Twitter's invitation to operate anonymously on Twitter, have been de-anonymized on the dark web, resulting in the disclosure of their identities and activity on Twitter, which they at all times intended to be anonymous and which Twitter claimed it would protect from public disclosure. As such, in addition to the other injuries applicable to all Twitter users whose PII was compromised in the Data Breach, these persons also face the constant and relentless concern that numerous viewpoints and personal information shared anonymously (in some cases regarding a user's most intimate views and matters) over the course of years will now be publicly linked with their actual identity.

148.    Twitter made billions of dollars off its users, like Plaintiffs and the Class. Twitter could have used some small portion to protect their privacy, but it made an informed and callous decision – time and time again – to disregard consumer privacy for its own financial gain. The consequences for Plaintiffs and the Class are serious harm that may continue in perpetuity.

## CALIFORNIA LAW APPLIES TO THE CLASS

149.    California substantive laws apply to every member of the Class. California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process and the Full Faith and Credit Clauses of the U.S. Constitution. California has significant contacts, or significant aggregation of contacts, to the claims asserted by Plaintiffs and the Class Members, thereby creating state interests to ensure that the choice of California state law is not arbitrary or unfair.

150.    Twitter maintains its principal place of business in California. Additionally, Twitter conducts substantial business in California, such that California has an interest in regulating Twitter's conduct under its laws. In addition, Twitter selected the laws of the State of California to apply to any dispute that may arise between Twitter and its users, such as Plaintiffs and the Class Members, as provided by the User Agreements entered into by the parties. (*See* Terms of Service, §6 ["The laws of the State of California, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and [Twitter]."]). Twitter's California residence, Twitter's choice to avail itself of the laws of California in the operation of its business, and the User

Agreements' choice of law provision render the application of California law to the claims asserted in this Action constitutionally permissible.

151.    The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the Class, and California has a greater interest in applying its laws here, given Defendant's location and the location of the conduct at issue, than any other interest state.

### TWITTER'S DISCLAIMER AND LIMITATION OF LIABILITY CLAUSES ARE PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE AND THUS ARE UNENFORCEABLE

152.    Twitter's Terms of Service purports to limit Twitter's liability on claims brought by its users, claiming to release Twitter from liability for "INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, OR OTHER INTANGIBLE LOSSES" (Terms of Service ("TOS"), §5).

153.    This purported limitation clause is unconscionable and unenforceable.

154.    California Commercial Code §2719(b)(3) provides that a contractual limitation of consequential damages is invalid if it is unconscionable.  Unconscionability under California law involves both procedural and substantive unconscionability.

155.    Substantive and procedural unconscionability are comparatively assessed on a "sliding scale" – *e.g.*, "'the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.'"  *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 910 (Cal. 2015).

156.    Procedural unconscionability focuses on two factors: oppression and surprise. Oppression can be found where there is unequal bargaining power among the parties, resulting in an absence of choice of terms and true negotiation.  Surprise examines the extent that the terms at issue are buried in lengthy forms drafted by the party wishing to enforce the term.

157.    Twitter's User Agreement suffers from both oppression and surprise.

158.    As to oppression, the User Agreement is a standardized contract, and Twitter users may not negotiate or change any of its terms.  This contract of adhesion was drafted by Twitter, the

party of superior bargaining strength, does not provide Twitter users with any opportunity to modify, amend, or negotiate the User Agreement and relegates to Twitter users only the opportunity to adhere its provisions or reject it by not using Twitter.

159.    As to surprise, the limitation of liability terms was included in lengthy forms drafted by Twitter.  The terms are neither identified nor disclosed to users nor conspicuously set forth on the initial landing page of Twitter's website or its Privacy Policy webpage.  In fact, the purported limitation of liability contained in Twitter's Terms of Service were not identified on the landing page, rather they were buried in a hyperlink within a hyperlink on the "About" page entitled "Rules and Policies" (shown here)[53]:



160.    Once users clicked on the "Rules and policies" hyperlink they would be redirected to another webpage on Twitter's website and would then be required to click on yet another

---

[53]    *Security and privacy*, Twitter (X), https://web.archive.org/web/20210307120914/https://about.twitter.com/en/our-priorities/security-and-privacy (last visited Apr. 17, 2024).

hyperlink at the bottom of that webpage entitled "Twitter Rules" (shown here) which contained a hyperlink to the "Terms and Conditions":



161.    If a user were to have clicked through all these hyperlinks and clicked on the hyperlink to Twitter's Terms of Service, users would still have had to scroll down to pages 9 and 10 of the 12-page list of terms to find the limitation of liability provisions Twitter seeks to enforce.[54]

---

[54]    Terms of Service, https://web.archive.org/web/20210307013726/https://twitter.com/en/tos.

1



162.    Notably, as of September 29, 2023, Twitter, following the commencement of this action changed the Terms of Service to include a "Summary of our Terms" at the very top on page 1 of the document, which includes a bullet point regarding its purported limitation of liability on page 2.  This presentation and summary were not included in the applicable versions of the User Agreement at issue in this Action.  Increasing the visibility of this provision – after the filing of the initial complaint in this Action and subsequent motion to dismiss briefing alerted Twitter to its deficiency – serves to underscore the surprise Class Members encountered when signing up for Twitter.

163.    A contractual limitation of liability term is substantively unconscionable where the term is overly one-sided, overly harsh, and bars any effective relief.  In the Terms of Service, Twitter purports to effectively disclaim any duty to "secure [Plaintiffs'/users'] personal information" based on a broad provision stating that its services are provided on an "AS IS" basis and that Twitter makes no "warranty or representation and disclaim[s] all responsibility and liability for" broad categories of harm encompassing virtually any harm that could arise from use of its services (Terms of Service, §5).  Twitter thus provided Plaintiffs and the Class with a product or service while forcing them to agree that the product or service could be completely useless, if not harmful.

164.    Further, as described above, the Terms of Service attempts to release Twitter from liability from virtually any category of damages.  Such a broad limitation of liability and attempt to

56

exclude nearly every type of damages claim is overly harsh, one-sided, and has no other purpose than to maximize Twitter's advantage over its users and is therefore substantively unconscionable.

165.    Moreover, the disclaimer and limitation terms are also substantively unconscionable because there is no reasonable commercial justification for such extreme limitations on users' ability to pursue any claim.  Twitter is already obligated by law to maintain reasonable data security systems.  In addition, Twitter, a large technology company, is in a far superior position to its users to address and manage the risk of data security matters.  These factors render the disclaimer and limitation of liability clauses in the TOS a commercially unfair re-allocation of risk, and thus substantively unconscionable.

166.    Finally, even where, as here, a company offers a free service and would otherwise be allowed discretion over those services to minimize its exposure, a limitation of liability clause can be substantively unconscionable where the company took minimal action despite knowing about its inadequate security measures.  As described above, Twitter's security regime was woefully insufficient (and Twitter was callously ignoring dangerous vulnerabilities in its data security apparatus at the very time it was purportedly disclaiming any liability for these vulnerabilities), rendering the disclaimer and limitation clauses unconscionable.

## CLASS ALLEGATIONS

167.    Plaintiffs bring this nationwide class action pursuant to Rule 23(b) and 23(c) of the Federal Rules of Civil Procedure, on behalf of themselves and on behalf of all members of the following class ("Class"):

> **Nationwide Class.**  All individuals in the United States and its territories whose PII was compromised in connection with the Data Breach (the "Class" or "Class Members").

168.    Excluded from the Class are the following individuals and/or entities:  Twitter and its parent(s), subsidiaries, affiliate(s), officers and directors, and any person or entity which has a controlling interest in Twitter, or in any entity in which Twitter has a controlling interest; and any judicial officers assigned to this Action; and each of their respective legal representatives, heirs, successors, or assigns.

169.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class prior to the Court's determination regarding whether class certification is appropriate.

170.    **Numerosity.**  The Class is so numerous that joinder of all members is impracticable. Twitter collected the PII of tens of millions of users upon sign up, and that information was compromised by the Data Breach as described herein.  Determining membership in the Class can be easily determined via Twitter's records.

171.    **Commonality.**  The Class has questions of law and fact that exist which are common among Class Members; and these questions of law and fact predominate over any questions affecting only individual Class Members.  These questions include:

a.    Whether Twitter breached the terms of its User Agreements, Terms of Service, Privacy Policy, Rules and Policies, website representations and public blog statements as a result of the Data Breach;

b.    Whether Twitter's representations constituted implied breaches of contract;

c.    Whether Twitter owed a duty to the Class to protect PII;

d.    Whether Twitter breached that duty;

e.    Whether Twitter was negligent;

f.    Whether Twitter was grossly negligent;

g.    Whether Twitter violated Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. 45(a);

h.    Whether Twitter violated the Consent Order;

i.    Whether Twitter was unjustly enriched;

j.    Whether Twitter breached its contracts with the Class;

k.    Whether Twitter violated the California Constitution, Article 1 Section 1 which states that "[a]ll people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

l.    Whether Twitter violated California's unfair competition statute;

m.    Whether Plaintiffs and other Class Members are entitled to relief under the Declaratory Judgment Act;

n.    Whether Twitter caused Plaintiffs' and Class Members' injuries; and

o.    Whether Plaintiffs and the other Class Members are entitled to damages, including restitution, monetary, equitable, injunctive, and other appropriate relief.

172.    **Typicality.**  Plaintiffs' claims are typical of those of the other Class Members, all of whom suffered from the Data Breach's exposure of their PII as alleged herein.

173.    **Adequacy.**  Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs' counsel is competent and is experienced in litigating complex class actions nationwide, including data breach and privacy-related class action litigations.  Plaintiffs intend to prosecute this action vigorously; and Plaintiffs' counsel has adequate financial means to vigorously pursue this action to ensure the interests of the Class will not be harmed.

174.    **Superiority and Manageability:**  Under Rule 23(b), a class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable.  Individual damages for any individual Class Members are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Twitter's misconduct would go unpunished and unrectified.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.  Certifying the case as a Class will centralize these substantially identical claims in a single proceeding, which is the most manageable litigation method available to Plaintiffs and the Class and will conserve the resources of the parties and the court system, while protecting the rights of each member of the Class.  There will be no difficulty in the management of this action as a class action.

175.    Class certification is also appropriate under Rules 23(a) and (b) because Twitter has acted or refused to act on grounds generally applicable to the Class, so that final monetary and/or injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
**Breach of Contract – User Agreements**
**(On Behalf of Plaintiffs and the Class)**

176.    Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth and incorporated herein.

177.    Upon registering as a Twitter user, each of Plaintiffs and the Class Members entered into a binding contract with Twitter, in the form of the then-effective Twitter User Agreement, including the Terms of Service, Privacy Policies and Rules and Policies, website disclosures, public blog statements, and other statements and incorporated policies which represent Twitter's promises to Plaintiffs and the Class.

178.    Twitter's landing page on its website and cover pages contained hyperlinks embedded within language pointing directly to the Privacy Policy and are thus incorporated therein. *Brown v. Google LLC*, _F. Supp. 3d_, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023).  Moreover, Twitter's representations and promises made on its website and public blog related to Twitter's Privacy Policy, regarding the safety and security of PII and were also incorporated into Twitter's User Agreement with Plaintiffs and the Class.

179.    Each User Agreement in effect during a period in which Plaintiffs or Class Members used or accessed the Twitter platform as registered Twitter Users is a binding contract between Twitter and each such Plaintiff or Class Member for the effective period of the operative User Agreement.

180.    Plaintiffs and Class Members performed all obligations under the User Agreements by using and accessing the Twitter platform in compliance with the terms of the User Agreement and all applicable laws, rules and regulations (*see* 2022 Terms of Service, §4.).  Plaintiffs and Class Members also performed their obligation under the User Agreement to provide Twitter with the information, including PII, that Twitter requires to establish a user account (*see* 2022 Privacy Policy, §1.1).

181.    Twitter breached the User Agreements with respect to the following commitments.

182.    Twitter's landing page represented that it was "committed to protecting the information you share with us" and "[o]ur commitment to serve the public conversation is also a commitment to protect the information you share with us and to provide meaningful privacy controls."

183.    Twitter's Privacy Policy as of 2021 represented that the data users shared was to provide data security: "When you use Twitter, even if you're just looking at Tweets, we receive

some personal information from you like the type of device you're using and your IP address. You can choose to share additional information with us like your email address, phone number, address book contacts, and a public profile. ***We use this information for things like keeping your account secure*** . . . ."

184. Twitter's Privacy Policy represented that "[i]n the limited circumstances where we disclose your private personal data, ***we do so subject to your control, because it's important for operating our services, or because it's required by law***."

185. Twitter represented in its Privacy Policy that it was required to limit access to Plaintiffs' and the Class' PII only where authorized. Specifically, on the Privacy Policy landing page, Twitter represented under the heading "Sharing You Control" that it would "***share or disclose your personal data with your consent or at your direction***, such as when you authorize a third-party web client or application to access your account or when you direct us to share your feedback with a business."

186. In its Privacy Policy, Twitter stated: "Non-Personal Information – We share or disclose non-personal data, such as aggregated information like the total number of times people engaged with a Tweet, demographics, the number of people who clicked on a particular link or voted on a poll in a Tweet (even if only one did), the topics that people are Tweeting about in a particular location, some inferred interests, or reports to advertisers about how many people saw or clicked on their ads."

187. Pursuant to the User Agreement, Twitter agreed to limit use of Plaintiffs' and Class Members' data, to the purposes specified by the Privacy Policy, as further limited by the terms and conditions of each such category. *See* 2022 Privacy Policy, §2 (identifying the five ways in which Twitter uses the information provided to it by users, as follows: to "Operate, improve, and personalize our service"; to "Foster safety and security"; to "Measure, analyze and make our services better"; to "Communicate with you about our services"; and for "Research"); 2021 Privacy Policy, §1 (identifying the ways in which Twitter uses the information provided to it by users, as follows: to "operate our service"; to "send you information about our service"; to "personalize our service"; and "to protect the safety and integrity of our platform"); 2020 Privacy Policy, §1

61

(identifying the ways in which Twitter uses the information provided to it by users, as follows: to "operate our service"; to "send you information about our service"; to "personalize our service"; and to "to protect the safety and integrity of our platform").

188.    Pursuant to the User Agreement, Twitter also agreed to limit any sharing of Plaintiffs' and Class Members' data, to the categories specified by the Privacy Policy, as further limited by the terms and conditions of each such category. *See* 2022 Privacy Policy, §3 (specifying how, when, and to which third-parties that user data may be shared to:  content that that is shared "When you Tweet, post, and share"; data that is shared by Twitter "with service providers" that "perform functions and provide services" on behalf of Twitter; data that may be shared in connection with "Third-party content & integrations," such as when a user authorizes "a third-party web client or application"; data that is accessed by third-party developers through Twitter APIs in accordance with Twitter's standard developer agreement and in accordance with its related compliance program; data or information that Twitter may be compelled to share "[w]hen required by law," or otherwise "to prevent harm, or in the public interest"; data that is shared with Twitter's affiliates, specifically in order "to provide our products and services"; and data and information held by Twitter that will necessarily be disclosed "[a]s a result of a change in ownership" of Twitter, as "in connection with a merger, acquisition, reorganization, sale of assets, or bankruptcy"); 2021 Privacy Policy, §3 (specifying how, when, and to which third-parties that user data may be shared: content that is shared "your personal data with your consent or at your discretion, such as when you authorize a third-party web client"; and that "private personal data" is shared "with service providers" that help Twitter "operate our services"; data or information that Twitter may be compelled to share data when it is "necessary to comply with a law" or "protect the safety or integrity of our platform"; data and information held by Twitter that will necessarily be disclosed as a result of "[c]hange in [o]wnership of Twitter," as in connection with "a bankruptcy, merger, acquisition, reorganization, or sale of assets"; and data that is "non-personal data" such as "demographics" and "engage[ment]" with Tweets"); 2020 Privacy Policy, §3 (specifying how, when, and to which third-parties that user data may be shared: content that is shared "your personal data with your consent or at your discretion, such as when you authorize a third-party web client"; and that "private personal data" is

shared "with service providers" that help Twitter "operate our services"; data or information that Twitter may be compelled to share data when it is "necessary to comply with a law" or "protect the safety or integrity of our platform"; data and information held by Twitter that will necessarily be disclosed as a result of "[c]hange in [o]wnership" of Twitter," as in connection with "a bankruptcy, merger, acquisition, reorganization, or sale of assets"; and data that is "non-personal data" such as "demographics" and "engage[ment]" with Tweets").

189.    Twitter also promised Plaintiffs and Class Members that their email addresses and phone numbers, specifically, would only be used for certain purposes. *See* 2022 Privacy Policy, §2.2 ("We use information we collect to provide for the safety and security of our users, our products, services, and your account.  This includes verifying your identity, authenticating your account, and defending against fraud, unauthorized use, and illegal activity.  We also use the information to evaluate and affect the safety and quality of content on Twitter."); 2021 Privacy Policy, §1.3 ("We use your contact information, such as your email address or phone number, to authenticate your account and keep it – and our services – secure, and to help prevent spam, fraud, and abuse.  Subject to your settings, we also use contact information to enable certain account features (for example, for login verification), to send you information about our services, and to personalize our services, including ads. . . .  Twitter also uses your contact information to market to you as your country's laws allow, and to help others find your account if your settings permit, including through third party services and client applications."); 2020 Privacy Policy, §1.3 (similar). *See also* 2022 Privacy Policy, §2.1 ("We use your contact information to help others find your account if your settings permit, including through third-party services and client applications.").

190.    Twitter further promised Plaintiffs and Class Members that they could otherwise control access to their data security through their personalized privacy and account settings.  *See* 2022 Privacy Policy, §5 ("Take Control" – "Access it, delete it, or change your settings.  Basically, you're the boss."); *see also id.*, §§3, 3.1; 2021 Privacy Policy, §4 ("You control the personal data you share with us.  You can access or rectify this data at any time.  You can also deactivate your account.  We also provide you with the tools to object, restrict, or withdraw consent where applicable for the use of data you have provided to Twitter."); *see also*, *id.*, §§1.6, 2.10; 2020 Privacy Policy,

§4 ("You control the personal data you share with us.  You can access or rectify this data at any time.  You can also deactivate your account.  We also provide you tools to object, restrict, or withdraw consent where applicable for the use of data you have provided to Twitter."); *see also id.*, §§1.6, 2.10.

191.    Twitter also promised Plaintiffs and Class Members that their email addresses and phone numbers, specifically, would only be used for certain purposes.  *See* 2022 Privacy Policy, §2.1 ("we use your contact information to help others find your account if your settings permit, including through third-party services and client operations."); 2021 Privacy Policy, §1.3 ("We use your contact information, such as your email address or phone number, to authenticate your account and keep it – and our services – secure, and to help prevent spam, fraud, and abuse.  Subject to your settings, we also use contact information to enable certain account features (for example, for login verification), to send you information about our services, and to personalize our services, including ads. . . .  Twitter also uses your contact information to market to you as your country's laws allow, and to help others find your account if your settings permit, including through third party services and client applications."); 2020 Privacy Policy, §1.3 (similar).  *See also* 2022 Privacy Policy, §2.1 ("We use your contact information to help others find your account if your settings permit, including through third-party services and client applications.").

192.    Twitter's Code of Business Conduct & Ethics, which referenced Twitter's Privacy Policy, and which represented that Twitter had the necessary security procedures to protect users' PII from unauthorized access.

193.    Twitter's public blog posts which incorporated and referenced Twitter's Privacy Policies regarding its privacy and data security efforts represented that users' right to privacy and data protection is something Twitter has fought to protect since Twitter was created in 2006.  Twitter identified that this right included the ability to create pseudonymous accounts to protect users' identity and the ability to lett people control who sees their Tweets.  Twitter stated that behind the scenes, teams across the company are constantly working to protect user privacy and data.

194.    Twitter also stated on its blog that privacy and data protection was at the heart of Twitter's 2020 company-wide priority to build products that earn the trust of people who use them.

195.    Twitter stated on its public blog in 2020 that it was improving its methods for detecting and preventing inappropriate access to Twitter's internal systems and prioritizing security work across many of its teams.

196.    Twitter also made the following additional representations regarding data security and privacy on its blog:

- We're committed to keeping you informed on our work to protect your privacy and the data you share with Twitter.

- Infusing security and privacy into everything we build.

- Keeping your data secure and respecting your privacy will always be ongoing work for us.

197.    Twitter's website also made similar disclosures including: "Across all of our APIs and data products, we take our responsibility to protect our users' data seriously.  We maintain strict policies and processes to assess how developers are using Twitter data, and restrict improper use of this data."  And "[w]e want you to know how to make your Twitter experience better – and more secure.  So whether its initiatives we're driving, announcements about new settings and controls, or communications about security incidents, you'll find it all here."

198.    Twitter breached these provisions of the User Agreements in that it did not have proper safeguards in accordance with applicable law to protect Plaintiffs' and Class Members' personal information, including, but not limited to, Section 5(a) of the FTC Act, and did not limit access to that information to the specified individuals or entities, or for the specified purposes. Twitter violated its commitment to maintain the confidentiality and security of the PII of Plaintiffs and Class Members and failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security.

199.    But for the API vulnerability caused, and allowed to persist, by Twitter, the Data Breach would not have occurred.

200.    The Data Breach caused by Twitter disclosed the PII Plaintiffs' and Class Members' provided to Twitter.  The use and disclosure of Plaintiffs' and Class Members' PII resulting from the Data Breach violated the User Agreement, because the resulting disclosure on the dark web and related uses or potential uses are not within any of the use or disclosure categories permitted by the

User Agreement and were not otherwise authorized or consented to by Plaintiffs or Class Members by such users' privacy settings or otherwise.

201.    The Data Breach was a direct and legal cause of the injuries and damages suffered by Plaintiffs and Class Members.

202.    Twitter's breach of the User Agreement is continuing, as PII associated with Plaintiffs and the Class Members continues to be used and disclosed outside the permissible uses and conditions provided by the User Agreement.

203.    Twitter's breaches of the User Agreement have caused Plaintiffs and the Class Members injuries, including:

A.    Theft of their PII;

B.    Loss of the opportunity of (and control over) how their PII is used;

C.    The compromise, publication, and/or theft of their PII;

D.    The deanonymizing of their usernames and exposure of private Twitter communications;

E.    Costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;

F.    Lost time and expenses addressing the data breach;

G.    Costs associated with purchasing credit monitoring and identity theft protection services;

H.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

I.    Costs associated with the time and the loss of productivity from taking time to address and attempt to ameliorate, or mitigate, the actual and future consequences of the data breach – including finding fraudulent charges, canceling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

J.   Lost opportunity costs associated with the efforts expended and the loss of productivity addressing and attempting to mitigate the actual present and future consequences of the Data Breach;

K.   The continued risk to their PII, which remains in Twitter's possession and may be subject to further unauthorized disclosures so long as Twitter fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and Class Members;

L.   The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of cyber criminals; and

M.   Costs in terms of time, effort, and money that will (or might) be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach of the remainder of the lives of Plaintiffs and Class Members.

204.   Plaintiffs and Class Members will also foreseeably continue to suffer further injury for such time as Twitter remains in breach of the User Agreement.

205.   These injuries have caused Plaintiffs and Class Members contract damages in an amount to be determined at trial.  Alternatively, in the event that the trier of fact determines that the injuries caused by Twitter's breaches of the User Agreement have not resulted in quantifiable contract damages, Plaintiffs and Class Members are entitled to an award of nominal damages, including as provided by Section 3360 of the Civil Code of the State of California.

206.   To the extent that the User Agreement purports to disclaim or limit liability or damages, those disclaimers and limitations are unconscionable and unenforceable, for the reasons described above in paragraphs 152-166.

207.   Further, the disclaimers are unenforceable under California Civil Code § 1668, which prohibits enforcement of contract terms where the contract attempts to "exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent …"

208.    Here, to the extent Defendants attempt to disclaim or limit liability to avoid responsibility for their violation of laws, including Section 5 of the FTC Act, among others, such disclaimers and limitations are against the policy of the law and cannot be enforced.

209.    Plaintiffs and Class Members also seek a declaration that Twitter is in breach of the User Agreement and injunctive relief compelling Twitter to refrain or take such actions as required to ensure that Plaintiffs' and Class Members' data is protected, and only used and disclosed, in accordance with the terms of the User Agreement.

**COUNT II**
**Breach of Implied Contract**
**(In the Alternative to the Claim for Breach of Express Contract)**
**(On Behalf of Plaintiffs and the Class)**

210.    Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth and incorporated herein.

211.    To the extent that Defendants' User Agreement, Terms of Service, Privacy Policies and Rules and Policies, website disclosures, and public blog statements did not form express contracts, the opening of a Twitter account created implied contracts between Defendants and Plaintiffs and the Class, the terms of which were set forth by the relevant Terms of Service, Privacy Policies and Rules and Policies, website disclosures, public blog statements and other incorporated policies (including the landing and cover pages hyperlinked thereto).

212.    Defendants breached such implied contracts by failing to adhere to the terms of the applicable User Agreement(s), as described above in Plaintiffs' First Claim for Relief.

213.    Defendants violated their commitment to maintain the confidentiality and security of the PII of Plaintiffs and the Class and failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security.

214.    Plaintiffs and Class Members were harmed as the result of Defendants' breach of the implied contracts because their PII was compromised, placing them at a greater risk of identity theft and subjecting them to identity theft, and their PII was disclosed to third parties without their consent.  Plaintiffs and Class Members also suffered diminution in value of their PII in that it is now easily available to hackers on the dark web.  Plaintiffs and the Class have also suffered consequential

damages as described above. Class Members are further damaged as their PII remains in Defendants' possession without adequate protection and is also in the hands of those who obtained it without their consent.

215. The breach of implied contracts was a direct and legal cause of the injuries and damages to Plaintiffs and members of the Class as described above.

**COUNT III**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

216. Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth and incorporated herein.

217. Twitter owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing Twitter's security systems to ensure that Plaintiffs' and Class Members' PII in Twitter's possession was adequately secured and protected; (b) implemented processes that would prevent or detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts including those generated by its own security personnel or systems, regarding intrusions to its networks; and (d) maintaining data security measure consistent with industry standards.

218. Twitter knew that the PII of Plaintiffs and the Class was personal and sensitive information that was valuable to identity thieves and other criminals. Twitter also knew of the serious harm that could happen if the PII of Plaintiffs and the Class was wrongfully disclosed, that disclosure was not fixed, or Plaintiffs and the Class were not told about the disclosure in a timely manner. Twitter also knew that anonymity associated with the use of Twitter was important to certain Plaintiffs and the Class and that the disclosure of the identity of such users would be valuable to identity thieves, other criminals, and state actors.

219. By being entrusted by Plaintiffs and the Class to safeguard their PII, and the identity of anonymous users, Twitter had a special relationship with Plaintiffs and the Class. Plaintiffs and the Class signed up for Defendants' services and agreed to provide their PII with the understanding

69

that Twitter would take appropriate measures to protect it, and would inform Plaintiffs and the Class of any breaches or other security concerns that might call for action by Plaintiffs and the Class. But, Twitter did not. Twitter not only knew that their data security was inadequate, it also knew it did not even have the tools to detect and document intrusions or exfiltration of PII. Twitter is morally culpable, given its repeated security breaches, wholly inadequate safeguards, and refusal to notify Plaintiffs and the Class of breaches or security vulnerabilities.

220.    Twitter also owed a duty under California law to provide reasonable data security measures and to protect Plaintiffs' and the Class' PII and their privacy.

221.    Article I, Section 1 of the California Constitution, states that "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Thus, Plaintiffs and the Class have an inalienable right to privacy and for Twitter to have protected persons such as Plaintiffs and the Class from violations of these rights. Twitter's actions which resulted in the disclosure of Plaintiffs' and the Class' PII and the disclosure of certain Plaintiffs' and the Class' identity who had been anonymous violated California's constitution.

222.    California's Online Privacy Protection Act, Cal. Bus. & Prof. Code §22578 provides that the Legislature intended to have a uniform policy statewide regarding privacy policies on the internet.

223.    California's Information Practices Act, Cal. Civ. Code §1798.1, provides that Legislature declares that ". . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information"; and specifically, Cal. Civ. Code §1798.81.5(a)(1) established that "[i]t is the intent of the Legislature to ensure that personal information about California residents is protected."

224.    Twitter's violation of California law, accordingly, constitutes negligence and, indeed, presumptively establishes that Twitter acted negligently.

225.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Twitter for failing to use reasonable measures to protect PII.  Various FTC publications and orders also form the basis for Twitter's duty.

226.    Twitter violated Section 5 of the FTC Act and the Consent Order by failing to use data security reasonable measures to protect user privacy interests and data, including PII.  Twitter's conduct was particularly unreasonable given the nature and amount of user data it obtains and stores, and the inability or unwillingness to categorize and delete the PII data as detailed above, and the foreseeable consequences of a data breach within the technology industry.

227.    Plaintiffs and Class Members are within the class of persons that the FTC Act and the Consent Order are intended to protect.

228.    Moreover, the harm that has occurred is the type of harm the FTC Act and the Consent Order are intended to guard against.  Indeed, the FTC has pursued over 50 enforcement actions against businesses, including Twitter, which, as a result of their failure to employ reasonable data and security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

229.    Twitter's violation of Section 5 of the FTC Act, accordingly, constitutes negligence and, indeed, presumptively establishes that Twitter acted negligently.

230.    Twitter owned a duty under the California Constitution and these aforementioned laws to prevent foreseeable harm to others.  Moreover, Twitter owed a duty under common law to prevent foreseeable harm to others.  Twitter's duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of the inadequate security practices on the part of Twitter, as detailed above.  By collecting and storing valuable PII that is routinely targeted by cybercriminals for unauthorized access, Twitter was obligated to act with reasonable care to protect against these foreseeable threats.  Twitter has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class Members could and would suffer if the PII were wrongfully disclosed and anonymous users could and would be deanonymized.

231.    Twitter's breaches of these duties were not merely isolated incidents or small mishaps.  Rather, the breaches of the duties set forth above resulted from a long-term company-wide refusal by Twitter to acknowledge and correct serious and ongoing data security problems.  Twitter had a wildly inappropriate corporate culture of ignoring and failing to fixing security issues and refusing to adhere to its own employees' recommendations, including Zatko's recommendations, regarding data security to improve Twitter's data security practices.  Twitter made a company decision not to acknowledge the severity of the Data Breach when it knew about it, but rather to sweep it under the rug as long as possible.

232.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and the Class, their PII would not have been compromised, stolen, and viewed by unauthorized persons and their anonymity of their identities on Twitter's platform would not have been discoverable.  Twitter's negligence was a direct and legal cause of the theft of the PII of Plaintiffs and the Class and all resulting damages.  The injury and harm suffered by Plaintiffs and the Class Members was the reasonably foreseeable result of Twitter's failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII.  Twitter knew its systems and technologies for processing and securing the PII of Plaintiffs and the Class had numerous security vulnerabilities.

233.    Twitter breached the duty owed to Plaintiffs and Class Members and thus was negligent.  Twitter breached its duty by, among other things, failing to (a) exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiff and Class Members; (b) detect the data breach while it was ongoing; (c) maintain security systems consistent with industry standards; and (d) adequately and timely disclose to Plaintiffs' and Class Members' the existence and scope of the Data Breach and that Plaintiffs' and Class Members' PII in Twitter's possession had been or was reasonably believed to have been stolen or compromised.

234.    But for Twitter's wrongful and negligent breach of its duties owed to Plaintiffs and the Class Members, their PII would not have been compromised, and their once anonymous accounts would not have been deanonymized.

235.    There is a close causal connection between Twitter's failure to implement security measures to protect the PII of Plaintiffs and Class Members and the present harm, or risk of imminent harm, suffered by Plaintiffs and Class Members.  The PII of Plaintiffs and Class Members was lost and accessed as the proximate result of Twitter's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

236.    As a direct and proximate result of Twitter's negligence, Plaintiffs and Class Members have been placed at a greater risk of identity theft and subjecting them to identity theft. Plaintiffs and the Class have suffered and will continue to suffer forms of injury and/or harm, including but not limited to loss of privacy and other economic and non-economic losses, including:

a.    Theft of their PII;

b.    Loss of the opportunity of (and control over) how their PII is used;

c.    The compromise, publication, and/or theft of their PII;

d.    The deanonymizing of their usernames and exposure of private Twitter communications;

e.    Costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;

f.    Costs associated with purchasing credit monitoring and identity theft protection services;

g.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

h.    Costs associated with the time and the loss of productivity from taking time to address and attempt to ameliorate, or mitigate, the actual and future consequences of the Data Breach – including finding fraudulent charges, canceling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

i.    Lost opportunity costs associated with the efforts expended and the loss of productivity addressing and attempting to mitigate the actual present and future consequences of the Data Breach;

j.    The continued risk to their PII, which remains in Twitter's possession and may be subject to further unauthorized disclosures so long as Twitter fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and Class Members;

k.    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of cyber criminals; and

1

2

l. Costs in terms of time, effort, and money that will (or might) be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach of the remainder of the lives of Plaintiffs and Class Members.

3

4

5

237. As a direct and proximate result of Twitter's negligence, Plaintiff and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

6

7

8

9

10

11

12

238. Additionally, Twitter's misconduct as alleged herein is malice or oppression under Civil Code §3294(c)(1) and (2) in that it was despicable conduct carried on by Twitter with a willful and conscious disregard of the rights or safety of Plaintiffs and the Class and despicable conduct that has subjected Plaintiffs and the Class to cruel and unjust hardship in conscious disregard of their rights.  As a result, Plaintiffs and the Class are entitled to punitive damages against Twitter under Civil Code §3294(a).

13

**COUNT IV**
**Gross Negligence**
**(On Behalf of Plaintiffs and the Class)**

14

15

16

239. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding and following paragraphs.

17

240. The foregoing allegations constitute negligence.

18

19

20

21

22

23

24

25

241. Twitter's conduct also constitutes gross negligence in so far as Twitter's breach of duty constitutes an extreme departure from the ordinary standard of care, because Twitter knowingly operated without data security systems sufficient to adequately secure user PII or to detect inappropriate or unauthorized access to user PII within Twitter's systems, including despite repeated warnings to senior management from its engineers and head of data security.  In the course of breaching its duty to users to secure PII, Twitter also knowingly operated in violation of the FTC Act and the 2011 FTC Consent Order.  Taken together, the publicly available information strongly indicates that Twitter did essentially nothing to secure Plaintiffs' and Class Members' PII.

26

27

28

242. Twitter's actions in the course of breaching its duty of care to Plaintiffs and Class Members accordingly constitute an extreme departure from the ordinary standard of care and constitute gross negligence.

243.    As a direct and proximate result of Twitter's gross negligence, Plaintiffs and Class Members have been injured as described herein and in paragraph 235 and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

244.    Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth and incorporated herein.

245.    Plaintiffs and Class Members have an interest, both equitable and legal, in their data that was conferred upon, collected by, and is held and maintained by Twitter and was ultimately stolen in the Data Breach.

246.    Twitter accepted the benefits accompanying the conferral of Plaintiffs' and Class Members' PII and its ability to retain and use this data.  Among other valuable benefits, Twitter used this data to develop, design, market, and sell their revenue generating products, including advertising and data licensing.  Twitter also uses this data to develop and maintain its social media platform and the services provided by this platform.

247.    Twitter knew and understood that it would benefit and continues to benefit by its access to and use of this data.  Twitter also knew and understood that Plaintiffs' and Class Members' PII was private, and confidential and its value depended on Twitter securely maintaining the privacy, and confidentiality of that PII.

248.    Twitter held and profited from the data at the expense and to the detriment of Plaintiffs and Class Members by failing to implement adequate safeguards to secure their PII.

249.    Twitter was repeatedly placed on notice of numerous inadequacies in its data security systems that placed user PII at risk.  Twitter was also aware of cost-effective measures to mitigate these data security risks.  Nonetheless, Twitter decided to further benefit itself financially, to Plaintiffs' and Class Members' detriment, by not incurring the costs to implement reasonable measure to secure user PII.

250.    Twitter has accordingly unjustly received and retained enormous monetary benefits from Plaintiffs and Class Members – *i.e.*, by way of Twitter's use of, and profiting from, their data

under unjust circumstances and by retaining funds that it saved by shirking data-security, such that inequity has resulted.

251.    Twitter's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiffs' and Class Members' sensitive PII and failure to securely maintain that information.

252.    The benefits conferred upon, received, and enjoyed by Twitter were not conferred gratuitously, and it would be inequitable and unjust for Twitter to retain these benefits under the circumstances.

253.    Under the common law doctrine of unjust enrichment, it is inequitable and unconscionable for Twitter to be permitted to retain the benefits it received, and it is still receiving from the use of Plaintiffs' and Class Members' PII, including the funds it has retained by failing to incur the costs required to implement adequate data security measures, while Plaintiffs and Class Members must suffer the resulting harm.

254.    Plaintiffs and Class Members are therefore entitled to an award of restitution damages, in an amount to be determined at trial, consisting of the monetary benefits that have been unjustly conferred upon Twitter, and a constructive trust over any such benefits that may be unjustly conferred upon Twitter in the future.  Plaintiffs and Class Members seek this equitable relief only to the extent that they are not otherwise entitled to an adequate legal remedy.

## COUNT VI
### Violation of California Unfair Competition Law (Cal. Bus. & Prof. Code §17200, *et seq.*)
### (On Behalf of Plaintiffs and the Class)

255.    Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth and incorporated herein.

256.    Plaintiffs bring this claim on behalf of themselves and Class Members pursuant to the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits unfair and unlawful business acts or practices.

257.    Plaintiffs are "persons" within the meaning of Cal. Bus. & Prof. Code §17201.

258.    Twitter is a "business" within the meaning of Cal. Bus. & Prof. Code §17201.

259.    Twitter engaged in both unfair and unlawful business practices in violation of the UCL by unreasonably failing to adopt data security measures adequate to protect Plaintiffs' and Class Members' PII and prevent the Data Breach, and, by the same action, violating applicable state and federal laws intended to protect consumer privacy interests.

260.    These unfair and unlawful practices occurred repeatedly in connection with Twitter's trade or business.

261.    Twitter willfully engaged in these unfair and unlawful acts and practices and knew or should have known that these acts and practices were unfair and unlawful in violation of the UCL.

***Twitter's Unfair Business Acts and Practices***

262.    Under the UCL, any business act or practice that is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers or violates a legislatively declared policy constitutes an unfair business act or practice.

263.    Twitter's affirmative acts in adopting and maintaining grossly inadequate data security measures are unfair within the meaning of the UCL because they constituted immoral, unethical, oppressive, and unscrupulous activity, caused substantial injury to consumers and businesses, and did not benefit consumers or competition.

264.    These affirmative acts were also unfair within the meaning of the UCL because this conduct undermined California public policy that businesses protect personal and financial information as reflected in Article I, Section 1 of the California Constitution, which states that all persons have an inalienable right to privacy and was enacted to protect consumers from violations of these rights by private sector data processing activity, and other California statutes. *See* Online Privacy Protection Act, Cal. Bus. & Prof. Code §22578 (explaining that the Legislature intended to have a uniform policy statewide regarding privacy policies on the internet); the Information Practices Act, Cal. Civ. Code §1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); and Cal. Civ. Code §1798.81.5(a)(1) ("It is the intent of the Legislature to ensure that personal information about California residents is protected.").

265.    Twitter also engaged in unfair competition by affirmatively misrepresenting the adequacy of its data security measures, the disclosures and uses that Plaintiffs' and Class Members' PII would be subject to, and omitting material information concerning serious inadequacies (of which Twitter was aware) in its data security systems and, in turn, its ability to safeguard PII. Plaintiffs and Class Members relied on these misrepresentations and omissions to their detriment by providing Twitter with their PII and allowing Twitter to continue to use and possess their PII by maintaining a Twitter account.

266.    Upon information and belief, Twitter also made materially misleading statements and omissions in its public statements related to the Data Breach concerning the potential risk of leaks arising from the Data Breach, and the nature, origin, and extent of the Data Breach.  Plaintiffs and Class Members detrimentally relied on these misrepresentations and omissions by failing to initiate independent action to investigate or remediate the possible impact of the Data Breach based on Twitter's inaccurate characterizations of the extent and attendant risk of the Data Breach.

*Twitter's Unlawful Business Acts and Practices*

267.    The violation of any law constitutes an unlawful business practice under the UCL.

268.    As detailed above, Twitter has violated FTC Act, 15 U.S.C. §45(a)(1) and the 2011 FTC Consent Order.  These unlawful acts also provide an independent basis for Twitter's violation of the UCL.

269.    In addition, Twitter violated the California Constitution, Article I, Section 1 which states that "[a]ll people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."  Twitter's actions also violated the California Customer Records Act, Cal. Civ. Code §1798.81.5(b) (the "California Customer Records Act") constitute unlawful acts or practices under the UCL.  The California Customer Records Act requires a "business that owns, licenses, or maintains personal information about a California resident" to "implement and maintain reasonable security procedures and practices appropriate to the nature of the information" and "to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."  Twitter failed to implement and maintain such

reasonable security procedures and practices before, at the time of, and following the Data Breach in violation of the California Customer Records Act, Cal. Civ. Code §1798.81.5(b).

270. Additionally, Twitter violated the unlawful prong of the UCL by violating Cal. Bus. & Prof. Code §22576, which prohibits Twitter from knowingly, negligently, and materially failing to adhere to its published Privacy Policy, as specifically addressed above.

***Twitter's Business Acts and Practices Harmed Competition and Caused Injury and Losses to Plaintiffs and the Class***

271. Twitter's conduct harmed competition. While Twitter cut corners and minimized costs, its competitors spent the time and money necessary to ensure PII was appropriately secured and safeguarded. Further, the injuries suffered by Plaintiffs and Class Members are not outweighed by any countervailing benefits to consumers or competition. And, because Twitter is solely responsible for securing its networks and protecting its customers' PII, there is no way Plaintiffs and Class Members could have known about Twitter's inadequate security practices or avoided the injuries they sustained. There were reasonably available alternatives to further Twitter's legitimate business interests other than its conduct responsible for the Data Breach.

272. Twitter's unlawful and unfair business practices have caused Plaintiffs and Class Members to suffer economic injury. Because Defendants breached their own privacy policy in violation of Cal. Bus. & Prof. Code §22576 ("Section 22576"), economic injury is demonstrated by the loss of the benefit of the bargain inherent in the Data Breach itself. Due to the nature of Twitter's wrongdoing these injuries and losses will continue, as detailed above.

273. In addition, Plaintiff Weitzman and certain Class Members have been required to enter into transactions, costing money or property, that would otherwise have been unnecessary if not for Twitter's unlawful and unfair conduct resulting in the Data Breach. These transactions include credit monitoring, reputation monitoring, and services designed to mitigate increased spamming and spoofing of Class members and their online presences.

274. These injuries and losses are the direct and proximate result of Twitter's violations of the UCL, and Plaintiffs and the Class are entitled to equitable and such other relief as this Court considers necessary and proper.

**COUNT VII**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

275.    Plaintiffs restate and reallege the allegations in each of the foregoing paragraphs as if fully set forth and incorporated herein.

276.    Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes, as described in this Complaint.

277.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' PII and whether Twitter is currently maintaining data-security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII.  Plaintiffs allege that Twitter's data-security measures remain inadequate.  Twitter denies these allegations.  Furthermore, Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

278.    Plaintiffs further declare that to the extent Plaintiffs' claims are covered by Twitter's Terms of Service, the limitation of liability therein is unconscionable and unenforceable, or precluded by federal and state law.

279.    The grounds for unconscionability of the disclaimers and limitations on liability mentioned above are alleged in paragraphs 152-166 and are specifically incorporated herein by reference.

280.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      A.    Twitter owes a legal duty to secure consumers' PII and to timely notify consumers of a data breach pursuant to its common law duties, Section 5 of the FTC Act, and various state statutes; and

      B.    Twitter continues to breach these legal duties by failing to employ reasonable measures to secure consumers' PII.

281.    This Court also should issue corresponding prospective injunctive relief requiring Twitter to employ adequate security protocols consistent with its duties at law and industry standards to protect consumers' PII.

282.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Twitter.  The risk of another such breach is real, immediate, and substantial.  If another breach at Twitter occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

283.    The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to Twitter if an injunction is issued.  Plaintiffs and Class Members will likely be subjected to substantial identity theft and other damage.  On the other hand, the cost to Twitter of complying with an injunction by employing reasonable prospective data-security measures is relatively minimal, and Twitter has a pre-existing legal obligation to employ such measures.

284.    Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by preventing another data breach at Twitter, thus eliminating the additional injuries that would result to Plaintiffs, Class Members, and other consumers whose confidential information would be further compromised absent the injunctive relief requested herein.

### **PRAYER FOR RELIEF**

285.    WHEREFORE, Plaintiffs on behalf of themselves and all other similarly situated, pray for relief as follows:

A.    For an order certifying the Class and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B.    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

C.    For monetary damages, including punitive damages, in an amount to be determined by the trier of fact;

D.     For an order of restitution and all other forms of equitable monetary relief;

E.     Declaratory and injunctive relief as described herein;

F.     Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

G.     Awarding pre- and post-judgment interest on any amounts awarded; and

H.     Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

286.    Pursuant to Fed. R. Civ. P. 38(b), a jury trial is demanded on all claims so triable.

DATED:  April 19, 2024

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

_s/ Joseph P. Guglielmo_
Joseph P. Guglielmo (*pro hac vice* admitted)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
jguglielmo@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph A. Pettigrew (CA Bar No. 236933)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
jpettigrew@scott-scott.com

**ISRAEL DAVID LLC**

_s/ Israel David_
Israel David (*pro hac vice* admitted)
Blake Hunter Yagman (*pro hac vice* admitted)
17 State Street, Suite 4010
New York, NY 10004
Telephone: (212) 739-0622
isreal.david@davidllc.com
blake.yagman@davidllc.com

**LYNCH CARPENTER LLP**
Gary F. Lynch (*pro hac vice* pending)
Jamisen A. Etzel (*pro hac vice* forthcoming)
Nicholas A. Colella (*pro hac vice* pending)
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: 412.322.9243
gary@lcllp.com
jamisen@lcllp.com
nickc@lcllp.com

**ZIMMERMAN REED LLP**
Jeff Westerman (CA Bar No. 94559)
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Telephone: 877-500-9780
jeff.westerman@zimmreed.com

*Attorneys for Plaintiffs Stephen Gerber and Eric Cohen*

**WOOD LAW FIRM, LLC**
E. Kirk Wood (*pro hac vice* forthcoming)
P.O. Box 382434
Birmingham, AL 35238-2434
Telephone: (205) 908-4906
kirk@woodlawfirmllc.com

*Attorneys for Plaintiff Casey Weitzman*